UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| DAVID LEE SANDERS, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 03-455-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| RANDY WHITE, *Warden*, | ) | **OPINION & ORDER** |
| | ) | |
| Respondent. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

In June 1987, a Kentucky jury convicted Petitioner David Lee Sanders of murdering James Brandenburg and Wayne Hatch. The jury sentenced Sanders to death. Sanders admits that he killed both men, but claims that he was insane at the time. He alleges in his habeas petition that numerous errors—errors by the judge, jury, appellate courts, and counsel alike—produced an unconstitutional conviction and death sentence. R. 73. He seeks to supplement those allegations through motions for additional discovery, R. 78, an evidentiary hearing, R. 79, funds for a clinical psychologist, R. 80, and an expansion of the record, R. 97 (collectively, the "evidentiary motions"). The Court denied the motions without prejudice, choosing instead to address them concurrently with Sanders' habeas petition. *See* R. 110. Sanders presents a litany of claims, some with multiple subparts. All told, he identifies thirty-three errors that he believes entitle him to relief. On all thirty-three, Sanders is not entitled to habeas relief, nor is he entitled to the additional evidence he seeks.

## BACKGROUND

On January 28, 1987, Sanders walked into Boone Variety Store to buy a few items and to use the phone. He called his parents to find out if he needed to help his father work on a barn that day—he did—then called his wife to let her know that he would be helping his father and spending the night with his parents. Finished with his business in the store, he walked outside to his truck, retrieved two guns, and reentered the store. He shot and killed the proprietor, James Brandenburg, and a customer, Wayne Hatch. Sanders killed both men with a single shot to the back of the head. Sanders got in his truck and went home, tossing some of Hatch's items out of the window and off of a bridge along the way.

On January 31, Kentucky State Police Detectives Skip Benton and Robert Stephens, along with Madison County Commonwealth's Attorney Tom Smith, drove to Flemingsburg, Kentucky, to question Sanders—the first of several police interrogations. They interrogated Sanders about the Madison County murders and a similar shooting that occurred a few weeks before in Lincoln County. Sanders steadfastly denied killing Brandenburg and Hatch or having any part in the Lincoln County shooting. Sanders admitted that he did drive to Madison County that afternoon and showed Detective Benton where he parked the day of the murders. Later that day, Detective Benton had Sanders' truck taken to the state police post in Madison County to be searched for evidence.

On February 2, Sanders and his wife called the Kentucky State Police to see when the truck would be released. Detective Benton told them that it could be released to someone whose name was on the Bill of Sale. Sanders went to retrieve the truck that evening. Upon Sanders' arrival at the state police post, Detective Benton *Mirandized* him and, along with

2

Stephens and Smith, interrogated him again.  They arrested Sanders between 8:30 p.m. and 9:00 p.m. that night and put him in the drunk tank.

Before long, Sanders began to break down.  He started hitting his head against the wall and would later report that he wanted to kill himself.  He finally told one of the jailors to find Detective Benton.  When Benton arrived early the next morning, Sanders confessed to killing Brandenburg and Hatch.  Sanders also admitted to the Lincoln County shooting.

A grand jury indicted Sanders on two charges of capital murder and two charges of first-degree robbery.  Sanders retained Kevin Charters as defense counsel.  Two weeks after his arrest, Sanders asked for psychiatric help; so the court sent him to the Kentucky Correctional Psychiatric Center ("KCPC") for evaluation.  Though Sanders requested treatment for his neurological health, the court directed KCPC to also evaluate whether Sanders was competent to stand trial and whether he had been insane when he committed the murders.  After a forty-day evaluation by a team of psychologists, psychiatrists, and social workers, the KCPC concluded that Sanders was competent to stand trial and was not insane at the time of the murders.  In late May, a week before Sanders' trial, he secured the pro bono services of Dr. Stuart Cooke, a clinical psychologist.  Dr. Cooke spent an afternoon evaluating Sanders and concluded that Sanders was insane when he shot Brandenburg and Hatch.

Sanders' trial took place during the first week of June 1987.  He offered insanity as his sole defense.  During the Commonwealth's case-in-chief, Detective Benton testified about his interrogations of Sanders, including Sanders' inconsistent stories and confession.  He also testified about the similarities between the Lincoln County and Madison County shootings.  A firearms examiner testified that the bullet removed from Brandenburg and the

3

bullet removed from the Lincoln County victim, Ethel Rankin, were fired from the same gun—a gun Sanders admitted he borrowed from his brother.

The Commonwealth called Sanders' wife to testify. She detailed Sanders' actions the morning of the shooting, recounted some of his past, and declared that he was a good father to her two children. She insisted that he would not hurt anyone and said that their marriage had been happy. She also described two incidents where Sanders hit her—she said that she provoked him and that he felt awful for doing it.

Sanders testified in his own defense. He admitted that he killed Brandenburg and Hatch and shot Rankin. He recounted the events of both shootings, testifying that he felt like he was watching himself commit the crimes from outside his own body.

Dr. Cooke also testified for the defense. Dr. Cooke concluded that Sanders had a depersonalization disorder—a disorder where a person feels like he has lost control over his own body. He believed that this illness prevented Sanders from conforming his conduct to the law.

In rebuttal, the Commonwealth presented testimony from Dr. Candace Walker, the clinical psychologist who led the KCPC evaluation team. She described the evaluation and presented the team's findings. Though Sanders had some type of personality disorder, Walker concluded, he was not insane. She said that the team considered but quickly rejected Dr. Cooke's diagnosis. Throughout the KCPC's extensive evaluation, Walker's team could not find evidence of psychosis or the type of mental illness that would prevent Sanders from understanding the criminality of his conduct. In Walker's opinion, Sanders showed no remorse and was motivated by a desire for money.

The jury found Sanders guilty on both counts of murder and on both counts of robbery. The penalty phase of trial was short; the Commonwealth moved and the court agreed to incorporate all of the guilt-phase evidence into the sentencing phase. Sanders presented a total of about ten minutes of mitigation testimony from four witnesses. Sanders also took the stand himself. He cried throughout his eight-minute statement, stated he did not understand what happened or why, and blamed the KCPC for not giving him the help he needed. After the close of evidence and arguments, the jury found two aggravating circumstances supporting a death sentence: (1) the murders were committed during the course of a robbery, and (2) the murders were intentional and resulted in multiple deaths. The jury recommended and the court imposed a sentence of death.

After trial, Sanders completed three rounds of appeals over the course of two decades. On direct appeal, Sanders presented forty separate grounds for relief. He challenged everything from *voir dire* to the constitutionality of Kentucky's death-penalty and execution scheme. The Kentucky Supreme Court ultimately denied relief on all claims. *Sanders v. Commonwealth*, 801 S.W.2d 665 (Ky. 1990) ("*Sanders I*"). Sanders then moved for post-conviction relief, alleging that his attorney had provided deficient representation. The Kentucky Supreme Court again denied relief. *Sanders v. Commonwealth*, 89 S.W.3d 380 (Ky. 2002) ("*Sanders II*"), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009). In 2003, Sanders filed a claim for federal habeas relief in this Court. R. 9. A little over one year later, the Court held proceedings in abeyance to allow Sanders to exhaust several claims in state court. R. 32. Sanders presented dozens of grounds for relief to the Kentucky courts. The Kentucky Supreme Court denied Sanders' third relief effort, concluding that each claim should have been presented in either of his prior appeals.

*Sanders v. Commonwealth*, 339 S.W.3d 427 (Ky. 2011) ("*Sanders III*").   Sanders then returned to this Court.  He now presents thirty-three separate claims that he argues entitle him to relief.

## DISCUSSION

### I.   Federal Habeas Corpus for State Prisoners

#### A. Anti-Terrorism and Effective Death Penalty Act

Federal court is the forum of last resort for prisoners convicted in state courts. Federal habeas corpus is not a mechanism for ordinary error correction; that process is better left in the hands of the sovereign state responsible for the petitioner's conviction.  Rather, federal courts "guard against extreme malfunctions" of the state system.  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted).

This principle is reflected in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs federal review of state-court criminal convictions.  Under AEDPA, where the state court adjudicated a prisoner's claims on the merits, a federal court may grant relief only if the state court decision (a) was "contrary to" clearly established Federal law, as defined by the Supreme Court; (b) involved an "unreasonable application" of clearly established Federal law, as defined by the Supreme Court; or (c) was based on an "unreasonable determination" of the facts, in light of the evidence presented to the state court.  *See* 28 U.S.C. § 2254(d).  AEDPA's standards are difficult to meet—this is a feature of the habeas structure, not a bug.  *Richter*, 131 S. Ct. at 786.

Under AEDPA, a state court's decision is measured against then-existing federal law. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–99 (2011).  Under § 2254(d)(1), a state court's decision is "contrary to" clearly established law if it applies a rule that "contradicts the

6

governing law set forth" in applicable Supreme Court decisions. *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J.).[1]  A decision is also contrary to federal law if the state court analyzes "materially indistinguishable" facts from the relevant Supreme Court decision and then reaches the opposite conclusion. *Id.* at 406.  But, generally, so long as a state court identifies and applies the correct Supreme Court rule to the facts of the case, the resulting decision is not "contrary to" clearly established federal law. *Id.*

The "unreasonable application" prong of § 2254(d)(1) is similarly weighted in favor of state court decisions.  For a petitioner to succeed under this prong, the state court's application of clearly established federal law "must be objectively unreasonable." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted).  Indeed, a federal court applying this standard does not ask whether the state court decision was incorrect—for a decision might be incorrect but not unreasonable. *See Richter*, 131 S. Ct. at 785.  "[E]ven 'clear error' will not suffice" to render a state court decision unreasonable. *Woodall*, 134 S. Ct. at 1702.  Rather, a petitioner must show that the state court's decision was "so lacking in justification" that the error was "beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87.

Along the same lines, § 2254(d)(2) allows for relief if the state court based its decision on an "unreasonable determination of the facts."  A state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Where "[r]easonable minds reviewing the record might disagree" about the

---

[1] Justice O'Connor wrote a separate concurrence.  However, this portion of her opinion represents the opinion of the Court.

correctness of the state court's factual findings, a federal court cannot grant relief. *Id.* (alteration in original) (internal quotation marks omitted).[2]

AEDPA deference applies even if the state court opinion summarily denies habeas relief. *See Richter*, 131 S. Ct. at 784–85 (holding that AEDPA deference applied to a "one-sentence summary order" denying relief). Even though a state-court decision might have no discussion or reasoning, reviewing federal courts must "presume[ ] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* Indeed, a state court "need not cite or even be aware of" Supreme Court precedent to receive AEDPA-deference. *Id.* at 784 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). The absence of explanation from the state court does not relieve habeas petitioners of their burden. They must still demonstrate that "there was no reasonable basis for the state court to deny relief." *Id.*

The *Richter* standard also applies where a state court addresses state-law issues but "rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). When a state court discusses only some of the petitioner's claims, federal habeas courts must still "presume that the federal claim was adjudicated on the merits." *Id.* Either the petitioner or the state may rebut the presumption. The Supreme Court outlined several possible routes of rebuttal. For instance, a petitioner could show that

---

[2] Section 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner must rebut that presumption "by clear and convincing evidence." Both the Supreme Court and Sixth Circuit have left open the resolution of the interplay between § 2254(d)(2) and § 2254(e)(1). *See Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) ("We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."); *Rice v. White*, 660 F.3d 242, 254 n.6 (6th Cir. 2011). The difference in the burden between the two standards does not affect the outcome here. Therefore, the Court will rely on the "unreasonable determination" standard set out in § 2254(d)(2). *See Wood*, 558 U.S. at 849 (noting that § 2254(e)(1) is "arguably more deferential" to the state court).

the state standard is less protective than the federal standard or that the "state court had overlooked his federal claim." *Id.* at 1097. The state could rebut the presumption by demonstrating that the petitioner forfeited his federal claim by not developing it. *Id.* at 1096.

### B. State Rules

AEDPA is not the only limit on federal habeas relief. A federal habeas court cannot reevaluate state-court decisions based on matters of state law or grant relief based on an alleged state law error. *See* 28 U.S.C. § 2241; *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Nor may federal courts or habeas petitioners ignore state procedural rules. When a state court declines to address a claim because the petitioner did not comply with state procedural rules, then that claim is procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). With two exceptions, a federal habeas court may not grant relief on a procedurally defaulted claim. *Id.*; *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The first exception allows a prisoner to raise a defaulted claim in federal court if he can demonstrate both (a) cause for the default and (b) prejudice from the violation of federal law. *Coleman*, 501 U.S. at 750. The other exception, while not at issue here, allows the prisoner to raise such a claim if the federal court's failure to consider the claim "will result in a fundamental miscarriage of justice." *Id.*

A state post-conviction attorney's error—whether through ignorance or inadvertence—is not "cause" to excuse procedural default. *Coleman*, 501 U.S. at 752–54. In the absence of a constitutional right to the assistance of an attorney in state post-conviction proceedings, there can be no attendant constitutional right to the *effective* assistance of an attorney in those proceedings. *Id.* at 752 (citing *Wainwright v. Torna*, 455 U.S. 586 (1982)).

The Supreme Court carved out exceptions to the *Coleman* bar: post-conviction attorney error may establish the "cause" prong of a defaulted ineffective assistance of trial counsel ("IATC") claim either where IATC claims may only be raised in post-conviction proceedings, *Martinez v. Ryan*, 132 S. Ct. 1309, 1318–21 (2013), or where it is "highly unlikely" that a defendant would have a "meaningful opportunity to raise" an IATC claim in his direct appeal, *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). *Martinez* and *Trevino* are limited to IATC claims—*Coleman* controls all other claims. *Martinez*, 132 S. Ct. at 1316 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial."); *Hodges v. Colson*, 727 F.3d 517, 540 (6th Cir. 2013) (holding that post-conviction attorney error cannot excuse procedural default of a competency claim).[3]

### C.  Relation Back

Sanders filed his initial habeas petition in December 2003.  R. 9.  In October 2013, Sanders filed an amended habeas petition.  R. 73.  In order to meet the statute of limitations for new claims in his amended petition, Sanders contends that his new claims "relate back" to his original habeas petition pursuant to Federal Rule of Civil Procedure 15.  R. 73 at 90–95.[4]  Because the Court determines that Sanders is not entitled to relief on any of the claims he presents in his amended petition, it need not decide whether those claims relate back to

---

[3] The courts of appeals generally agree.  *See Dansby v. Hobbs*, 766 F.3d 809, 833–34. (8th Cir. 2014) (declining to extend *Martinez* to ineffective assistance of appellate counsel or trial error claims); *Reed v. Stephenson*, 739 F.3d 753, 778 n.16 (5th Cir. 2014) (holding that *Coleman* controls defaulted claims of ineffective assistance of appellate counsel); *Banks v. Workman*, 692 F.3d 1133, 1147–48 (10th Cir. 2012) (same).  *But see Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1292–96 (9th Cir. 2013) (extending *Martinez* and *Trevino* to ineffective assistance of direct appeal counsel claims).

[4] The Court cites to the page number listed on CM/ECF.  That may not correspond to the pagination in the briefing.

the original habeas petition.  The Court will assume that the claims relate back to the original habeas petition.

### D.  Procedural Default

After Sanders filed his federal habeas petition, he moved to stay the case.  R. 29; R. 32 (order granting motion to stay).  While the Court held his case in abeyance, Sanders returned to the Kentucky Supreme Court and presented over thirty-six claims for habeas relief in a motion under Rule 60.02 of the Kentucky Rules of Civil Procedure.  *See Sanders III*, 339 S.W. 3d at 431.  Sanders already raised a number of the claims on direct appeal and in his Kentucky Rule of Criminal Procedure ("RCr") 11.42 motion.  *See Sanders I*, 801 S.W.2d at 669, 671, 672–74, 676–77, 679–80, 683 (resolving eleven claims for constitutional error that Sanders maintains occurred during trial); *Sanders II*, 89 S.W.3d at 385–91 (raising nine claims based on ineffective assistance of counsel and one claim related to the prosecution's *Brady* obligations).  The Kentucky Supreme Court did not evaluate the claims individually.  339 S.W.3d at 437.

In its response to Sanders' federal habeas petition, the Commonwealth argues that Sanders procedurally defaulted on each of these thirty-six claims.  *See* R. 85 at 7–9.  The Commonwealth notes that the *Sanders III* court rejected the claims for not having been brought during the direct appeal or the RCr 11.42 proceeding.  Accordingly, the Commonwealth claims that the *Sanders III* court relied on an adequate and independent state law of procedure that foreclosed federal review.  *Id.*  But that rule does not apply to the claims that Sanders *did* present on direct appeal and in his RCr 11.42 motion but presented again in his Rule 60.02 motion.  In *Cone v. Bell*, the Supreme Court held that a claim is not procedurally defaulted where—like here—it is presented to the state court more than once.

11

*See* 556 U.S. 449, 467 (2009); *see id.* at 466–67 ("When a state court refuses to readjudicate a claim . . . the court's decision does not indicate that the claim has been procedurally defaulted.  To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is ripe for federal adjudication.").

Sanders properly presented his eleven claims of constitutional error, nine claims for ineffective assistance of trial counsel, and his *Brady* claim on direct appeal and collateral review.  That he again raised the issues in his Rule 60.02 motion has no effect on the availability of federal habeas relief.  *Bell*, 556 U.S. at 466–67.  Accordingly, the Commonwealth cannot successfully argue that Sanders procedurally defaulted on those claims that he brought before the Kentucky Supreme Court on multiple occasions.  So the Court may consider those claims in Sanders' federal habeas petition.

## II.   Procedurally Defaulted Claims (Claims 8.5, 10.5, 10.6, 10.7, 10.8, 10.9, 22.5, 22.6, and 29).

Sanders concedes that the following claims are procedurally defaulted:   His Fourteenth Amendment claims based on the prosecution's definition of "reasonable doubt" during *voir dire*, which also implicates the Sixth Amendment right to a jury trial (8.5), the denial of a defense-based psychiatric expert and improper disclosures from the neutral psychiatric expert (10.5), Sanders' incompetence to stand trial (10.6), the trial court's failure to hold a trial competency hearing (10.7), Sanders' incompetence at sentencing (22.5), the trial court's failure to hold a sentencing competency hearing (22.6), and the prosecution's failure to correct Dr. Walker's false testimony at trial (29); a Fifth Amendment claim based on the introduction at trial of statements made during Sanders' KCPC evaluation (10.9); and a Sixth Amendment claim based on Charters' conflict of interest (10.8).  R. 111 at 4–5.

12

None of the claims, with the exception of claim 10.8, is itself an IATC claim. Sanders "relies solely on ineffective assistance of initial-review collateral proceeding counsel to excuse the [procedural] default" of the above claims. *Id.* For the defaulted claims that are not IATC claims, the *Coleman* bar applies, meaning that post-conviction attorney error cannot excuse his default. Consequently, the Court will deny Sanders' petition for relief, R. 9, R. 73, and the evidentiary motions as to those claims, R. 78, R. 79, R. 111.

That leaves claim 10.8, in which Sanders alleges that Charters had a conflict of interest. R. 73 at 148. According to Sanders, his family gave his original court-appointed attorney $2,000.00 to hire a psychologist or psychiatrist. *Id.* at 149. After replacing the court-appointed attorney, Charters used the money for his fee instead of for hiring a psychologist or psychiatrist—or so Sanders claims. *Id.* This arrangement created a pecuniary conflict of interest, Sanders argues, because Charters had to choose between hiring an expert to help Sanders and pocketing the money for himself. *Id.* at 152–55.

An attorney's conflict of interest may establish the "denial of the 'right to have the effective assistance of counsel'" guaranteed by the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980) (quoting *Glasser v. United States*, 315 U.S. 60, 76 (1942)). Because a conflict of interest is a form of ineffective assistance, Sanders may escape procedural default only by showing cause through the *Martinez-Trevino* gateway and prejudice.

Under *Martinez* and *Trevino*, Sanders may satisfy the "cause" prong if he establishes the following: (1) his IATC conflict-of-interest claim is "substantial"; (2) his state post-conviction counsel was ineffective; (3) the state post-conviction proceeding was the "initial" review for the IATC claim; and (4) the state's post-conviction procedures "makes it highly

13

unlikely in a typical case that a defendant will have a meaningful opportunity to raise" the IATC claim. *Trevino*, 133 S. Ct. at 1921. In this case, the trial court proceeding in *Sanders II* was the initial review for the IATC claim. *See Martinez*, 132 S. Ct. at 1320.

The Court cannot reach Sanders' *Trevino* argument because Sanders' gateway to the merits—ineffective assistance of post-conviction counsel—is itself procedurally barred. When a habeas petitioner relies on ineffective assistance of counsel to excuse a procedural default, his argument of ineffective assistance must still follow the rules regarding procedural default and exhaustion. Both of those rules are relevant to Sanders' claim here. First, he must exhaust. That requires presenting the ineffective-assistance argument "to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986). Second, "a procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Carpenter*, 529 U.S. at 450–51. Here, Sanders has not exhausted and has procedurally defaulted on his ineffective-assistance-of-post-conviction-counsel argument.[5]

On exhaustion, Sanders had the opportunity in *Sanders III* to argue that his post-conviction counsel in *Sanders II* was ineffective. *Sanders III*, 339 S.W.3d at 435. Indeed, Sanders made two specific arguments that his *Sanders II* counsel was ineffective: (1) counsel was ineffective for failing to argue that evidence of a prior crime admitted at trial was

---

[5] Even though Kentucky does not argue failure to exhaust or procedural default with respect to the ineffectiveness of post-conviction counsel, the Court may raise exhaustion and procedural default *sua sponte*. *See Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).

improper and (2) counsel was ineffective for failing to argue that Sanders' trial counsel was ineffective for not removing a victim from the courtroom. *Id.*; *see* Brief for Appellant at 32–34, *Sanders III*, 339 S.W.3d 427 (Ky. 2011). Sanders also broadly contended that he was effectively without an attorney while his post-conviction motion was pending in *Sanders II*. *Id.* None of those points encompassed a claim that Sanders' trial counsel was ineffective due to a pecuniary conflict-of-interest. The *Sanders III* court rejected Sanders' claims of ineffective assistance of post-conviction counsel, explaining that such claims were "limited to counsel's performance on direct appeal" and did not extend to post-conviction relief. 339 S.W.3d at 435.

Sanders failed to exhaust the available state remedies because he did not take advantage of the opportunity, in *Sanders III*, to present his argument to the Kentucky courts. As Sanders recognized, he could have brought his ineffective assistance of post-conviction counsel claims in *Sanders III*. And he brought two such claims. But Sanders left out any claim that his attorney was ineffective for failing to cite his trial counsel's conflict of interest. Because Sanders omitted that claim, he failed to exhaust the available state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). That the Kentucky Supreme Court rejected the other post-conviction-counsel claims in *Sanders III* does not relieve Sanders of his obligation to make use of his only opportunity to present that specific argument to the state court. *See Engle v. Isaac*, 456 U.S. 107, 130 (1982); *Johnson v. Beckstrom*, Civil No. 08–194–ART, 2011 WL 3439135, at *1 (E.D. Ky. Aug. 5, 2011).

Additionally, Sanders' failure to exhaust renders his argument that post-conviction counsel was ineffective procedurally defaulted. Where a petitioner does not exhaust "and the court to which the petitioner would be required to present his claims in order to meet the

exhaustion requirement would now find the claims procedurally barred," the petitioner has procedurally defaulted.  *Coleman*, 501 U.S. at 735 n.1; *see also Awkal v. Mitchell*, 613 F.3d 629, 646 (6th Cir. 2010) (en banc) ("If an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review." (internal quotation marks omitted)).  Kentucky courts would now find Sanders' contention that his post-conviction counsel was ineffective procedurally barred.  At this time, Sanders could exhaust his ineffective-assistance-of-post-conviction-counsel argument only by proceeding under Kentucky Civil Rule 60.02 in Kentucky courts.  As the Kentucky Supreme Court has explained, that avenue of relief is solely for errors that "were unknown and could not have been known to the moving party by exercise of reasonable diligence and in time to have otherwise been presented to the court."  *Sanders III*, 339 S.W.3d at 437 (internal quotation marks omitted).  But Sanders knew about this issue.  As discussed above, he could have raised his argument that post-conviction counsel (in *Sanders II*) was ineffective during *Sanders III*.  Moreover, Sanders was aware of the underlying conflict-of-interest issue during *Sanders III* because he included that claim (a separate claim from the allegation that his post-conviction counsel was ineffective for not raising the conflict-of-interest claim) in his briefing in *Sanders III*. *See* Motion for Relief from Judgment at 112–13, *Sanders III*, 339 S.W.3d 427 (Ky. 2011).

Because Sanders did not present this argument to the Kentucky courts in *Sanders III*, the Kentucky Supreme Court would find an attempt to bring that claim now procedurally barred.  That results in Sanders procedurally defaulting his argument in this court.  Additionally, the Court gave Sanders the opportunity to present *all* his unexhausted claims to

16

the Kentucky courts in 2004.  *See* R. 32.  Sanders cannot now have another chance at Kentucky courts.

Even if the Court could reach the *Martinez-Trevino* factors, Sanders has not established that his conflict-of-interest claim is "substantial."  *Trevino*, 133 S. Ct. at 1921.  A conflict of interest requires the petitioner to "show[ ] that his counsel actively represented conflicting interests" and that the conflict impaired his interests.  *Cuyler*, 446 U.S. at 350. Conclusory allegations will not suffice; rather the petitioner must "point to specific instances in the record to suggest an actual conflict or impairment of [his] interests."  *United States v. Hall*, 200 F.3d 962, 965–66 (6th Cir. 2000) (internal quotation marks omitted).  Only after such a showing is prejudice presumed.  *Cuyler*, 446 U.S. at 349–50.   But the Supreme Court has not expanded the Sixth Amendment conflict-of-interest doctrine to include pecuniary conflicts, *see Mickens v. Taylor*, 535 U.S. 162, 174 (2002), and the Sixth Circuit has cautioned against applying *Cuyler* broadly, *Moss v. United States*, 323 F.3d 445, 473 n.25 (6th Cir. 2003) ("[T]he *Mickens* rationale compels our strong hesitation to apply [*Cuyler v.*] *Sullivan* to conflicts of interest cases arising outside of the joint representation context.").  Indeed, the conflict Sanders alleges—between an attorney's funds and his client's interests— "is the same theoretical conflict that exists . . . in any pro bono or underfunded appointment case."  *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995).  Such claims are more appropriately viewed as fee disputes, which are usually adjudicated under *Strickland*, not *Cuyler.  See United States v. O'Neil*, 118 F.3d 65, 72 (2d Cir. 1997) ("To the extent that the attorney shirks his ethical obligation to dutifully represent his client as a result of a fee dispute, we believe *Strickland* provides the appropriate analytic framework."); *Bonin v. Calderon*, 59 F.3d 815, 827 (9th Cir. 1995) ("[A]n assertion of conflict based on the fact that

17

payment for any investigation or psychiatric services could have come from counsel's pocket forc[ing] counsel to choose between [the client's] interests and his own . . . do[es] not typically create actual conflicts under *Cuyler*." (internal quotation marks omitted)); *United States v. Taylor*, 139 F.3d 924, 932 (D.C. Cir. 1998); *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993). Under *Strickland*, Sanders has not presented a substantial claim. Sanders does not demonstrate how it was unreasonable for Charters to use the services of the KCPC and Dr. Cooke, nor does Sanders attempt to show prejudice under *Strickland*. As a result, his claim of ineffective assistance is not "substantial" for purposes of *Martinez-Trevino* and his underlying conflict-of-interest claim is procedurally defaulted.

## III.   Claim 26: Kentucky's Death Penalty Proportionality Review.

Sanders objects to Kentucky's death penalty proportionality review under the Eighth and Fourteenth Amendments. R. 73 at 204. Consistent with its standard practice, the Kentucky Supreme Court compared Sanders' case to only those cases where a death penalty was imposed, not to cases where the jury found similar aggravating factors but did not impose a death sentence. Sanders contends that this practice is unconstitutional. *Id.* at 204–05. He also argues that Kentucky improperly considered verdicts handed down before the Supreme Court declared the death penalty unconstitutional in *Furman v. Georgia*, 408 U.S. 238 (1972), and cases where the death sentence was later reversed or where clemency was granted. R. 73 at 208.

This Court considered and rejected similar objections in *Bowling v. Parker*, Civil No. 03-28-ART, 2012 WL 2415167, at *8–10 (E.D. Ky. June 26, 2012). The same analysis applies here. A death sentence is unconstitutional if it "is grossly out of proportion to the severity of the crime." *Coker v. Georgia*, 433 U.S. 584, 592 (1977). But "when a life has

been taken deliberately by the offender," the death penalty is not "invariably disproportionate to the crime." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). In determining whether one defendant's death sentence is proportional, a comparative proportionality review is not constitutionally required. *See Pulley v. Harris*, 465 U.S. 37, 50 (1984); *McQueen v. Scroggy*, 99 F.3d 1302, 1333–34 (6th Cir. 1996), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174, 179–82 (6th Cir. 2004) (en banc) ("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review."). Indeed, a defendant "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987). And Sanders admits that "[p]roportionality review in capital cases is generally not required." R. 73 at 211.

Kentucky's framework—requiring a comparative proportionality review—goes beyond the Constitution's mandate. Kentucky law requires the Kentucky Supreme Court to consider "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ky. Rev. Stat. § 532.075(3)(c). In doing so, the Kentucky Supreme Court must "include in its decision a reference to those similar cases which it took into consideration." *Id.* § 532.075(5). The Supreme Court has explained that similar appellate procedures from Georgia were "a check against the random or arbitrary imposition of the death penalty." *Gregg*, 428 U.S. at 206. By going beyond what the Constitution requires, Kentucky's framework does not create an Eighth Amendment violation.

Sanders also contends that Kentucky's decision to set up a comparative proportionality review afforded him a due process right. Kentucky has violated this due

process right, he argues, because the review relies on pre-*Furman* cases and analyzes only cases where the death penalty was imposed.  R. 73 at 212.  This Court dealt with the same issue in *Bowling*.  2012 WL 2415167, at *8–10.  As an initial matter, it is unlikely that Kentucky's proportionality review established a due process right.  *See Bowling v. Parker*, 344 F.3d 487, 521–22 (6th Cir. 2003).  Even assuming Sanders had a due process right emanating from the proportionality review, there was no clearly established federal law in 1990 requiring consideration of cases where the defendant did not receive a death sentence.  *See Bowling*, 344 F.3d at 522.  Nor did the Kentucky Supreme Court commit error by considering pre-*Furman* cases.  The court could have viewed those cases as evidence of the sentences juries handed down in similar cases.  Indeed, the Kentucky Supreme Court would have violated state law by failing to consider pre-*Furman* cases.  As a result, Sanders is not entitled to relief based on a due process violation stemming from Kentucky's comparative proportionality review.

## IV.     Juror and Voir Dire Claims: 2, 3, 5, 8, and 9.

The Sixth and Fourteenth Amendments guarantee to a criminal defendant a trial by an impartial jury.  *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992) (quoting *Irvin v. Dowd*, 366 U.S. 717, 721–22 (1961)).  Due process requires only "a jury capable and willing to decide the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  In deciding whether juror bias violates due process, courts perform a two-prong analysis: (1) whether the juror swore that he "could set aside any opinion he might hold and decide the case on the evidence" and (2) whether the trial court should have believed the juror's declaration of impartiality.  *Patton v. Yount*, 467 U.S. 1025, 1036–37 (1984).  The answer to those questions, the Supreme Court says, "is plainly one of historical fact."  *Id*.  As such, a

state court's answer is entitled to deference. *Id.* at 1037 n.12; *Rushen v. Spain*, 464 U.S. 114, 120 (1983).

### A. Claim 2: Failure to remove jurors Meinzer and Warren.

Sanders asserts that the seating of jurors John Meinzer and George Warren violated his right to an impartial jury, though he did not challenge either juror during *voir dire*. Sanders first challenged Meinzer on direct appeal in *Sanders I*. He challenged Warren for the first time as part of an ineffective-assistance-of-counsel claim in *Sanders II*. In both cases, the Kentucky Supreme Court found that the jurors were qualified to sit on the jury. *See Sanders I*, 801 S.W.2d at 669 (Meinzer); *Sanders II*, 89 S.W.3d at 388 (Warren). Sanders alleges that the Kentucky Supreme Court mishandled the law and took an unreasonable view of the facts in reaching that conclusion. R. 73 at 107–110. In his federal petition, Sanders requests an evidentiary hearing to rectify the factual errors and omissions. In any event, he argues, he is entitled to federal habeas relief on the law. *See* R. 110. But Sanders is wrong. He is not entitled to the relief he seeks.

*Meinzer.*   Meinzer approached the bench twice in response to questions during general *voir dire*. After general *voir dire*, counsel and the court questioned him in individual *voir dire*. During his first visit to the bench, Meinzer informed the court that he knew of one of the victims, Mr. Brandenburg. VR 06/01/87, 10:04:13–10:05:33 (Tape 3, 01:04:41–01:06:02).[6]  Meinzer worked the third shift as a respiratory therapist at the hospital, while Mr. Brandenburg's wife worked the day shift in the hospital's business office. *Id.*  Meinzer advised the court and counsel that he met Mr. Brandenburg at a hospital Christmas party and had "a couple drinks" with him at the party, which Meinzer said "was about the extent" of

---

[6] "VR" refers to the video recording of Sanders' trial.

their acquaintance. *Id.* According to Meinzer, the whole interaction lasted "a couple minutes." *Id.* In response to a question from the court, Meinzer stated that his acquaintance with Mr. Brandenburg would not affect his ability to render a fair and impartial verdict based solely on the evidence. *Id.* Defense counsel inquired whether Meinzer's acquaintance with Mrs. Brandenburg would make him "embarrassed if [he] did not return a guilty verdict." *Id.* Meinzer replied that he did not know Mrs. Brandenburg well, but was aware she worked at the hospital. *Id.* As the Kentucky Supreme Court described the exchange, counsel was "evidently satisfied with a negative response" and declined to challenge Meinzer for cause or by peremptory strike. *Sanders I*, 801 S.W.2d at 669.

When the court called Meinzer back to the bench a few minutes later for further questioning, Meinzer stated that he had heard "the talk" around the hospital about the murder. VR 06/01/87, 10:17:48–10:18:23 (Tape 3, 01:18:15–01:18:50). He again stated that he could render a verdict based solely on the evidence presented in court, putting aside anything he "might have heard at the hospital." *Id.* Defense counsel again declined to challenge Meinzer's inclusion in the jury pool.

After general *voir dire* of the jury pool, the court called the potential jurors into chambers for individual *voir dire*. During individual *voir dire*, the court asked Meinzer if he had heard, read, or seen anything about the case that he would not be able to put out of his mind. VR 06/01/87, 10:33:16–10:38:23 (Tape 3, 01:33:42–01:38:50). Meinzer replied, "not that I know of." *Id.* Meinzer then volunteered that he had read articles on the case in the local newspaper, but did not remember much except a photo of the roped-off store. *Id.* The court closed individual *voir dire* by asking if there was any reason Meinzer could not give

both sides a fair trial; Meinzer said "no." *Id.* Defense counsel did not inquire any further about potential bias or challenge Meinzer's seating on the jury.

Sanders finally challenged Meinzer on direct appeal. The Kentucky Supreme Court noted that Sanders' argument was unduly belated, but addressed the challenge anyway. The court held that counsel "reasonably and responsibly found [Meinzer] to be competent, qualified, and impartial." *Sanders I*, 801 S.W.2d at 669. The court went on to hold that even if counsel had moved to excuse Meinzer, the trial court's denial of that motion would not have constituted reversible error. *Id.* The court based its holding on a determination that Meinzer's "passing acquaintance" with the Brandenburgs and "passing familiarity with the reported circumstances of the crime" did not suffice to imply bias. *Id.*

Sanders asserts that the Kentucky Supreme Court's factual determinations were unreasonable. In his federal petition, Sanders presents a distorted recitation of the facts that is inconsistent with the record evidence. Sanders converts Meinzer's statement that he had "a couple drinks" with Mr. Brandenburg at a party into "Juror Meinzer . . . used to have drinks with the victim." R. 73 at 105. Meinzer and Mrs. Brandenburg worked different shifts in different departments in the hospital; but Sanders describes this relationship as Meinzer "work[ing] with" Mrs. Brandenburg. *Id.*

Though Sanders offers an alternative description of the facts, he presents no basis for finding that the *Sanders I* recitation was unreasonable. Meinzer said he did not know Mrs. Brandenburg well and just had "a couple drinks" at a party with Mr. Brandenburg. *See Sanders I*, 801 S.W.2d at 669. The Kentucky Supreme Court was hardly unreasonable in taking Meinzer at his word—as defense counsel evidently did at the time. This is especially true given that trial counsel had the opportunity to explore potential bias during *voir dire* and

was satisfied as to Meinzer's impartiality.  Given the evidence before it, the Kentucky Supreme Court was not unreasonable in finding that Meinzer had a "passing acquaintance" with the Brandenburgs.

Sanders' strongest claim for relief might be Meinzer's statement that he heard "the talk" around the hospital about the trial, which Sanders characterizes as "Juror Meinzer had heard so much at the hospital about the case that he referred to it as the 'talk' at the hospital." R. 73 at 105.  But the Constitution does not guarantee a panel of jurors who have heard nothing about the case before trial.  *See Skilling v. United States*, 561 U.S. 358, 380–81 (2010) ("[J]uror *impartiality* . . . does not require *ignorance*."); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("[S]carcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.").  Rather, due process requires that the jury be "capable and willing to decide the case solely on the evidence before it."  *Smith*, 455 U.S. at 217.  Confronted with possible juror bias via pretrial publicity, the ultimate question for the court is whether the juror should be believed when he says he can render an impartial verdict.  *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991).  The trial court here asked Meinzer four times, in four different ways, if he could render an impartial verdict.  Meinzer affirmed that he could.  In the crucible of the courtroom, where one can see a juror's responses, body language, and the like, the trial court—and defense counsel—both believed Meinzer's assurances.  *See Skilling*, 561 U.S. at 396 (holding that the defendant's failure to challenge a juror for cause was "strong evidence" that the defendant was convinced the juror was unbiased).  Sanders does not offer any basis for rejecting that on-the-scene determination.

Sanders also contends that that the Kentucky Supreme Court unreasonably applied "the law." R. 73 at 110. Sanders does not cite or identify the relevant law that the Kentucky Supreme Court allegedly applied unreasonably. According to Sanders, the fact that Meinzer had "knowledge of the case" and a "relationship with the victim and his wife" required Meinzer's dismissal. *Id.* But Sanders does not point to any clearly established law mandating that result. Rather, the relevant Supreme Court law requires courts to ask whether the juror swore he could be impartial and, if so, whether the court should have believed him. *See Smith*, 455 U.S. at 217; *Patton*, 467 U.S. at 1036–37. The Kentucky Supreme Court accurately applied the *Smith* and *Patton* standard to the facts it found. As a result, habeas relief is not appropriate under the unreasonable application prong. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

***Warren.*** According to Sanders, the trial court's failure to remove Warren from the jury amounted to a violation of Sanders' due process rights. R. 73 at 107. Sanders' mother had alerted the court that she had seen Warren speaking with Colonel Hatch at some point during trial. Colonel Hatch was the prosecution's last witness and the father of one of the victims. The court, prosecution, and defense counsel met with Warren. In that meeting, Warren volunteered that he knew Colonel Hatch "a long time ago;" Hatch was an administrator at a hospital when Warren's mother died. Warren stated that Hatch "did [Warren's family] a lot of favors, I mean, ya know he talked to us when my mother died." Warren stated that he did not know the victim, that he did not know Colonel Hatch was the victim's father until trial, and that his prior acquaintance would not "weigh on his mind in any manner." Rather, he kept "[his] own mind." VR 6/04/87, 12:30:30–12:31:55 (Tape 6, 1:11:12–1:13:20).

Sanders did not object to Warren's presence on the jury at trial or on direct appeal.  In *Sanders II*, Sanders alleged that counsel was ineffective for failing to question and challenge Warren.  Finding no prejudice from the alleged error, the court denied the claim.  *Sanders II*, 89 S.W.3d at 388.  In *Sanders III*, Sanders presented the Sixth-and-Fourteenth-Amendments version of his challenge to Warren, which he presses in his federal petition, alleging that the court should have removed Warren.  The court denied the claim, holding that Sanders should have presented the claim in *Sanders II*.  *Sanders III*, 339 S.W.3d at 435, 438.  Despite having two opportunities to present the claim, he failed to do so.  On the third try, the Kentucky Supreme Court held that he failed to meet state procedural requirements and denied relief.  That holding would ordinarily constitute procedural default of the claim and bar federal habeas relief.  *See Coleman*, 501 U.S. at 729–30.[7]

In his federal petition, Sanders argues that the *Sanders II* consideration of his IATC claim counts as an "adjudication on the merits," and so the claim is not procedurally defaulted.  This position has some merit.  The Third Circuit has held that a claim is adjudicated on the merits where the state court considered the claim under the prejudice prong of an IATC claim.  *See Moore v. Penn. Dep't of Corr.*, 457 F. App'x 170, 178 (3d Cir. 2012) (citing *Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007)).  The court reasoned that where the state court identifies the correct legal principle and applies it to the petitioner's claim, the court has adjudicated the claim on the merits for AEDPA purposes.  *Id.* (citing

---

[7] The Commonwealth asserts both that the claim is procedurally barred on the basis of *Sanders III* and that the Kentucky Supreme Court fully considered the claim in *Sanders II*.  R. 85 at 8–11.  It is unclear if the Commonwealth's argument that *Sanders II* fully considered the claim refers only to the ineffective assistance claim, or if it is an affirmative concession that *Sanders II* adjudicated the underlying claim on the merits.  If it is the latter, then Sanders would not procedurally default the claim.  *See Cone v. Bell*, 556 U.S. 449, 467 (2009) ("A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration—not when the claim has been presented more than once.").  The Court need not resolve this issue as it addresses Sanders' argument on the merits.

*Richter*, 131 S. Ct at 783–85).   Even if *Moore* is correct and Sanders' claim is not procedurally defaulted, he would still not be entitled to relief.

According to the *Sanders II* court, Sanders failed to establish any prejudice because he did not demonstrate what bias further questioning of Warren might have revealed. *Sanders II*, 89 S.W.3d at 388.  The court went on to hold that Warren did not have a close enough acquaintance with Colonel Hatch to establish bias.  *Id.*

Sanders argues that the Kentucky Supreme Court unreasonably determined the facts surrounding Warren's bias.  *See* 28 U.S.C. § 2254(d)(2).  He argues that the Kentucky courts should not have believed Warren's declarations of impartiality.  Jurors were asked during *voir dire* if they knew any of the victims or witnesses; Warren said that he did not.  Sanders claims this was not an oversight; rather, Warren "intentionally failed to disclose" his acquaintance with Colonel Hatch.  R. 73 at 107.  Why would Warren do such a thing?  Because, the argument goes, he wanted to get on the jury to secure a conviction.  The Kentucky Supreme Court's failure to recognize this, Sanders argues, means its decision was based on an unreasonable determination of the facts.

Sanders' argument is unpersuasive.  Though Warren did not disclose his acquaintance with Colonel Hatch during *voir dire*, he offered a reason for the omission: he did not know the victim and did not realize that Colonel Hatch was the victim's father.  As in his objections to Meinzer, Sanders offers an inflated recitation of the facts.  For example, Sanders quotes Warren as saying that Hatch "did a lot of favors" for Warren's family, but ignores the context of that quotation.  Evidently, doing "a lot of favors" amounted to talking to Warren's family when his mother died—a more limited relationship than Sanders insinuates.  Sanders focuses on the fact that Warren appears to say he knew Hatch "a long

27

time."  R. 73 at 109.  But Warren says that he knew Hatch "a long time ago."  While the video recording is not a model of clarity, the latter phrase is more consistent with the rest of Warren's testimony.  Warren talks about his relationship with Hatch only in the context of a few events at a hospital—it is unlikely that Warren would say he knew Hatch "a long time" based solely on those instances.

Given that Warren discussed only a few interactions with Hatch around the time Warren's mother died, the Kentucky Supreme Court could reasonably conclude that their limited interactions did not rise to the level of juror bias.  And Warren stated that his acquaintance with Hatch would not impact his decision-making "in any way" and that he "keeps [his] own mind."  The trial court believed him.  While Sanders came to disagree almost two decades after the fact, he offers no basis for declaring that the Kentucky Supreme Court was unreasonable in reaching the same conclusion as the trial court.  Because Warren affirmed his impartiality and had limited interactions with Hatch, the Kentucky Supreme Court reasonably found that their relationship was not sufficient to "imply bias."  *Sanders II*, 89 S.W.3d at 388.  Warren's presence on the jury does not entitle Sanders to the relief he seeks.

Sanders also contends that the Kentucky Supreme Court unreasonably applied clearly established law by failing to consider the impropriety of both Warren speaking to a witness and the content of that conversation.  But no clearly established federal law requires specific consideration of these points.  As discussed in relation to Meinzer, the inquiry for juror bias is whether the juror swore he could be impartial, and if so, whether the court should believe him.  *See Smith*, 455 U.S. at 217; *Patton*, 467 U.S. at 1036–37.  Warren said that he could be impartial.  The court and defense counsel were evidently satisfied with that answer.  *See*

*Skilling*, 561 U.S. at 396.  Under the facts found by the Kentucky Supreme Court, it was not objectively unreasonable, and in fact was likely correct, to conclude that Sanders' "allegation of bias on the part of the juror is merely speculative." *Sanders II*, 89 S.W.3d at 388.

Nor is Sanders entitled to the evidentiary hearing he seeks on this claim.  The Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Because Sanders must meet his burden under § 2254(d)(1) using only the state-court record, the Court cannot grant him an evidentiary hearing to expand that record.  *See id.* at 1399–1400.  And Sanders cannot receive a hearing by relying on § 2254(d)(2)'s "unreasonable determination of the facts."  That section is specifically limited to "the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2); *see also Pinholster*, 131 S. Ct. at 1415–16 (Sotomayor, J., dissenting) (explaining that § 2254(d)(2) "more logically depends on the facts presented to the state court"); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012).  Both §§ 2254(d)(1) and 2254(d)(2) restrict this Court's scope of consideration to the facts that were before the state court. Accordingly, Sanders is not entitled to an evidentiary hearing.

***Ineffective Assistance of Trial Counsel*.**   In his discussion of jurors Meinzer and Warren, Sanders briefly asserts that "trial counsel's failure to request their excusal was deficient performance that prejudiced Sanders."  R. 73 at 109.  Sanders does not elaborate on this *Strickland* claim.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  With no further argumentation (or even a citation to *Strickland*), the Court need not consider Sanders' argument.  *See Frazier v. Jenkins*, 770 F.3d 485, 501 n.9 (6th Cir. 2014) ("This cursory argument has been waived, for issues adverted to in a perfunctory manner, unaccompanied

29

by some effort at developed argumentation, are deemed waived." (internal quotation marks and alterations omitted)).   In fact, he does not identify which Kentucky Supreme Court decisions on ineffective assistance were unreasonable, and, as a result, makes no argument as to why they were unreasonable.   Nor does Sanders elaborate on either prong of the ineffective-assistance analysis.   With no developed argumentation on this *Strickland* claim, Sanders is not entitled to relief.

**B. Claim 3: The trial judge improperly commented ex parte to the prosecutor about juror Meinzer.**

Sanders argues that the trial judge abandoned his role as a neutral arbiter by making an *ex parte* comment to the prosecutor about juror Meinzer after his second bench conference.   The record reflects just that.   After Meinzer and defense counsel left the bench and were out of earshot, the trial judge turned to the prosecutor.   The judge lowered his voice, partially shielded his mouth with his hand, and uttered five words about Meinzer— "He's dying to get on."   VR 06/01/87, 10:18:27–10:18:30 (Tape 3, 01:18:56–01:18:59).

On direct appeal, the Kentucky Supreme Court concluded that it could not condone the trial judge's comment.   But the court declined to find that his remark amounted to a constitutional violation and held that there was no prejudice to Sanders' rights to due process, a fair trial, or rational sentencing.   *Sanders I*, 801 S.W.2d at 669–70.   This Court agrees.   While there is no question that the trial judge's *ex parte* comment was inappropriate, under federal law, it amounted to exactly what Sanders claims it is:   an *ex parte* comment.

Sanders, however, contends that by finding some justification in his complaint and perceiving no prejudice on direct appeal, the Kentucky Supreme Court found a constitutional violation and applied harmless error analysis.   R. 73 at 113–114.   But he is mistaken in his

30

assessment of the Kentucky Supreme Court opinion.  Acknowledging "some justification" to Sanders' complaint is not the same as finding a constitutional violation.  The court simply noted that, as a general matter, the trial judge should not have made the comment.  Any number of things can happen during a trial that should not happen—judges are not above making mistakes—but not all such mistakes have a constitutional dimension.  *See, e.g.*, *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) ("[M]ost matters relating to judicial disqualification do not rise to a constitutional level." (quotations and alterations omitted)); *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974) (stating that erroneous jury instructions do not always "rise to the level of constitutional error").

The Kentucky Supreme Court's holding does not contradict or unreasonably apply clearly established federal law.  No Supreme Court opinion squarely addresses *ex parte* communication between the judge and prosecutor or articulates a constitutional right to a trial free from such *ex parte* comments.  Sanders cites to Justice Marshall's dissent in *Rushen v. Spain*, 464 U.S. 114 (1983), and two Sixth Circuit opinions: *United States v. Barnwell*, 477 F.3d 844 (6th Cir. 2007) (concluding that *ex parte* communications between the trial judge and government deprived the defendant of constitutional rights) and *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992) (same).  However, a dissent is not clearly established federal law—for AEDPA purposes or otherwise.  Nor are decisions from the courts of appeals clearly established law under AEDPA.[8]  *See* 28 U.S.C. § 2254(d)(1); *Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) ("We have emphasized . . . that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional

---

[8] Sanders also asserts, without supporting authority, that an *ex parte* communication is "structural error" and thus cannot be harmless.  *See* R. 73 at 114.  There is no basis in Supreme Court precedent for this proposition.

principle is 'clearly established.'").  With no clearly established law, there is nothing for the Kentucky Supreme Court to contradict or apply—unreasonably or not—meaning that Sanders cannot obtain relief.

Unlike *Rushen*, this case involves an *ex parte* comment between a trial judge and a prosecutor—not between a judge and a juror.  But even if *Rushen* could be analogized to this case, *Sanders I* is not "contrary to" or an "unreasonable application of" the *Rushen* decision. Why?  Because the Supreme Court did not even analyze the constitutional dimensions of *ex parte* communication between a judge and juror in that per curiam opinion.  *See* 464 U.S. at 117 n.2 ("Whether the error was of constitutional dimension in this case is not before us. Because we find that no actual prejudice was shown, we assume, without deciding, that respondent's constitutional rights to presence and counsel were implicated in the circumstances of this case.").  *Rushen* merely reiterated that while *ex parte* judge-juror communications should be disclosed to the parties, a failure to do so does not always require reversal.  464 U.S. at 119.  So *Rushen* does not clearly establish that a judge's *ex parte* communication with a juror necessarily amounts to a constitutional violation—let alone a judge's *ex parte* communications with a prosecutor.  And *Sanders I* is consistent with that ruling because the Kentucky Supreme Court concluded that the challenged *ex parte* communication was inappropriate without rising to a constitutional violation.

The *Rushen* Court contemplated that any prejudicial effect of an undisclosed *ex parte* conversation could be ascertained by a post-trial hearing.  *Id.* at 119–20.  However, nothing in the *Rushen* opinion requires state courts to hold such a hearing.  So the Kentucky Supreme Court did not misapply *Rushen* by forgoing an evidentiary hearing before concluding that the judge's *ex parte* comment did not prejudice Sanders.  In the absence of a clear rule—as

opposed to a non-binding statement of best practices—it is difficult to say that the Kentucky Supreme Court incorrectly applied *Rushen*, much less did so *unreasonably*. *See Richter*, 131 S. Ct. at 786 ("It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." (quotation marks and alteration omitted)). Moreover, Sanders has not even alleged that the constitutional violation stems from the lack of a hearing. He has not requested an evidentiary hearing on the claim in his federal proceedings, nor has he indicated what a hearing would have revealed. *See* R. 110. In short, he offers no basis to conclude that he suffered any prejudice from the lack of a post-trial hearing.

Sanders' last avenue for relief is § 2254(d)(2)'s "unreasonable determination of the facts" standard. But that claim also fails. Neither party disputes that the trial judge told the prosecution that Meinzer was "dying to get on" the jury. The Kentucky Supreme Court recognized this comment in its opinion. *Sanders I*, 801 S.W.2d at 669. The court explained that the remark was "brief" and did not specify whether Meinzer was disposed to "serve and convict, or to serve and acquit." *Id.* This, too, is consistent with the record. The video recording of the *ex parte* communication reveals that the statement consisted of five words ("He's dying to get on") spanning all of two seconds. VR 06/01/87, 10:18:27–10:18:29 (Tape 3, 01:18:56–01:18:58). The Kentucky Supreme Court reasoned that the remark merely conveyed the judge's own opinion about Meinzer's attitude—one that was as observable by counsel as by the trial judge. *Sanders I*, 801 S.W.2d at 669. This conclusion is also consistent with the record. The video recording shows that counsel for both sides were present for Meinzer's bench approaches and individual *voir dire*. VR 06/01/1987, 10:04:14–10:05:37; 10:17:47–10:18:24 (Tape 3, 01:04:42–01:06:06; Tape 3, 01:18:15–01:18:52). On

33

these facts, it was not *unreasonable* for the Kentucky Supreme Court to conclude that the trial court merely said out loud what both parties could see for themselves. While the Kentucky Supreme Court also concluded that it could not condone the trial judge's statement, *Sanders I*, 801 S.W.2d at 669, this admonition does not demonstrate that it unreasonably characterized the *ex parte* comment.

Sitting as the reviewing court in the first instance, the Court may have described the facts surrounding the *ex parte* comment differently. But that is not grounds to find that the Kentucky Supreme Court's description was "unreasonable" or to grant relief on a federal habeas petition. *See Wood*, 558 U.S. at 301 ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

The trial judge's *ex parte* remark to the prosecutor was unnecessary and inappropriate. Judges function as neutral arbiters, not as advocates. Much like umpires who simply call balls and strikes and do not themselves line up to bat for a team, judges must stay neutral in litigation. However, federal law does not clearly establish that *ex parte* comments by trial judges deprive defendants of constitutional rights. Given the state of the law, the Kentucky Supreme Court was reasonable in finding that the trial judge's *ex parte* comment, while improper, did not impair Sanders' constitutional rights.

### C. Claim 5: The trial court failed to permit adequate voir dire of juror King on the death penalty.

In individual *voir dire*, Sanders' counsel sought to ask juror Ronnie King the following question: "If a person were found guilty, based on the facts, of a double murder, would you give more consideration to the death penalty than any of the other three

alternatives?"  The Commonwealth objected.  The trial court sustained the objection because, in its view, Kentucky law prohibited hypothetical questions.  Sanders' counsel attempted to ask another death-penalty related question.  The Commonwealth again objected, and the trial court sustained the objection.  The trial court then asked King "Do you feel that there are certain cases where a murder might be involved where twenty years might be appropriate, certain cases where life in prison might be appropriate, certain cases where life in prison without parole for twenty-five years might be appropriate, and certain cases where the death penalty might be appropriate?"  King responded that "after hearing the evidence and then instructions from you, I would weigh all of it."  The court asked again: "well would you go back and just because it was a murder case, . . . say death penalty is the only thing I am going to recommend."  King answered "no sir, I would just have to hear, you know, the evidence and how the crime was committed" before reaching a decision.  VR 6/1/1987 14:50:42–14:53:01 (Tape 3 4:42:40–4:45:00); *Sanders I*, 801 S.W.2d at 671–72.

On direct appeal, the Kentucky Supreme Court held that the court should have allowed the "double murder" question because Sanders was on trial for two charges of murder.  *Sanders I*, 801 S.W.2d at 671–72.  The court then concluded that the subsequent *voir dire* questions from the court and King's answers to those questions served to both eradicate "any possible prejudice" to Sanders and demonstrate that King was qualified.  *Id.* at 672.

Sanders first argues that *de novo* review, as opposed to the strictures of § 2254(d), applies because the *Sanders I* decision employed harmless error.  But the Kentucky Supreme

Court did not apply harmless error after finding a constitutional violation.[9]  Rather, the court found that the error did not violate Sanders' constitutional rights.  Specifically, the Kentucky Supreme Court said that, as a general matter, the trial court should have allowed the double-murder question.  *Sanders I*, 801 S.W.2d at 672.  But this acknowledgment does not mean that the error was automatically one of constitutional magnitude.  *See, e.g.*, *Caperton*, 556 U.S. at 876; *Donnelly*, 416 U.S. at 645.  And, here, the error was not of constitutional magnitude: the *Sanders I* court concluded that the juror was qualified, which is the relevant constitutional inquiry.  *See Morgan*, 504 U.S. at 729 ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.").  Because the Kentucky Supreme Court did not find a constitutional error, the Court applies § 2254(d) to its decision.

Under § 2254(d), the Kentucky Supreme Court's decision was not contrary to, nor an unreasonable application of, clearly established law.  In looking at whether a juror's views on capital punishment are grounds for exclusion, the relevant standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation marks omitted).  In applying that broad standard, the Kentucky courts receive "more leeway . . . in reaching outcomes in case-by-case determinations."  *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  By finding

---

[9] Even if the Kentucky Supreme Court had found a harmless constitutional violation, this Court would not employ *de novo* review.  Rather, the Court would analyze the decision under harmless error.  *See Fry v. Pliler*, 551 U.S. 112, 116–20 (2007).  Sanders could only get relief if the error "had [a] substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted).  That standard is at least as deferential to the state court as AEDPA.  *Fry*, 551 U.S. at 116–17.

that King was qualified and that Sanders was not prejudiced by the trial court's erroneous curtailment of Sanders' *voir dire*, the Kentucky Supreme Court applied the correct standard. *See Morgan*, 504 U.S. at 729.  King said that he would determine the appropriateness of the death penalty based on the evidence and gave no indication of any bias.  The Kentucky Supreme Court emphasized that King gave "definite responses" that he would decide based "upon the evidence and the court's instructions."  *Sanders I*, 801 S.W.2d at 672.  Indeed, there is no evidence that King had any bias.  Accordingly, the Kentucky Supreme Court's decision that King was qualified was not unreasonable.

Nor did the Kentucky Supreme Court or the trial court unreasonably determine the facts under § 2254(d)(2).  In the context of juror *voir dire*, the Supreme Court (pre-AEDPA) explained that a federal habeas court must determine only whether the factual findings are "fairly supported by the record."  *Wainwright*, 469 U.S. at 433.  Under AEDPA, the court can grant relief only if the factual findings were unreasonable.  *Wood*, 558 U.S. at 301.

Nothing in King's statements to the trial court suggested that he would be partial or biased.  In fact, he stated to the court, multiple times, that he would weigh the evidence to determine whether the death penalty or prison would be appropriate.  Even though Sanders' counsel could not ask King about his views on double murder, the Kentucky Supreme Court reasonably concluded that the rest of King's responses sufficed to demonstrate his impartiality.  Because King explained, in no uncertain terms, that he would sentence a defendant based solely on the evidence at trial, the Kentucky Supreme Court acted reasonably in its factual determination.  Accordingly, Sanders is not entitled to relief on Claim 5.

### D. Claim 8: The prosecutor violated Sanders' rights by defining "reasonable doubt" during *voir dire*.

During *voir dire*, the prosecutor asked potential jurors if they understood that the Commonwealth's burden of proving Sanders' guilt beyond a reasonable doubt "does not mean beyond all doubt or a shadow of a doubt?" *Sanders I*, 801 S.W.2d at 671; *see also* VR 6/2/1987 13:32:50–13:33:15 (Tape 4 2:23:03–2:23:25). The prosecutor then asked if any of the jurors would "hold the Commonwealth to a higher standard of proof than the reasonable doubt standard?" *Id.* These are common questions asked during *voir dire*. Unsurprisingly, defense counsel did not object. *Id.* On direct appeal, Sanders argued that the prosecutor violated Kentucky law by attempting to define "reasonable doubt" when the prosecutor used "beyond all doubt" and "shadow of a doubt" in comparison. *Sanders I*, 801 S.W.2d at 671. Despite counsel's failure to object at trial, the Kentucky Supreme Court "[a]ssum[ed], without deciding" that the prosecutor's questions were erroneous but the court was "wholly unconvinced" that the error had any impact on the jury's verdict or sentence. *Id.*

In his federal petition, Sanders claims that the prosecutor's questioning amounted to prosecutorial misconduct and violated his rights in two ways. R. 73 at 118. First, the comments contravened Kentucky law, which bars defining "reasonable doubt." *See Commonwealth v. Callahan*, 675 S.W.2d 391 (Ky. 1984). Second, the prosecutor impermissibly lowered the government's burden of proof. The Constitution requires proof of a criminal charge beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 361–63 (1970). According to Sanders, the prosecutor's comments violated Sanders' constitutional rights by lowering that burden.

38

Sanders' claim suffers from three flaws. Each flaw is fatal to Sanders' claim for relief: Sanders cannot get federal relief for state-law violations, did not exhaust his claims in state court, and does not present a claim that could prevail under AEDPA. The first is a *McGuire* problem: to the extent that Sanders alleges that the prosecutor violated state law, he cannot obtain federal habeas relief. *McGuire*, 502 U.S. at 67 ("[F]ederal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted)). State law violations appear to have formed the substance of Sanders' claim before his federal petition. In *Sanders I*, Sanders' two-paragraph argument focused entirely on the state law issue. *See* Appellant's Brief at 69–70, *Sanders I*, 801 S.W.2d 665 (1990). His only reference to federal law was the undeveloped assertion that he was "denied . . . due process," without any argument or explanation as to how.[10] *Id.* The Kentucky Supreme Court certainly appeared to think his claim was based on state law as its two-sentence opinion on the claim framed the issue as a state-law error.

The second flaw in Sanders' petition on this claim is lack of exhaustion. Failure to exhaust a claim in state court bars consideration of the claim in federal habeas proceedings. 28 U.S.C. § 2254(b)(1)(A). Sanders did not present a substantive allegation of a

---

[10] Sanders' argument in *Sanders I* reads in full:

> During voir dire the prosecutor informed the jury that reasonable doubt did not require proof of guilt beyond all doubt or beyond a shadow of a doubt. Tape 3, 6-1-87, 13:23:52. That discussion of reasonable doubt was in conflict with established Kentucky case law and RCr 9.56. It denied appellant due process. 14th AMDT., U.S. CONST.; §11., KY. CONST.

> As this Court has held, "Having prohibited the court from definition of the term 'reasonable doubt', in the instructions by RCr. 9.56(2), we can hardly condone a client-serving definition by defense counsel or prosecutor in voir dire, opening statement or closing argument." Commonwealth v. Callahan, Ky., 675 S.W. 2d 391, 393 (1984). "[A]ll counsel shall refrain from any expression of the meaning or definition of the phrase 'reasonable doubt'. Id. at 393. Recently, this Court has reiterated that it was error when "[t]he prosecutor improperly defined reasonable doubt to the jury, as prohibited" by Callahan. Sanborn v. Commonwealth, Ky., 35 K.L.S. 7, at 20, _____S.W.2d_____ (1988).

constitutional violation until his federal petition.  While exhaustion does not require "citing book and verse on the federal constitution" to the state court, a petitioner must present the state court with his federal habeas claim.  *Picard v. Connor*, 404 U.S. 270, 277–78 (1971).  This requirement means presenting the state court with the same claim he later raises in federal court.  *Id.* at 276.  Sanders has not done so.  He presented *no* substantive constitutional argument in state court.  His premised his entire appeal on Kentucky's prohibition on defining "reasonable doubt," which is not sufficient to exhaust his federal claim.  *See Anderson v. Harless*, 459 U.S. 4, 6–7 (1982) (finding that a federal claim was not "fairly presented" to the state court because the argument focused entirely on alleged violations of state law).  The statement that he was "denied . . . due process" is not a developed argument, and therefore is not a fair presentation of his claim to the state court.  *See Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (holding that simply citing to a constitutional amendment is not enough to exhaust).  His failure to exhaust bars federal relief.

Finally, even assuming that Sanders sufficiently presented his federal claim in state court, he is still not entitled to habeas relief.  *See Baldwin v. Reese*, 541 U.S. 27, 31 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'").  While *Sanders I* does not explicitly address the federal claim, the Court still applies AEDPA deference pursuant to *Johnson* and *Richter*.  *Johnson*, 133 S. Ct. at 1096 (deferring to a state court's decision under AEDPA even where the state court "rejects a federal claim without expressly addressing that claim").

40

Sanders could get *de novo* review only by demonstrating that the Kentucky courts overlooked his claim. *See id.* at 1097. Because Sanders makes no such argument, the Court will proceed under the regular AEDPA framework.

The Kentucky Supreme Court's holding does not contravene or unreasonably apply clearly established federal law.[11] A prosecutor's comments violate due process only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The *Darden* rule "is a very general one," which gives state courts "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012). Because of the rule's generality, habeas relief is appropriate only if there is "no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 131 S. Ct. at 786.

Fairminded jurists would likely all agree that the Kentucky Supreme Court's decision did not conflict with then-existing Supreme Court precedent. Sanders does not direct the Court to any Supreme Court cases from or before 1990 forbidding prosecutors from attempting to define "reasonable doubt" at trial, let alone barring such attempts during *voir dire*. Nor does Sanders cite to any Supreme Court cases holding that "beyond any doubt" or "beyond a shadow of a doubt" are unconstitutional ways to distinguish "beyond a reasonable

---

[11] Sanders contends that *Sanders I* applied harmless error to this issue, and therefore his claim should be reviewed outside the boundaries of § 2254(d). As discussed previously, review of a state court's harmless error determination is reviewed under the *Brecht* standard, not de novo. Here, however, the Kentucky Supreme Court did not apply harmless error to the federal constitutional claim because it did not address that claim. It applied harmless error to the state-law issue. The Court will presume that the federal decision was on the merits and not under harmless error.

doubt." *Cf. Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam) (holding that the combined effect of the phrases "such doubt as would give rise to a grave uncertainty" and "an actual substantial doubt" resulted in unconstitutional definition of "reasonable doubt"), *overruled on other grounds by McGuire*, 502 U.S. at 72 n.4.

Then-existing Supreme Court case law on reasonable doubt, as set out in *Boyde v. California*, 494 U.S. 370 (1990) (not cited by Sanders), involved jury instructions, not *voir dire*. The standard from *Boyde* turns on whether there is a reasonable likelihood that, given the instructions presented, the jury applied a lower standard of proof than "reasonable doubt." *See id.* at 380; *McGuire*, 502 U.S. at 72 & n.4. *Boyde*, however, noted that "prosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court." *Boyde*, 494 U.S. at 384–85. Even assuming that *Boyde* applies to *voir dire*, Sanders has offered no reasons why the prosecutor's comparison unreasonably applied or contravened *Boyde*. He provides no basis for concluding that the prosecutor articulated a lower standard of proof, or that the prosecutor's comments led the jury to apply a lower standard of proof. While the Supreme Court has questioned the wisdom of attempting to define "reasonable doubt," it has not gone so far as to hold that the conduct at issue here is unconstitutional or even erroneous. *See Holland v. United States*, 348 U.S. 121, 140 (1954) ("Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." (internal quotation marks omitted)).

Similarly, Sanders does not link the prosecution's attempted definitions of reasonable doubt to any cases regarding prosecutorial misconduct. *See Donnelly*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning

42

from the plethora of less damaging interpretations."); *cf. Darden*, 477 U.S. at 181–82 (holding that prosecutor's reference to defendant as an "animal" in closing argument did not deprive defendant of a fair trial). Because the Kentucky Supreme Court's decision was not contrary to, or an unreasonable application of, Supreme Court case law, relief on this claim is not appropriate.

### E. Claim 9: The trial court constructively deprived Sanders of a peremptory strike by failing to strike potential juror Lanter for cause.

During *voir dire*, Robert Lanter stated that he could decide the case solely upon the evidence, consider all of the penalty options, and impose a sentence according to the evidence. VR 06/01/87, 16:41:00–16:42:50 (Tape 4 at 00:02:14–00:04:04). He also affirmed that he could follow the court's instructions. *Id.* at 16:42:50–16:43:30 (00:04:04–00:04:44). The trial court then asked him if there was any reason that he could not be fair and impartial. Lanter responded that he had been robbed when an assailant pointed a gun at his head and was "a little paranoid" over the incident. *Id.* at 16:46:03–16:46:37 (00:07:17–00:07:51). He indicated that he hoped this would not affect him, but said, "I never know." *Id.* at 16:46:37–16:46:44 (00:07:51–00:07:58). Defense counsel then inquired whether Lanter could be objective in a case involving a robbery and a gun pointed at the victim's head; Lanter again expressed hope that he would be impartial and acknowledged that one can never be sure. *Id.* at 16:46:54–16:47:25 (00:08:08–00:08:39). The court asked Lanter if he could set aside any feelings he might have stemming from being a robbery victim and decide the case solely on the evidence, to which he replied "I think I've come out of the trauma." *Id.* at 16:47:49–16:48:31 (00:09:03–00:09:45). Defense counsel challenged Lanter for cause; the court overruled the objection. *Id.* at 16:48:31–16:48:36 (00:09:45–00:09:50). Sanders

subsequently used a peremptory challenge to excuse Lanter.  *See Sanders I*, 801 S.W.2d at 670.

Sanders argues that the trial court's failure to strike non-juror Lanter for cause forced him to use one of his peremptory strikes, R. 73 at 124, and violated his due process rights.  In *Sanders I*, the Kentucky Supreme Court, after "review[ing] the interrogation," was "unable to conclude that the trial court's ruling was clearly erroneous and an abuse of discretion."  *Id.* While the *Sanders I* court did not discuss the federal law basis of its holding, the Court still applies the deferential AEDPA standard.  *See Johnson*, 133 S. Ct. at 1096.  For Sanders to succeed, he must show that there was "no reasonable basis" for the *Sanders I* decision. *Richter*, 131 S. Ct. at 784.

Under AEDPA, the Kentucky Supreme Court's decision was not unreasonable for one straightforward reason: Lanter did not sit on the jury.   Criminal defendants enjoy a constitutional right to an impartial jury.  *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000).  A defendant is not deprived of any constitutional right where no biased juror sat on the jury.  *Skilling*, 561 U.S. at 395 n.31 (citing *Martinez-Salazar*, 528 U.S. at 307).  Peremptory challenges are "one means to achieve the constitutionally required end of an impartial jury," *Martinez-Salazar*, 528 U.S. at 307, but standing alone, they "are not of constitutional dimension," *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).  Indeed, one primary purpose of a peremptory challenge is to cure a trial judge's erroneous for-cause ruling. *Skilling*, 561 U.S. at 395 n.31.  When a defendant so uses a challenge, he has not "lost" a peremptory strike, nor has he been deprived of a constitutional right.  *Id.*; *Martinez-Salazar*, 528 U.S. at 315–16.  Even assuming that Lanter was unqualified, Sanders was not deprived of any constitutional right by being forced to use a peremptory strike to remove him.

44

Sanders contends that this case is distinguishable from *Skilling, Martinez-Salazar*, and *Ross* because of the nature of Kentucky law.  R. 73 at 128–29.  Under Kentucky law, "the failure to strike a clearly biased juror for cause, necessitating the use of a peremptory strike to ensure an unbiased jury, is the denial of a substantial right."  *McDaniel v. Commonwealth*, 341 S.W.3d 89, 93 (Ky. 2011) (citing *Shane v. Commonwealth*, 243 S.W.3d 336, 340 (Ky. 2007)).  Sanders contends that Kentucky law would grant him a new trial because he used his peremptory challenge on a biased juror.  Because state law would require a new trial, Sanders says, he has a due process right to a new trial under the United States Constitution as well.  R. 73 at 128–29.

Sanders is incorrect.  *See Bowling v. Haeberlin*, Civil No. 03-28-ART, 2012 WL 4498647, at *23–24 (E.D. Ky. Sept. 28, 2012) ("Individuals who do not actually sit on the jury that renders a verdict have no impact on a defendant's right to an impartial jury.").  Under *Rivera v. Illinois*, the Supreme Court held that "the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern."  556 U.S. 148, 157 (2009).  Any errors denying peremptory challenges are "matter[s] for the State to address under its own laws."  *Id.*  The simple fact that the state's adjudication of peremptory challenge is "at odds with state law" is "not constitutionally significant."  *Id.* at 159–60.  Thus, the trial court's refusal to strike Lanter for cause is "not constitutionally significant." *Id.*

Finally, Sanders has not demonstrated that the "loss" of one of his peremptory challenges resulted in a fundamentally unfair trial.  The Supreme Court has acknowledged that the loss of peremptory challenges could create a fundamentally unfair trial in a couple exceptional circumstances.  If "the trial judge repeatedly or deliberately misapplied the law

45

or acted in an arbitrary or irrational manner," *Rivera*, 556 U.S. at 160, or if the loss of a peremptory challenge "result[ed] in the seating of any juror who should have been dismissed for cause," *Martinez-Salazar*, 528 U.S. at 316, then the petitioner might be able to establish a constitutional violation.  Sanders, however, has not argued that those situations occurred at his trial.  As a result, relief on this claim is not merited.

## V.    Trial Error Claims: 11, 11.5, 13, 14, 17, 18, and 28.

### A.  Claim 11: The trial court improperly admitted evidence of another shooting.

About one month before the murders of Brandenburg and Hatch, a similar shooting occurred in nearby Lincoln County.  A man robbed a bait shop and shot the proprietor in the back of the head.  The proprietor survived.  Law enforcement determined that the assailant used the same gun in both the Lincoln County shooting and the murders of Brandenburg and Hatch.  After Sanders' arrest, he initially denied any involvement with the Lincoln County shooting.  Later, however, he admitted committing both crimes, in essentially the same manner.  Prosecutors tried Sanders for the Madison Country murders before trying him for the Lincoln County shooting.  *See Sanders I*, 801 S.W.2d at 674–75.

Before trial on the Madison County murders, Sanders moved to exclude evidence of the Lincoln County shooting.  *Id.* at 674.  The court denied the motion because the evidence tended to show intent and a common scheme or plan between the two attacks.  *Id.*  The Commonwealth presented evidence of the Lincoln County shooting, including investigative details and Sanders' confession, during its case-in-chief.  The court then admonished the jury to consider the Lincoln County evidence "only in as far as it may tend to show, if you believe it does, knowledge or intent or pattern of conduct on the defendant's part."  *Id.*; VR 6/3/87 12:06:52–12:07:34 (Tape 5 at 2:54:00–2:54:42).

46

On direct appeal, Sanders challenged the trial court's admission of the evidence.  The
Kentucky Supreme Court held that admitting the evidence in conjunction with the limiting
instruction was not an abuse of discretion.  *Sanders I*, 801 S.W.2d at 675.  The evidence
tended to establish the intent, identity, and plan of action of the Lincoln County assailant.  *Id.*
The court explained that intent and identity are elements of both intentional murder and first-
degree robbery.  Because the Commonwealth had to prove each element of the charged
crimes and the Lincoln County evidence served that purpose, the evidence was admissible.
*Id.* at 674–75.

In his federal petition, Sanders renews his argument regarding the Lincoln County
evidence.  R. 73 at 165.  To the extent that Sanders' claim rests on an alleged violation of
Kentucky rules of evidence, he cannot obtain relief in federal court.  *See McGuire*, 502 U.S.
at 67; *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) ("[A] state court's violation of its
own evidentiary law does not, *ipso facto*, provide a basis upon which a federal court may
grant habeas relief.").  Under federal law, Sanders argues that admission of the evidence
violated his right to due process.  According to Sanders, the Kentucky Supreme Court's
decision to the contrary was an unreasonable application of clearly established law and an
unreasonable determination of facts.  *See* R. 73 at 171.

In his federal petition, Sanders argues that admission of the Lincoln County evidence
was so unfairly prejudicial as to deprive him of a fair trial in three ways:  First, it effectively
placed him on trial for two separate criminal acts.  Second, the Commonwealth did not need
to introduce the evidence to prove intent because Sanders conceded that he committed the
murders.  And third, despite the limiting instruction during the *guilt* phase of the trial, the
court told the jury, without a limiting instruction, that it could consider all of the guilt-phase

47

evidence during the *penalty* phase.  Even though the *Sanders I* court did not expressly address Sanders' federal law argument, the Court still applies the deferential AEDPA standard.  *See Johnson*, 133 S. Ct. at 1096.  Sanders does not rebut the presumption under *Johnson* that AEDPA still applies.  Under the AEDPA standard, none of Sanders' arguments entitle him to habeas relief.  *See* R. 73 at 169–71.

To assess the merits of Sanders' arguments, the Court must first identify the relevant "clearly established federal law," as it existed in 1990.  The case Sanders offers, *Michelson v. United States*, is neither squarely on point nor the last word on the matter.  335 U.S. 469 (1948).  *Michelson* held that once a criminal defendant presents testimony of his own good reputation, the government is permitted to cross-examine the witness.  *Id.* at 485–87.  Sanders' case is markedly different.  Where *Michelson* involved character evidence, Sanders' claim relates to evidence specifically admitted for purposes other than for bolstering or attacking character—a distinction recognized by both the Federal Rules of Evidence and Kentucky evidence law.  *See* Fed. R. Evid. 404(b); *O'Bryan v. Commonwealth*, 634 S.W.2d 153, 156 (Ky. 1982).

Unlike *Michelson*, *Dowling v. United States*, 493 U.S. 342 (1990), is squarely on point and provides what was, at the time of *Sanders I*, the final word on "other acts" evidence.[12]  So *Dowling* is the "clearly established federal law" that *Sanders I* must be tested against.  In *Dowling*, the Supreme Court addressed the due process implications of "prior bad acts" evidence.  493 U.S. at 352.  There, the prosecution sought to introduce evidence of prior acquitted conduct against Dowling.  *Id.* at 343–44.  During Dowling's trial on bank-

---

[12] The Supreme Court decided *Dowling* in January of 1990, more than eight months before the Kentucky Supreme Court decided *Sanders I*.

robbery charges, the prosecution called the victim from a different burglary—one for which Dowling had previously been acquitted. *Id.* The trial court allowed the testimony, but gave the jury a limiting instruction. *Id.* at 345–46.

The Supreme Court held that the admission of the testimony did not violate due process. *Id.* at 353. To succeed under the Due Process Clause, the *Dowling* Court explained, a petitioner must show that the admission of the evidence "violate[d] fundamental concepts of justice." *Id.* at 352 (internal quotation marks omitted). It is not the common evidentiary issue that satisfies such a high standard. Rather, the Due Process Clause "has limited operation" because the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id.* at 352. The evidence of Dowling's previous acquitted conduct did not "merit[ ] this kind of condemnation," "[e]specially in light of the limiting instructions provided by the trial judge." *Id.* at 353; *see also Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) ("Apart from the[ ] guarantees [of the rights to counsel, compulsory process, and confrontation of witnesses], we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence . . . .").

Proceeding to the merits of Sanders' petition, his first and second complaints, which relate to the admissibility of the evidence at trial, are foreclosed by *Dowling*. For Sanders to receive habeas relief, he must show that the Kentucky Supreme Court unreasonably applied *Dowling*. The evidence of the Lincoln County shooting constitutes a constitutional error only if it were "so extremely unfair that its admission violate[d] 'fundamental conceptions of justice.'" *Dowling*, 493 U.S. at 352 (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). Under that standard, the Kentucky Supreme Court had flexibility in reaching its decision.

The Kentucky Supreme Court's decision was reasonable because there is no basis to distinguish the Lincoln County evidence from the evidence the Supreme Court concluded was admissible in *Dowling*. Both involved previous crimes, and there is no principled reason to differentiate the burglary in *Dowling* from the Lincoln County shooting here. In fact, reasonable jurists would likely consider the *Dowling* burglary to be *more* constitutionally problematic because it involved acquitted conduct. The Lincoln County shooting was only dismissed. A dismissal, unlike an acquittal, does not necessarily involve a decision on the merits of the underlying charge. As the *Dowling* Court acknowledged, the potential pitfalls and prejudice associated with the admission of other bad acts are better addressed through the rules of evidence rather than through the Due Process Clause. *Id.* The same reasoning applies here. Like in *Dowling*, the judge in Sanders' trial gave limiting instructions to the jury, further minimizing the potential for a due process violation. *Id.* at 353 ("Especially in light of the limiting instructions provided by the trial judge, we cannot hold that the introduction of [the witness's] testimony merits this kind of condemnation."). Under *Dowling*, the *Sanders I* court could reasonably conclude that the admission of the Lincoln County evidence did not violate Sanders' right to due process. Accordingly, *Sanders I* was not contrary to, or an unreasonable application of, clearly established law, nor did it unreasonably determine the facts. *See Wilson v. Corcoran*, 131 S. Ct. 13, 17 (2010) (holding that an unreasonable determination of the facts must result in a constitutional violation to be cognizable under AEDPA).

The second way in which Sanders argues he was denied a fair trial is that the jury considered the Lincoln County evidence without any limiting instruction in the penalty phase. Sanders contends that the court's instruction to the jury that it could consider his lack

of prior criminal history as a mitigating factor *ensured* that the jury would consider the Lincoln County evidence.  But this is pure speculation.  Sanders offers no reason, argument, or authority for the proposition that evidence may be admitted for a specific purpose, but later float freely through the evidentiary ether, free from the shackles of its limiting instruction.

Even if, at the penalty phase, the jury disregarded the trial court's guilt-phase limiting instruction, the Kentucky Supreme Court could have reasonably found that the jury was permitted to consider the evidence of the Lincoln County shooting at the penalty phase.  The Supreme Court has not established a constitutional right precluding a jury from considering a defendant's previous criminal acts during the penalty phase.  In *Williams v. New York*, 337 U.S. 241, 251–52 (1949), the Supreme Court held that a trial judge could look to crimes for which the defendant was a suspect, but had never been convicted, in deciding whether to impose the death penalty.  The Supreme Court reiterated, in a non-death penalty case relying in part on *Williams*, that sentencing bodies may "consider[] a defendant's past criminal behavior, even if no conviction resulted from that behavior."  *Nichols v. United States*, 511 U.S. 738, 747 (1994); *see also Tuilaepa v. California*, 512 U.S. 967, 976 (1994).  Citing no clearly established law to the contrary, Sanders does not show that the Kentucky Supreme Court was unreasonable in allowing the jury to consider the Lincoln County shooting at the penalty phase.

### B.  Claim 11.5: Sanders' sentence is based in part on criminal charges that the Commonwealth dismissed.

In 1996, the Commonwealth dismissed the Lincoln County charges.  R. 73 at 172. Sanders argues that his Madison County sentence and conviction must be vacated because

they were secured in part by evidence from a dismissed charge. *See id.* at 173–75. In *Sanders III*, the Kentucky Supreme Court denied this claim, finding that Sanders, "with the exercise of reasonable diligence, could have . . . brought" the claim in his direct appeal or in his initial state post-conviction petition (the *Sanders II* petition). *Sanders III*, 339 S.W.3d at 437. The Lincoln County charges, however, were dismissed after Sanders filed his *Sanders II* petition. R. 73 at 171–72; Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42, Madison Circuit Court, No. 87-CR-018 (Feb. 9, 1993). It appears that Sanders could not have amended that petition when he appealed the initial denial of his RCr 11.42 motion to the Kentucky Supreme Court, s*ee Brock v. Commonwealth*, 479 S.W.2d 644, 646 (Ky. 1972), nor could he have filed a successive RCr 11.42 motion, *see Fraser v. Commonwealth*, 59 S.W.3d 448, 454 (Ky. 2001).

The Court will assume that Sanders could have presented this claim only in *Sanders III*, not during his direct appeal or initial petition. As such, the Kentucky Supreme Court did not adjudicate the claim on the merits in *Sanders III*. While it denied relief on an independent and adequate state ground, its basis for the denial was an erroneous conclusion that Sanders could have brought the claim in an earlier proceeding. Because that conclusion was incorrect, § 2254(d)'s limitations do not apply. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 303 (6th Cir. 2011) (holding that the federal court could adjudicate the claim *de novo* where state's "enforcement of the procedural bar was . . . erroneous" (citing *Cone v. Bell*, 556 U.S. 449 (2009)). Outside of the confines of AEDPA, the Court reviews the Kentucky Supreme Court's decision *de novo*.

Many of the same principles discussed above in claim 11 apply here. To the extent that Sanders objects to the Lincoln County evidence as a matter of state evidence law, he

cannot obtain federal habeas relief.  *See McGuire*, 502 U.S. at 67; *Bey*, 500 F.3d at 519.  Nor did the trial court offend due process by admitting the later-dismissed Lincoln County evidence during the guilt phase of Sanders' trial.  Under *Dowling*, there was no constitutional error in admitting the evidence of the Lincoln County shooting.  That result does not change because the state later dismissed the charge.  The act of dismissal does not suddenly thrust the evidence into the narrow "category of infractions that violate 'fundamental fairness.'" *Dowling*, 493 U.S at 352.  Rather, the same *Dowling* analysis controls.  In *Dowling*, the Supreme Court held that a trial court could admit evidence of a crime for which the defendant had been tried and *acquitted*.  *Id.* at 352–54.  Admitting dismissed conduct poses even less of a due process concern than does admitting acquitted conduct.  Unlike acquitted conduct, in which a jury has found the defendant not guilty, dismissed conduct reveals nothing about the guilt or innocence of the suspect.  It would be odd if the Constitution nevertheless barred evidence of charged-but-dismissed crimes while approving the use of acquitted ones.  The admission of the Lincoln County evidence was not a violation of the Due Process Clause—the subsequent dismissal does not alter that fact.

Sanders contends that *Johnson v. Mississippi* barred use of the Lincoln County evidence at his trial.  486 U.S. 578 (1988).  *Johnson* forbids basing a death sentence—even in part—on a reversed or vacated conviction.  *Id.* at 584–86.  In that case, the jury found three aggravating circumstances supporting the death penalty, including the defendant's robbery conviction in New York, and sentenced the defendant to death.  After the Mississippi conviction and sentence, New York vacated the robbery conviction.  *Johnson*, 486 U.S. at 581–83.  The Supreme Court held that the vacatur of the New York robbery conviction precluded its use as an aggravating circumstance supporting the death penalty.  *Id.* at 584–85.

Sanders' conviction and sentence do not violate *Johnson* for two reasons. First, *Johnson* considered a vacated conviction, which is different from a dismissed charge. Vacatur indicates that the conviction was somehow unlawful. Dismissal of a charge says nothing about the lawfulness or merits of the charge. *Johnson*'s holding made clear that the constitutional infirmity rested in part on the fact that "the jury was allowed to consider evidence that has been revealed to be materially inaccurate." 486 U.S. at 590. The dismissal of the Lincoln County shooting does not relate to the veracity or accuracy of Sanders' involvement in that crime. Rather, the dismissal could have been tied to the Commonwealth's success in securing a conviction and death sentence for the Madison County murders. After all, prosecuting the Lincoln County shooting would have wasted prosecutorial resources as Sanders had already received the death penalty. The Constitution does not require the government to prosecute *all* pending charges against a defendant just to preserve a conviction on one.

Second, the Lincoln County evidence did not form the basis of the aggravating factors for Sanders' sentence. In *Johnson*, the jury identified the (subsequently vacated) robbery conviction as one of the aggravating factors supporting the death penalty. 486 U.S. at 581. Sanders' jury made no such finding with respect to the Lincoln County shooting. During Sanders' formal sentencing, the trial court stated that the jury found two statutory aggravating factors: (1) the crime was committed during a 1st-degree robbery, and (2) the crime resulted in multiple deaths. VR 06/26/87, 10:04:25–10:04:45 (Tape 9 00:04:26–00:04:46). Sanders does not argue that these two factors were insufficient to support the death penalty or that the jury offered them as a pretense to cover its real consideration of the Lincoln County shooting. Indeed, the jury was not constitutionally precluded from

54

considering the Lincoln County shooting.  *See Williams*, 337 U.S. at 247.  But Sanders can

do no more than speculate that the jury even considered the Lincoln County shooting at all

during sentencing.  *See Donnelly*, 416 U.S. at 644.  Because the Lincoln County shooting

was dismissed, not vacated, and the crime did not form the basis of an aggravating factor,

*Johnson* does not control here and Sanders is not entitled to habeas relief.

### C.  Claim 13: Detective Benton's testimony on Sanders' mental state violated the Due Process Clause.

During cross-examination, Detective Skip Benton testified that "most of what

[Sanders] sa[id]" in his third interview with police "makes sense."  On redirect, the

prosecution asked Benton to explain what parts of the interview "made sense."  Specifically,

the prosecution asked whether Benton was referring to "the facts [Sanders] told you or the

assertions that he made that he couldn't control himself and was just sort of watching this

from out in nowhere?"  Benton responded "No, I can't honestly say I still believe that of

what he was saying."  He continued:  "That's not what I meant that made sense.  No, the part

about the way the crime occurred . . . that makes sense."  VR 6/3/87 13:37:30–13:41:23

(Tape 5 3:14:45–3:18:38).

On direct appeal in *Sanders I*, Sanders argued that Benton's testimony was improper

testimony on the ultimate issue of Sanders' mental state.  Brief for Appellant at 50–52,

*Sanders I*, 801 S.W.2d 665.  The Kentucky Supreme Court rejected that argument.  It found

that defense counsel "initially solicited an opinion from the witness" and that the

prosecution's questioning "legitimately pursued the matter within the proper scope of

redirect examination."  *Sanders I*, 801 S.W.2d at 676.  Sanders now contends that Benton's

testimony, as a lay witness, on Sanders' mental state was fundamentally unreliable testimony that violated due process. R. 73 at 178–79.

Sanders' argument fails for two reasons. First, he procedurally defaulted his claim. In his briefing on direct appeal in *Sanders I*, Sanders argued that Benton's testimony was improper because it was testimony on the "ultimate issue." Brief for Appellant at 50–52, *Sanders I*, 801 S.W.2d 665. He made no argument that the testimony was unreliable. In *Sanders III*, however, Sanders shifted gears and made the argument he now asserts: that Benton's testimony "was likely to mislead the jury because it bore the imprimatur of a professional." Motion for Relief from Judgment at 41, *Sanders III*, 339 S.W.3d 427. The *Sanders III* court rejected that argument because that claim could have been brought on direct appeal or in Sanders' first petition for post-conviction relief. 339 S.W.3d at 437. Because that is an independent and adequate state procedural ground, Sanders' claim is procedurally defaulted; Sanders does not attempt to demonstrate cause and prejudice. *See Coleman*, 501 U.S. at 750.

Second, even if Sanders did not procedurally default this claim, he is still not entitled to relief. According to Sanders, the Kentucky Supreme Court's decision in *Sanders I* was "unreasonable in light of the law." R. 73 at 178. As discussed above in claims 11 and 11.5, the admissibility of evidence is generally a matter of state evidentiary rules. To rise to a due process violation, the alleged error must fit within the "category of infractions" that the Supreme Court has defined "very narrowly." *Dowling*, 493 U.S. at 352. The evidence must be "so extremely unfair that its admission violates fundamental conceptions of justice." *Id.* (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). Under such a "general rule,' the Kentucky Supreme Court has "more leeway . . . in reaching outcomes in case-by-case

56

determinations." *Richter*, 131 S. Ct. at 786.  Sanders is entitled to habeas relief only if there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 131 S. Ct. at 786.

Fairminded jurists could find that Benton's testimony was not so fundamentally unfair as to violate due process.  *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (explaining that a petitioner bears "the heavy burden" of demonstrating that a state ruling "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" (internal quotation marks omitted)).  Benton never made a direct affirmative statement that Sanders was insane.  One could reasonably view his response—"I can't honestly say I still believe that of what he was saying"—as Benton's assessment of Sanders' credibility, not his mental state.  It was also reasonable to conclude that Benton's response to defense counsel that Sanders' story "made sense" permitted the prosecution to ask for clarification on which parts of the story "made sense."  *See Sanders I*, 801 S.W.2d at 676.  Without the prosecution's follow-up question, the jury may have interpreted Benton's testimony as supporting Sanders' insanity defense.  Additionally, other witnesses testified in more depth on Sanders' mental health.  The prosecution and defense both offered testimony from psychologists on the issue.  A reasonable jurist could determine that the jury placed more emphasis on that detailed and expert testimony than on Benton's one statement.  The *Sanders I* court could reasonably find that Benton's testimony did not so infect the trial as to violate the Due Process Clause.  Accordingly, the Court must deny relief on this claim.

### D. Claim 14: The trial court impermissibly admitted victim-impact testimony during the guilt phase of trial.

During the guilt phase of Sanders' trial, James Brandenburg's wife, Loquetta Brandenburg, testified about James' activities on the day he was murdered, where he was born, that he had siblings and children, the length of his marriage, and his church membership. VR 6/3/87 at 9:03:19–9:16:37 (Tape 5 00:04:21–00:17:39). Colonel Alden Hatch, Wayne Hatch's father, testified that Wayne Hatch was an engineer and inventor, was active in his church, had served in the Army and in the National Guard, had siblings, and was a Boy Scout leader. He also identified sympathy-inducing pictures of Wayne. VR 6/3/87 at 16:35:18–16:41:07 (Tape 6 01:00:11–01:06:00).

Sanders challenged the guilt-phase testimony of both witnesses. *See* Brief of Appellant at 66–69, *Sanders I*, 801 S.W.2d 665. The Kentucky Supreme Court did not specifically mention Brandenburg or Hatch. But it "considered . . . all errors enumerated by way of appeal," "reviewed all legal errors enumerated," and concluded that no error substantially prejudiced Sanders' rights. *Sanders I*, 801 S.W.2d at 683–84. Sanders asserts that the Kentucky Supreme Court's decision was contrary to, or an unreasonable application of, federal law.

The Court must defer to the Kentucky Supreme Court's decision under AEDPA even where, as here, the court issues a summary denial of Sanders' claims. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011) (citing *Richter*, 131 S. Ct. at 786). In these circumstances, a petitioner can clear the "unreasonable application" hurdle of § 2254(d)(1) only by showing that there was no reasonable basis for the state court's decision. *Id.* The federal habeas court must determine what arguments or theories could have supported the state court's decision,

and then determine whether "fairminded jurists could disagree" about whether those theories are inconsistent with Supreme Court precedent. *Id.* (quoting *Richter*, 131 S. Ct. at 786).

There are at least three reasons why the Kentucky Supreme Court decision would not have involved an "unreasonable application" of clearly established federal law:  (1) No clearly established law specifically prohibited victim-impact testimony at the guilt phase of a capital trial; (2) the Kentucky Supreme Court could have reasonably determined that any error resulting from the testimony was harmless; and (3) the court could have reasonably found that the testimony was not so unduly prejudicial as to violate Sanders' constitutional rights.

First, Sanders does not point to any clearly-established federal law prohibiting victim-impact testimony at the guilt phase of a capital trial.  Sanders interprets the Supreme Court's opinion in *Payne v. Tennessee* as stating that, at the time of his sentencing, constitutional law "categorically prohibited" victim-impact evidence at "any stage" of death penalty litigation. R. 73 at 180 (citing *Payne*, 501 U.S. 808 (1991)).  But Sanders misstates *Payne*, as the case articulates no such rule.

*Payne* overruled two Supreme Court decisions that held that victim-impact testimony is inadmissible at the *sentencing phase* of a capital trial.  *See* 501 U.S. at 830 (overruling *Booth v. Maryland*, 482 U.S. 496 (1987) and *South Carolina v. Gathers*, 490 U.S. 805 (1989)).  So, at the time Sanders' conviction became final, clearly established federal law prohibited, at most, victim-impact testimony during the *sentencing* phase of a capital trial— not evidence presented during the *guilt* phase of the trial, as was done in Sanders' case. Because Supreme Court silence does not create "clearly established federal law," there was

nothing for the Kentucky Supreme Court to contravene or unreasonably apply at the guilt phase of Sanders' trial.

The Due Process Clause does, however, prohibit evidence that is so unduly prejudicial that the trial is fundamentally unfair. *Payne*, 501 U.S. at 825. The *Sanders I* court reasonably applied this legal rule by analyzing whether the Brandenburg and Hatch testimony substantially prejudiced Sanders. 801 S.W.2d at 684. Sanders' only avenue for relief is to establish that the court erred in applying that law—that it unreasonably found that the Brandenburg and Hatch testimony was not unduly prejudicial.

The *Payne* Court set a high bar for what constitutes "unduly prejudicial" victim impact evidence. The facts of that case are brutal. Pervis Payne attacked 28–year–old Charisse Christopher and her two children, 3–year–old Nicholas and 2–year–old Lacie, repeatedly slashing and stabbing them with a butcher knife. *Payne,* 501 U.S. at 811–13. When police arrived at the scene, Charisse and Lacie were already dead from multiple stab wounds. *See id.* at 812. But emergency workers managed to save Nicholas after "seven hours of surgery and a transfusion of 1,700 cc's of blood." *See id.* At sentencing, the prosecution called Charisse's mother, Mary Zvolanek, to testify about how Charisse's son, Nicholas, "had been affected by the murders of his mother and sister." *Id.* at 814. She told the jury that Nicholas "cries for his mom" and "doesn't seem to understand why she doesn't come home." *Id.* Zvolanek said that Nicholas also "cries for his sister Lacie" and "comes to me many times during the week and asks me, Grandmama, do you miss my Lacie." *Id.* Notwithstanding the undoubtedly heart-wrenching nature of Zvolanek's testimony, the Supreme Court affirmed Payne's death sentence. The *Payne* Court held that defendants claiming a due process violation must show that witness testimony "is so unduly prejudicial

60

that it renders the trial fundamentally unfair." *Id.* at 825.  Zvolanek's testimony did not cross the line into fundamental unfairness, even though it undoubtedly moved the jurors.  *Id.* at 826–27; *id.* at 831–32 (O'Connor, J., concurring).

When viewed against the backdrop of *Payne*, neither Mrs. Brandenburg's nor Colonel Hatch's testimony even approaches unduly prejudicial.  Both witnesses focused on the personal characteristics of the victims: their families, jobs, regular activities, and the like. The *Payne* Court explained that evidence designed to show the victim's "uniqueness as an individual human being" is unobjectionable.   501 U.S. at 823 (approvingly discussing evidence that "showed that the victim was an out-of-work, mentally handicapped individual").  Notably, neither witness described the harm they suffered as a result of the murders—nothing akin to relaying a 3-year-old's unanswered cries for his brutally murdered mother and sister.

Any possible guilt-phase prejudice was further mitigated by the fact that Sanders confessed that he killed Brandenburg and Hatch.  At the end of the day, the most powerful evidence of Sanders' guilt came out of his own mouth on the witness stand.   The only disputed issue during the guilt phase of the trial related to Sanders' mental illness—an issue on which victim-impact testimony had no bearing.  Accordingly, the Kentucky Supreme Court would not have unreasonably applied federal law by concluding that the victim-impact testimony at the guilt phase was not so prejudicial as to deprive Sanders of due process.

### E. Claim 17: The prosecutor denigrated the insanity defense and shifted the burden of proof to Sanders.

*Insanity Defense.*  Sanders testified at trial.  During direct examination, he admitted that he killed Brandenburg and Hatch, but asserted that he had no control over his actions.

61

He said it was as if he were watching himself from outside of his body. *Sanders I*, 801 S.W.2d at 677.   During cross-examination, the prosecutor asked whether Sanders was floating around the courtroom; whether Sanders was in a second life; and whether Sanders had been under a spell.   The prosecutor also referred to the "good" David Sanders and the "bad" David Sanders. *Id.*   At one point, Sanders' counsel appeared to object, saying "I don't think it's necessary to get into this sarcasm and what have you."   The trial court did not rule on that objection as Sanders continued to testify.   VR 6/4/87 14:32:45–15:08:00 (Tape 6 3:14:01–3:49:16).

During closing argument, the prosecutor mocked much of Sanders' psychiatric evidence.   Defense counsel objected at the beginning of the prosecutor's discussion of that evidence, but the trial court overruled the objection.   The prosecutor continued with his argument, which included referring to Dr. Cooke as "the good doctor" and characterizing Dr. Cooke's diagnosis of a dissociative disorder as "psychobabble."   He similarly suggested that Sanders fabricated his headaches and sensitivity to light after talking to a lawyer at the jail. He called the insanity defense the "insanity trip or trick."   He went so far as to say that Dr. Cooke's analysis, if taken to its logical extreme, would absolve anyone of liability for murder so long as that person was "repress[ing] a bad day or a bad week or a bad month . . . and this anger builds up inside."   VR 06/05/87 at 10:50:04–11:08:22 (Tape 7 at 01:30:38–01:48:57).

On direct appeal, Sanders argued that the prosecutor's questions and argument amounted to prosecutorial misconduct in violation of both the Kentucky and United States Constitutions.   Brief of Appellant at 46–47; 52–58, *Sanders I*, 801 S.W.2d 665.   The Kentucky Supreme Court addressed the state-law issues and agreed that the prosecutor's tone in cross-examination was "less than exemplary."   But the court concluded that the cross-

examination "substantially and not unfairly addressed a crucial issue" that Sanders himself raised. *Sanders I*, 801 S.W.2d at 677. Closing argument, the court said, was "not . . . entirely commendable," but did not "exceed[ ] acceptable bounds." *Id.* at 680. Rather, the prosecutor's argument addressed properly admitted evidence and was not "outrageous" enough to merit reversal. *Id.*

The Kentucky Supreme Court did not specifically address the federal prong of Sanders' claim, but, as previously discussed, it need not do so to receive deference under AEDPA. *Packer*, 537 U.S. at 8. Rather, the AEDPA standards apply even where "a state court rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013).[13] The relevant "clearly established federal law" governing prosecutorial misconduct in the form of improper argument is *Darden v. Wainwright*, 477 U.S. 168 (1986). In *Darden*, the Supreme Court held that a petitioner is entitled to relief only where the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (quoting *Donnelly*, 416 U.S. at 643). The *Darden* rule "is a very general one," which gives state courts "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker*, 132 S. Ct. at 2155. Habeas relief is appropriate only if there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 131 S. Ct. at 786.

The facts of *Darden* are instructive here. In that case, the prosecutor made a number of comments in his closing argument reflecting his emotional reaction to the case, including

---

[13] Sanders does not attempt to rebut the presumption from *Johnson*. *See supra*.

indicating that the defendant was an "animal," stating that the defendant should be released only if he was kept on a leash, and expressing on at least four occasions a wish that the defendant had died in brutal fashion.  477 U.S. at 180–81 nn. 11, 12.  The Supreme Court observed that the prosecutor "did not manipulate or misstate the evidence," and that much of the argument was a response to the defense's closing argument.  *Id.* at 181–82.  The Court further noted that the trial court repeatedly instructed jurors to make their decision on the basis of the evidence alone, and that closing arguments did not constitute evidence.  *Id.* at 182.  Finally, the strength of the evidence of the defendant's guilt and defense counsel's opportunity to have the last word in closing argument ensured that the trial was not "fundamentally unfair."  *Id.* at 182–83.

The Kentucky Supreme Court's decision in *Sanders I* did not conflict with or unreasonably apply *Darden*.  The court could have reasonably found that the prosecutor's conduct in Sanders' case was less egregious than the *Darden* prosecutor's comments. Despite the "less than exemplary" nature of the prosecutor's conduct during Sanders' trial, the prosecutor did not attempt to dehumanize Sanders.  Nor did he express a personal desire to see Sanders killed.  Sanders does not contend that the prosecutor misstated any of the evidence introduced at trial.  Rather, a reasonable jurist could find that the prosecutor's cross-examination questions addressed Sanders' direct examination testimony—Sanders said he felt like he was watching from outside his body during the murders; the prosecutor inquired as to whether he felt that way during trial.  Similarly, the prosecutor's closing arguments related to evidence admitted at trial (Dr. Cooke's evaluation and report) or arguments presented by the defense (Sanders' headaches and explanation of his insanity).

Though prosecutors should never stoop to this level, the error does not receive *de novo* review. Rather, the Court applies the deferential AEDPA standard. Under AEDPA, the Kentucky Supreme Court reasonably concluded that the less-than-professional behavior did not constitute prosecutorial misconduct. Because those comments were less prejudicial than the constitutionally acceptable comments in *Darden*, the *Sanders I* court reasonably determined that Sanders was not entitled to relief on this issue.

Sanders also makes a fleeting reference to a claim of ineffective assistance of trial counsel based on counsel's failure to object to the prosecution's closing argument. R. 73 at 185. Sanders does not elaborate on this *Strickland* claim. *See Strickland v. Washington*, 466 U.S. 668 (1984). With no further argumentation (or even a citation to *Strickland*), the Court need not consider Sanders' argument. *See Frazier v. Jenkins*, 770 F.3d 485, 501 n.9 (6th Cir. 2014) ("This cursory argument has been waived, for issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks and alterations omitted)). Even if the Court were to reach the merits, Sanders has not met his burden. *See Pinholster*, 131 S. Ct. at 1403 (explaining that the combination of *Strickland* and AEDPA creates "doubly deferential" review). Trial counsel did object to the prosecutor's closing argument, but was overruled. VR 6/5/1987 at 10:51:45–10:51:57 (Tape 7 at 1:32:20–1:32:32).

**Burden of Proof.** During his closing argument, the prosecutor stated that "a person is presumed to intend the normal and logical consequences of his acts." VR 06/05/87 at 10:49:10–10:49:16 (Tape 7 at 01:29:50–01:29:56). According to Sanders, the prosecutor's statements to the jury that the law presumes intent impermissibly shifted the burden of proof to Sanders. He claims that his mental state was the only contested issue at trial. The law,

Sanders argues, required the prosecution to prove that he intended to kill Brandenburg and Hatch; only then would Sanders be required to prove his insanity as an affirmative defense. R. 73 at 183–84.

The Kentucky Supreme Court reviewed the prosecutor's closing argument and held that it did not "exceed[ ] acceptable bounds." *Sanders I*, 801 S.W.2d at 680. As with several other issues, *Sanders I* did not expressly address federal law in denying Sanders' claim. The Court presumes that the Kentucky Supreme Court adjudicated the issue on the merits. Accordingly, habeas relief is appropriate only if there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 131 S. Ct. at 786.

In his federal habeas petition, Sanders offers *Sandstrom v. Montana*, 442 U.S. 510 (1979) as the relevant clearly established federal law. In that case, the Supreme Court held that, where intent is an element of a crime, it was unconstitutional for the court to instruct the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 512. While Sanders insists that *Sandstrom* extends to a prosecutor's comments, its holding is limited to instructions from the court. *Id.* at 524. Under AEDPA, clearly established law refers only "to the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Even though the prosecutor's statement at Sanders' trial was the same as the one held unconstitutional in *Sandstrom*, that decision's holding did not encompass statements from prosecutors. Because clearly established law precludes only the court—and not the

prosecutor—from making such a statement, the Kentucky Supreme Court did not unreasonably apply *Sandstrom* in *Sanders I*.

*Sandstrom* is not the only relevant clearly established law from the Supreme Court. Under *Boyde v. California*, the "proper inquiry" in deciding the constitutionality of a jury instruction is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 494 U.S. 370, 380 (1990). While the Supreme Court set out that standard with regard to instructions from the trial court, *Boyde* also acknowledged that a prosecutor's misstatement of the law could violate due process. *Id.* at 385. A prosecutor's misstatement is "not to be judged as having the same force as an instruction from the court" but rather must be "judged in the context in which [it is] made." *Id.* at 384–85. *Boyde* appears to establish a watered-down form of the "reasonable likelihood" standard for a prosecutor's statements regarding jury instructions. Under AEDPA, the question is whether the Kentucky Supreme Court unreasonably applied *Boyde* in concluding that the prosecutor's comments were not out of bounds.

Here, the *Sanders I* court reasonably found that the prosecutor's comments did not violate Sanders' due process rights. First, the trial court never repeated the prosecutor's comments in the jury instructions and specifically told the jury that the law "presumes the defendant to be innocent of the crime." VR 06/05/87 at 10:28:15–10:28:20 (Tape 7 at 1:08:50–1:08:55). Second, the trial court also instructed the jury that it had to find, from the evidence and beyond a reasonable doubt, that Sanders had the intent to commit the murders. *Id.* at 10:22:25–10:10:23:55 (1:03:00–1:04:30). Third, the trial court explicitly defined "intentionally": "A defendant acts intentionally with respect to a result or to conduct when

67

his conscious objective is to cause that result or to engage in that conduct." *Id.* at 10:25:25–10:25:50 (1:06:00–1:06:25). The trial court did not mention any presumption with regard to intent, and Sanders does not contend that the trial court's statements were improper. Finally, the trial court instructed the jury that its duty was to "weigh the evidence that you've heard carefully and to deliberate and reach a verdict pursuant to the evidence that you've heard and the court's instructions." *Id.* at 11:22:00–11:22:25 (2:02:35–2:03:00).

Fariminded jurists could reasonably conclude that the jury relied on the trial court's instructions and ignored the prosecutor's comment. The jury had specific instructions from the court on the presumption of innocence and the definition of "intentionally." The jury was told to use those instructions in reaching the verdict, and a "jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). The jury had a copy of the court's instructions in the jury room but did not have a transcript of the prosecutor's closing argument. Even though the prosecutor improperly referred to a presumption of intent, reasonable jurists could find that the jury followed the instructions given by the trial court as opposed to the one misstatement by the prosecutor in closing. Accordingly, the *Sanders I* court acted reasonably, and the Court denies Sanders relief on claim 17.

### F. Claim 18: The trial court erred when instructing the jury on the burden of proof for the insanity defense.

At trial, the court did not use the phrase "preponderance of the evidence" when instructing the jury on the burden of proof for Sanders' insanity defense. R. 73 at 186–87; *see Gall v. Commonwealth*, 607 S.W.2d 97, 110 (Ky. 1980), *overruled on other grounds by Payne v. Commonwealth*, 623 S.W.2d 867 (Ky. 1981). Sanders did not object to the instruction at trial. Under Kentucky law, courts instruct juries that they may find an insanity

defense "from the evidence" and avoid using the phrase "preponderance of the evidence." *Id.* Sanders argues that the trial court's jury instructions on his insanity defense were constitutionally defective because they omitted the phrase "preponderance of the evidence." R. 73 at 188–93.

The trial court followed Kentucky law by using the phrase "from the evidence" in its instruction on the insanity defense. When the trial court instructed the jury as to the state's burden, it stated that the jury could find Sanders guilty of murder (or robbery) "if and only if" the jury believed "from the evidence beyond a reasonable doubt" that Sanders committed the elements of murder (or robbery). VR 6/5/1987 10:22:23–10:25:00 (Tape 7 1:03:00–1:05:37). The trial court used that language—"from the evidence beyond a reasonable doubt"—four times. *Id.* When instructing the jury as to Sanders' insanity defense, however, the court explained that the jury would have to find "from the evidence" that Sanders satisfied the elements of an insanity defense. VR 6/5/1987 10:26:06–10:27:43 (Tape 7 1:06:42–1:08:20). The judge used that formulation three times. *Id.* Finally, at the end of his instructions, the judge reiterated that the jury would have to find "from the evidence alone and beyond a reasonable doubt" that Sanders was guilty of the crimes. VR 6/5/1987 10:28:29 (Tape 7 1:09:06). But the court never used the words "preponderance of the evidence." As a result, Sanders argues, the instructions violated his constitutional rights.

Before reaching the merits of this claim, the Court must first clear a procedural hurdle. In *Sanders I*, the Kentucky Supreme Court discussed Sanders' burden-of-proof argument under only state law and summarily dismissed the argument. 801 S.W.2d at 679. In his direct-appeal brief, Sanders presented a constitutional argument in addition to the state law claim. Brief of Appellant at 95–96, *Sanders I*, 801 S.W.2d 665 (1990). That the

69

Kentucky Supreme Court analyzed solely state law in its opinion does not affect this Court's deference, under AEDPA, to that court's decision.  Because the *Sanders I* court denied habeas relief, the Court "presume[s]" that *Sanders I* adjudicated all of Sanders' claims, which includes the burden-of-proof argument under federal law.  *Richter*, 131 S. Ct. at 784–85.  While *Sanders I* provided no reasoning on the constitutional issue, AEDPA "does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* at 784.  Deferential review under AEDPA applies even where "a state court rejects a federal claim without expressly addressing that claim."  *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013).[14]  To demonstrate his entitlement to habeas relief, Sanders must show that "there was no reasonable basis" for the Kentucky Supreme Court's decision.  *Richter*, 131 S. Ct. at 784.

Under *Boyde v. California*, 494 U.S. 370 (1990), Sanders contends that there is a reasonable likelihood that the jury would have been confused as to the burden of proof for the insanity defense.  In *Boyde*, the Supreme Court held that courts should evaluate erroneous jury instructions by looking at "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Id.* at 380.  In developing this standard, the Court relied on the fact that *Boyde* was a capital case.  *See id.* ("There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case . . . .").  According to Sanders, the Kentucky Supreme Court unreasonably applied *Boyde*.

---

[14] Sanders does not attempt to rebut the presumption from *Johnson* and *Richter*.  *See supra*.

But Sanders fails to satisfy his burden to show that "there was no reasonable basis" for the conclusion in *Sanders I* that the jury instructions were not erroneous or a constitutional violation. *Richter*, 131 S. Ct. at 784. Kentucky may define the burden of proof for an affirmative defense as it sees fit. *See Patterson v. New York*, 432 U.S. 197, 206–07 (1977); *see also Smith v. United States*, 133 S. Ct. 714, 719 (2013) (shifting the burden of proving withdrawal from a conspiracy, an affirmative defense, to the defendant "does not violate the Due Process Clause"). Kentucky courts have resisted using "preponderance of the evidence" in jury instructions because it "is redundant and bad practice." *Hardin v. Savageau*, 906 S.W.2d 356, 358 (Ky. 1995). In Kentucky's view, that phrase "might not be understood" and defining it "could confuse or mislead the jury." *Id.* Here, the trial court dutifully instructed the jury using "from the evidence" under Kentucky law. The Kentucky Supreme Court concluded that there was no error in this instruction.

Reasonable jurists could conclude that the jury would not have been confused by the instruction's omission of "preponderance of the evidence." *See Richter*, 131 S. Ct. at 876 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)). A jury could understand Kentucky's formulation as distinguishing between "from the evidence" and "from the evidence beyond a reasonable doubt." Jurors can reasonably be expected to identify the significance of the explicit absence of "beyond a reasonable doubt" following "from the evidence" in the instructions on insanity. *See, e.g.*, *Gall*, 607 S.W.2d at 110 ("There is no reason to suppose or suspect that the jurors were ignorant bumpkins."). In each reference to the state's burden, the trial judge specifically included "beyond a reasonable doubt," but omitted that phrase when discussing

71

the burden for Sanders' insanity defense.  And the instructions on insanity did not mention "from the evidence" merely once in passing.  The judge repeated "from the evidence," standing alone, three times.  That provided sufficient contrast with the rest of the instructions to avoid any potential confusion.  Because of the divergence in the instructions, the Kentucky Supreme Court was not unreasonable in concluding that the instructions did not create a constitutional error.  Accordingly, Sanders is not entitled to habeas relief on this claim.[15]

### G. Claim 28: The government failed to disclose exculpatory evidence, in violation of *Brady v. Maryland*.

As a result of a motion by his attorney, Sanders was transported to the KCPC for a mental evaluation.  *See* TR Direct Appeal Vol. I at 19 (motion for a competency evaluation).  At the KCPC, Sanders underwent a comprehensive examination.  A team of social workers, psychologists, a psychiatrist, and a neurologist observed Sanders for twenty-four hours a day over a period of six weeks.   VR 6/5/87 19:13:23–19:13:40 (Tape 7 00:34:39–00:34:56) (Testimony of Dr. Walker).

One of the KCPC team members, Dr. Frank Flenning, evaluated Sanders toward the end of his stay.  Dr. Flenning memorialized his interview notes and summarized his findings and conclusions in a seven-page report.  *See* Appellate Proceeding Record at 765–71 (Report of Dr. Flenning).   In his report, Dr. Flenning describes (1) Sanders' childhood and upbringing, (2) his recollections of the crimes and the subsequent investigation, and (3) his responses to the psychological tests.  Dr. Flenning first noted how, as a child, Sanders was

---

[15] Sanders asserts in conclusory fashion that the Kentucky Supreme Court made an unreasonable determination of the facts. R. 73 at 190.  He does not say what facts were unreasonably determined.  The Kentucky Supreme Court in *Sanders I* makes no mention of any factual findings relevant to this claim.  Because the Court identifies no unreasonable factual determination, the Court rejects this claim.

"severely punished" by his alcoholic father and his mother. *Id.* at 765. Dr. Flenning also recorded that Sanders admits he "was not really close to anyone" in his family while growing up. *Id.* And after describing Sanders' performance on an array of psychological and psychiatric tests, Dr. Flenning concluded that there is "very strong evidence" that Sanders has an "atypical psychosis." *Id.* at 769. Dr. Flenning found that a "highly unusual type of fragmentation" had taken place in Sanders' personality structure. This, he reasoned, could explain Sanders' "loss of contact with reality and possibly delusional thinking" under "unusual stresses and circumstances." *Id.* at 770. Ultimately, Dr. Flenning concluded that Sanders suffered from an atypical psychosis that reflected characteristics typical of pseudo-neurotic schizophrenia. *Id.* at 769–70.

But neither Sanders nor Charters ever saw Dr. Flenning's report before trial. R. 73 at 333. Nor did they receive a complete summary of his conclusions. *Id.* Instead, the lead KCPC investigator, Dr. Candace Walker, prepared a summary of the KCPC evaluation team's overall findings for the court and counsel ("KCPC Report"). *See* TR Direct Appeal Vol. I at 134–44 (Dr. Candace Walker's letter and KCPC Report). In this report, Dr. Walker only summarized Dr. Flenning's notes about Sanders' recollections of his childhood. *See id.* at 139–40. Nowhere in the KCPC Report, however, did Dr. Walker relay Dr. Flenning's clinical conclusions or his determination that Sanders suffered from an atypical psychosis. Instead, Dr. Walker noted that Sanders contradicted himself during his time at KCPC by giving different accounts of his personal history to different evaluators. *Id.* at 136, 139, 140. She also summarized the KCPC team's findings as determining that Sanders did not suffer— and had not previously suffered—from a mental disease or defect. *Id.* at 143. Dr. Walker portrayed all the KCPC evaluators as concluding that Sanders did not suffer from any

73

thought disorder, major affective disorder, or "psychotic illness." *Id.* at 143–44. The prosecution called Dr. Walker as a rebuttal witness. At trial, Dr. Walker provided testimony consistent with the KCPC Report. *See generally* VR 6/5/87 09:01:00–09:54:06 (Tape 7 00:02:19–00:55:21) (Testimony of Dr. Walker).

Sanders claims that the prosecution had an obligation to disclose Dr. Flenning's psychiatric report because it was material, exculpatory evidence that would have supported his insanity defense. He claims that, at the very least, Dr. Flenning's conclusions substantially undermined Dr. Walker's testimony. Because Dr. Walker served as a prosecution witness, Sanders argued, the prosecution's *Brady* obligations extended to information that would rebut Dr. Walker's testimony. R. 73 at 351–52. Dr. Walker testified that the KCPC team found Sanders to be "competent to deal with reality," and that there was "no evidence" that Sanders suffered from "any type of psychosis or serious psychological or psychiatric impairment." VR 6/5/87 at 09:14:35–09:14:52 (Tape 7 00:15:52–00:16:08); R. 73 at 351. Dr. Walker also said that Sanders did not suffer from a mental disease or defect. VR 6/5/87 at 09:14:55–09:15:16 (Tape 7 00:16:11–00:16:33). Because the prosecution did not disclose Dr. Flenning's report in which he found that Sanders suffered from atypical psychosis, Sanders argues that the prosecution violated its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963). R. 73 at 334.

*Brady* requires prosecutors to disclose to the defendant evidence that is (1) exculpatory or could be used for impeachment, and (2) material—that is, evidence such that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 676, 682 (1985); *Brady*, 373 U.S. at 86–87. The prosecution has a duty to disclose under

74

*Brady* even if the defendant does not request the evidence. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

The Kentucky Supreme Court concluded that no *Brady* violation occurred for three reasons. The court first determined that Dr. Flenning's report did not support Sanders' insanity defense and thus was not exculpatory. *Sanders II*, 89 S.W.3d at 385. The court also concluded that *Brady* did not require the prosecution to disclose Dr. Flenning's report because it was in the possession of a third party—not in the possession of the prosecution. *Id.* Finally, the Kentucky Supreme Court found that the prosecution did not need to disclose information that was already known to the defense. *Id.*

At the present stage, this Court's role is not to independently evaluate whether Sanders can prevail on his *Brady* claim. Under AEDPA, the Court must constrain its review to determining whether the Kentucky Supreme Court decided the issue contrary to federal law, or unreasonably applied *Brady* and other clearly established Supreme Court holdings to the facts of Sanders' case. *See Williams v. Taylor*, 529 U.S. 362, 413 (2000).

The Kentucky Supreme Court identified and applied the *Brady* framework. *Sanders II*, 89 S.W.3d at 385. Where a state court "'identifies the correct governing legal principle' in existence at the time," the appropriate inquiry is whether the state court unreasonably applied that principle. *Pinholster*, 131 S. Ct. at 1399 (quoting *Williams*, 529 U.S. at 413). Because the *Sanders II* court identified and applied *Brady*, the question is not whether the decision was "contrary to" *Brady*, but rather whether the court "unreasonably applied" *Brady* and its "clearly established" progeny. An "unreasonable" application is not merely an "incorrect" application of federal law. *Richter*, 131 S. Ct. at 785. And "clearly established

law" under AEDPA refers to decisions of the Supreme Court rendered before the "state-court conviction became final." *Williams*, 529 U.S. at 390.

Under these standards, and assuming that Dr. Flenning's report was exculpatory, Sanders is not entitled to habeas relief. Why? Because the Kentucky Supreme Court's decision did not "unreasonably" apply clearly established law in concluding that the prosecution had no obligation to disclose evidence in the control of the KCPC and of which Sanders and his attorney were already aware.

Sanders does not argue that the prosecution actually possessed Dr. Flenning's report. R. 73 at 339. Rather, he notes that the report "was at least in the prosecution's constructive possession." *Id.* The Supreme Court has held that prosecutors have a duty to learn of and disclose exculpatory evidence possessed by others working on behalf of the government in the case, including police. *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The *Kyles* Court clarified that *Brady* evidence even includes information "known only to police investigators and not to the prosecutor." 514 U.S. at 438. But this rule does not help Sanders establish a *Brady* violation for two reasons. First, the Court decided *Kyles* in 1995—years after Sanders' conviction became final. So any rule in *Kyles* requiring the prosecution to disclose exculpatory evidence beyond its actual control was not "clearly established" federal law. *Williams*, 529 U.S. at 390. As a result, the Kentucky Supreme Court could reasonably conclude that the prosecutor had no obligation in 1987 to disclose evidence that he did not even possess.

Second, even if the prosecution's duty to disclose evidence beyond its actual possession was "clearly established" before *Kyles*, Sanders' claim for relief fails. The Supreme Court has *never* extended the prosecution's *Brady*-disclosure obligations to

information in the possession of witnesses like Dr. Walker.  Sanders argues that the prosecutor's *Brady* obligation extends to evidence in the possession of *all* government entities, including those independently involved in the case.  And because Dr. Walker testified as a government witness, Sanders argues, she operated as "an agent of the prosecution . . . acting on the government's behalf." R. 73 at 340.  For this reason, Sanders maintains that the prosecutor violated his *Brady* obligations by withholding Dr. Flenning's exculpatory report—evidence in the control of Dr. Walker, the prosecutor's agent. *Id.*

Sanders does not point to any case that expands the prosecutor's *Brady* obligation to evidence in the control of the witnesses and experts who simply testify for the prosecution. Nor is it likely that Sanders could identify a case establishing that rule.  Even *Kyles* merely expanded the prosecutor's *Brady* duty to learn about and disclose favorable evidence to information known to entities, like the police, working on the prosecution's behalf in the case.  514 U.S. at 437–38.  The KCPC, while a government entity, was not working for the prosecution.  Indeed, it was the court, not the prosecution, who requested that the KCPC evaluate Sanders. *See* Letter from the KCPC to the Honorable William Jennings (April 21, 1987), TR Direct Appeal, Vol. I at 134–35 ("Pursuant to your court order, the defendant, David Lee Sanders, has been received at the [KCPC] for evaluation and treatment.").  The *Kyles* Court did not require the prosecutor to search for favorable evidence wherever it may appear—in the control of scientific expert witnesses, neutral state agencies, or the defense team.  Any alternative reading of *Kyles* or related Supreme Court cases would frame the Supreme Court's precedents at an impermissibly "high level of generality." *See Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam) (quoting Nevada v. Jackson, 133 S. Ct. 1990, 1994 (2013) (per curiam)).  And that framing would improperly extend clearly established federal

law.  *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) ("[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.") (internal citations omitted).  As a result, the Kentucky Supreme Court could reasonably conclude that even under the rule of *Kyles*, the prosecution's *Brady* obligation did not extend so far as to reach the information in the KCPC's control.

But Sanders argues that Dr. Walker and the KCPC effectively functioned as the police by evaluating Sanders' mental condition.  Nothing in the record, however, indicates that Dr. Walker or the KCPC functioned like traditional police who aid the prosecution in its investigatory functions.  The police in *Kyles*, for example, recorded conversations with informants using microphones and took statements from eyewitnesses to the crime.  In contrast, the KCPC evaluated Sanders at the request of defense counsel and pursuant to a court order.  *See* TR Direct Appeal Vol. I at 19 (motion for a competency evaluation); *id.* at 21–22 (order for a mental evaluation).  The KCPC was created as part of the Cabinet for Health and Family Services.  908 KAR 3:160 (West 2012).  And the mission statement of the KCPC is to provide "professional objective and thorough forensic pretrial evaluations for the judicial system and quality inpatient psychiatric services of persons charged with or convicted of felony offenses."  *See* Gregory S. Taylor, *Pre Trial Evaluation Program Kentucky Correctional Psychiatric Center*, Ky. Dep't of Public Advocacy, http://dpa.state.ky.us/library/manuals/mental/Ch12.html (last visited Feb. 11, 2015).  Accordingly, the KCPC is not akin to the police and functions more like an arm of the courts.  For these reasons, the *Sanders II* court was reasonable in distinguishing the KCPC from the state agency that investigated child abuse in *Pennsylvania v. Ritchie*.  *See* 89 S.W.3d at 386

78

(citing *Ritchie*, 480 U.S. 39 (1987)).   Accordingly, the *Sanders II* court did not "unreasonably" apply clearly established federal law.

## VI.    Claim 27: Ineffective Assistance of Trial Counsel.

Sanders contends that his trial counsel was constitutionally ineffective.  He sets forth the following nine acts or omissions that he argues constituted ineffective performance:

1.  Failure to obtain adequate, independent mental health assistance.  (Subclaim 27(A) in Sanders' petition).

2.  Failure to investigate and obtain records related to Sanders' evaluation at the KCPC, particularly the report of Dr. Flenning on the KCPC evaluation team. (27(B)).

3.  Failure to obtain and present a videotape of Sanders, taken shortly after his arrest, which would have showed his psychological condition at the time of the murders and of his statements to police.  (27(E)).

4.  Failure to present testimony of three witnesses, Dr. John Moffitt, Roger Portwood, and Nolan Winkler, Jr., who would have testified about Sanders' psychological condition at the time of the murders and of his statements to police.  (27(F)).

5.  Failure to move to suppress Sanders' statements to police or introduce evidence of circumstances surrounding his interrogation.  (27(G)).

6.  Failure to assert marital privilege, failure to advise Sanders' wife of her testimonial privilege, and opening the door to testimony of Sanders' violence towards his wife.  (27(H)).

7.  Failure to prepare for and present mitigating evidence during the penalty phase.  (27(I)).

8.  Failure to consult with Sanders and prepare him for testifying during the penalty phase.  (27(J)).

9.  Failure to seek competency proceedings.  (27(L)).[16]

Criminal defendants enjoy the right to effective assistance of counsel guaranteed by the Sixth Amendment.   *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting

---

[16] Sanders withdrew subclaims (C), (D), (K), and (M).

*McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  In order to establish a violation of the right to effective assistance of counsel, a petitioner must demonstrate two things.  First, he must show that his attorney's performance was deficient—that it fell outside the "wide range" of professional competence. *Id.* at 689.  Courts must entertain a "strong presumption" that counsel performed reasonably. *Id.*  Second, a petitioner must demonstrate that he was prejudiced by counsel's incompetence—that but for counsel's errors, there is a reasonable probability that the results of the proceeding would have been different. *Id.* at 694.  This is a lighter showing than proof that the errors were more-probably-than-not outcome-determinative, but that is a distinction that matters "only in the rarest case." *Richter*, 131 S. Ct. at 792.  Failure to establish either prong is fatal to an ineffectiveness claim. *Strickland*, 466 U.S. at 700.  So *Strickland* sets a high bar for relief. *Richter*, 131 S. Ct. at 788 (quoting *Kentucky v. Padilla*, 559 U.S. 356, 371 (2010)).

For state prisoners, AEDPA adds a wrinkle to *Strickland*'s already-deferential inquiry for state prisoners.   Under AEDPA, federal courts only ask whether the state court reasonably applied *Strickland*. *Richter*, 131 S. Ct. at 785.  The Supreme Court refers to this as "doubly deferential." *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)).  So the Court must grant deference to the Kentucky Supreme Court's assessment of Charters' performance.  To succeed, Sanders must show that the Kentucky Supreme Court unreasonably applied *Strickland* to Sanders' claims that his trial counsel provided ineffective assistance. *Id.*

Because the Kentucky Supreme Court applied the *Strickland* framework to ineffective-assistance-of-counsel claims 1–8, its decision is not "contrary to" *Strickland*. *See Williams*, 529 U.S. at 405–06 (explaining that a state-court decision that "appl[ies] the

correct legal rule" from Supreme Court precedent does "not fit comfortably within § 2254(d)(1)'s 'contrary to' clause"). So, to obtain relief, Sanders must demonstrate that *Sanders II* was either an unreasonable application of *Strickland*, or based on an unreasonable determination of the facts. On each claim, Sanders has failed to carry his burden.

### A. Claim 27(A): Failure to obtain adequate, independent mental health assistance.

Before his trial, Sanders voluntarily submitted to a mental examination at the KCPC. Appellate Proceeding Record at 697 (Sanders' signed request for voluntary admission for a mental evaluation at the KCPC). The KCPC evaluation was comprehensive: A team of social workers, psychologists, a psychiatrist, and a neurologist observed Sanders for twenty-four hours a day over a period of six weeks. VR 6/5/87 19:13:23–19:13:40 (Tape 7 00:34:39–00:34:56) (Testimony of Dr. Walker describing the KCPC examination as a "long, six-week, 24-hour observation"). Based on the team's collective observations of and interviews with Sanders, Dr. Candace Walker, the team leader, prepared a report for the trial judge and counsel. *See* TR Direct Appeal Vol. I at 134–44 (Dr. Candace Walker's letter and the KCPC Report). The report concluded that while Sanders may suffer from a mixed personality disorder, he did not suffer from a mental disease or defect that caused him to lack substantial capacity to conform his behavior to the requirements of the law. *Id.* at 143.

Charters did not rely on the KCPC's findings to construct Sanders' insanity defense. Instead, he secured the pro bono services of Dr. Stuart Cooke, a specialist in clinical and counseling psychology. *See generally* VR 6/4/87 15:39:56–16:06:31 (Tape 6 04:06:23–04:32:56) (Testimony of Dr. Cooke). Dr. Cooke interviewed Sanders, administered an array of psychological tests, reviewed the KCPC report, and read police reports of the crimes. VR

6/4/87 15:43:45–15:46:04 (Tape 6 04:10:12–04:12:30).   Based on this information, Dr.

Cooke testified that Sanders suffered from a depersonalization disorder.   *Id.* 15:46:17–

15:47:33 (Tape 6 04:12:44–04:13:59).   He explained that this condition is marked by

dissociative episodes where Sanders would suddenly lose control of his actions.   *Id.*   In

contrast to the KCPC team, Dr. Cooke concluded that Sanders was mentally ill and could not

conform his behavior to the requirements of the law.   *Id.* 15:55:37–15:55:59 (Tape 6

04:22:03–04:22:25).

Sanders believes that his insanity defense was ultimately unsuccessful because

Charters failed to obtain the services of a paid "adequate, independent mental health" expert.

R. 73 at 216.  Sanders claims that, unlike Charters, any attorney providing "professionally

competent assistance" under "prevailing professional norms," *Strickland*, 466 at 690, would

have at the very least:  (1) used the $2,000 that Sanders allegedly earmarked for a mental

health expert to hire an expert witness instead of relying on state and pro bono evaluations,

(2) contacted the hired expert well in advance of trial instead of days before the proceeding,

and (3) provided the expert with existing documentation of Sanders' mental illness instead of

withholding that evidence.   *See* R. 73 at 217–21.   Sanders argues that Charters should have

retained experts like the three specialists who prepared reports about Sanders' mental health

for another case.   *See* R. 73 at 223 (identifying Drs. Roger H. Fisher, Glenn M. Weaver, and

Murray E. Tieger as alternative expert witnesses).   These experts agreed with Dr. Cooke's

assessment of Sanders' mental disorders.   *See* Appellate Proceeding Record at 592–611

(Report of Dr. Fisher) (concluding that Sanders suffered from depersonalization and

dissociative episodes); *Id.* at 613–18 (Report of Dr. Weaver) (observing that Sanders'

dissociative episodes demonstrate that he suffers from a major psychiatric disorder); *Id.* at

927–28 (Letter from Dr. Tieger) (concluding that Sanders may have lower levels of control and the "potential for brief psychotic episodes").

Sanders claims that Charters' failures harmed him in two ways.  First, neither the KCPC examination nor Dr. Cooke's evaluation provided him with a sufficiently strong defense-oriented mental health evaluation.  R. 73 at 225–26.  This failure, Sanders argues, deprived him of his due process right to competent psychiatric assistance in preparing an insanity defense under *Ake v. Oklahoma*, 470 U.S. 68 (1985).  *Id.*  And second, because Dr. Cooke did not have sufficient time to prepare his testimony, he invited a strong rebuttal from the state's mental health expert who called his findings into question.  *See, e.g.*, VR 6/4/87 16:01:58–16:02:06 (Tape 6 04:28:23–04:28:32) (Testimony of Dr. Cooke) (stating that he only examined Sanders for two-and-a-half to three hours); VR 6/4/87 16:02:15–16:02:23 (Tape 6 04:28:39–04:28:49) (Testimony of Dr. Cooke) (speculating about the day on which he examined Sanders); VR 6/5/87 19:13:23–19:13:40 (Tape 7 00:34:39–00:34:56) (Testimony of Dr. Walker) (describing the KCPC examination as a thorough "long, six-week, 24-hour observation").

The Kentucky Supreme Court found that Charters' actions did not deprive Sanders of his constitutional right to effective assistance of counsel.  *Sanders II*, 89 S.W.3d at 387–88. Viewed under AEDPA's deferential standard, the *Sanders II* court did not "unreasonably" interpret the "deficiency" or "prejudice" prongs of *Strickland*, or underlying facts, in reaching this conclusion.

On the record before it, the *Sanders II* court reasonably found that Charters provided competent representation under *Strickland*, although he did not retain a paid mental health expert.  Defense counsel rarely must pursue "any one . . . approach" in litigation, especially

when faced with limited resources.  *See Richter*, 131 S. Ct. at 779.  The court could therefore determine that Charters could properly devote resources to other defense efforts after learning that Dr. Cooke was willing to provide his services pro bono.  After all, Dr. Cooke conducted multiple tests just like the KCPC experts did.  *See* TR Direct Appeal Vol. I at 134–44 (indicating that the KCPC team performed "neurological and neurophysical consultations"); VR 6/4/1987 15:43:45– 15:45:05 (Tape 6 04:10:11–04:11:31) (Testimony of Dr. Cooke) (noting the multiple tests that he administered to Sanders).  And Dr. Cooke testified that he received a doctorate degree, just like the two KCPC neuropsychologists.  *See* TR Direct Appeal Vol. I at 134–44 (noting that the psychological and neuropsychological testing was performed by two specialists who held doctorate degrees); VR 6/4/1987 15:40:24–15:42:57 (Tape 6 04:06:51–04:09:23) (Voir dire of Dr. Cooke) (revealing that he received a doctorate degree in clinical and counseling psychology).  Ultimately, the decision to hire an expert is a "paradigmatic example" of the type of "strategic choic[e]" that is "virtually unchallengeable."  *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 690).  Given Dr. Cooke's qualifications and the fact that he testified that he administered multiple tests to Sanders, the *Sanders II* court could reasonably conclude that Charters was "not ineffective [for] obtaining the services of Dr. Cooke."  89 S.W. at 387.

The *Sanders II* court offered another explanation for why Charters was not ineffective in failing to secure a paid mental health expert:  The KCPC evaluation did not deprive Sanders of his right to competent psychiatric assistance.  *Sanders II*, 89 S.W.3d at 387–88.  The court found that Sanders was constitutionally entitled only to the comprehensive evaluation that he received at the KCPC—not necessarily to an evaluation conducted by

experts of his choice.  *Id.*  Without a constitutional violation, the argument goes, Charters was not obligated to pursue a remedy for that violation.  So Charters did not need to retain another mental health expert, paid or unpaid.  This reasoning is consistent with the Supreme Court's reasoning in *Kimmelman v. Morrison*.  *See* 477 U.S. 365 (1986).  There, the Court held that a defendant must first show that he experienced a constitutional violation before claiming his attorney improperly failed to remedy the constitutional violation.  *See* 477 U.S. at 382.

In concluding that Charters was not deficient for failing to secure a paid expert to remedy a non-existent constitutional violation, the Kentucky Supreme Court supplied a "reasonable argument" for why Charters was not ineffective under *Strickland*.  *Richter*, 131 S. Ct. at 788.  This justification accordingly survives the doubly deferential standard of review that AEDPA superimposes on the first prong of the *Strickland* inquiry.  *See id.*

Neither was the Kentucky Supreme Court unreasonable when it found that Sanders suffered no prejudice from Charters' failure to retain and prepare paid mental health experts. *Sanders II*, 89 S.W. 3d at 388.  Sanders argued that, but for his counsel's deficient performance, he would have relied on experts like the three who submitted reports in connection with his trial in Lincoln County.  Presenting their testimony and reports to the jury, he claimed, would have led to a different verdict in his case.  R. 73 at 231.  But the record reveals that this trio of experts would have presented the same conclusions that Dr. Cooke offered at trial.  Consistent with Dr. Cooke's testimony, Dr. Fisher concluded that Sanders suffered from depersonalization and dissociative episodes.  Appellate Proceeding Record at 592–611; VR 6/4/1987 15:46:17–15:47:33 (Tape 6 04:12:44–04:13:59).  Dr. Weaver  also  would  have  testified  about  Sanders'  dissociative  episodes.  Appellate

Proceeding Record at 613–18.  And Dr. Tieger would have testified that Sanders may have had lower levels of control and the "potential for brief psychotic episodes."  *Id.* at 927–28 (Letter from Dr. Tieger concluding that Sanders may exhibit "unpredictable outbursts of hostility").  This testimony is also consistent with Dr. Cooke's conclusion that Sanders suffered from a disorder characterized by the periodic loss of control over his actions.  VR 6/4/1987 15:46:17–15:47:33 (Tape 6 04:12:44–04:13:59).  The Kentucky Supreme Court noted that the jury rejected these substantive expert opinions related to the insanity defense. Given the identical content of these alternate experts' opinions, the Kentucky Supreme Court could reasonably have concluded these opinions, if included, would have had no impact on the trial.  Because there is no "substantial" likelihood of a different outcome, Sanders fails to demonstrate prejudice under *Strickland.*  89 S.W.3d at 388; *Richter*, 131 S. Ct. at 792.

Sanders argues that the jury would have accepted the alternative experts' opinions because they would have been paid and better prepared for cross examination. R. 73 at 231. This is a conceivable possibility, at best.  The jury might have been swayed by another expert's performance on cross examination.  But the court can only speculate about whether other "better prepared" experts would have answered questions on cross-examination any differently than Dr. Cooke did.  A conceivable difference in the trial's outcome is not enough for a court to find that a defendant was prejudiced by his counsel's alleged deficient performance.  *Richter*, 131 S. Ct. at 791–92.  Where the experts were similarly qualified and offered the same substantive testimony, the *Sanders II* court properly concluded that there was "no reason to believe" that the jury would have decided differently simply after hearing from a different mental health expert.  At the very least, given the similarities between the

expert that Charters used and the ones that Sanders wishes he had used, the decision was not an "unreasonable" interpretation of *Strickland*'s prejudice prong.

Other jurists could disagree with the Kentucky Supreme Court's determination that Charters' conduct did not violate Sanders' rights under *Strickland*.  But that is not enough to find that the court's decision was so unreasonable as to surmount AEDPA's "formidable barrier" to habeas relief.  *Titlow*, 134 S. Ct. at 15–16.  The *Sanders II* court provided logical explanations for why Charters made appropriate choices with limited resources and why presenting other experts was not substantially likely to change the outcome of this trial.  Those conclusions had ample support in the record before the *Sanders II* court.  So Sanders cannot show that the court's decision was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. at 786–77.

## B. Claim 27(B): Failure to obtain the report of Dr. Flenning on the KCPC evaluation team.

Sanders raises another ineffective-assistance-of-counsel claim related to his comprehensive evaluation at the KCPC.  *See* R. 73 at 235.  After Sanders' six-week stay at the KCPC, the team of examining professionals released a report about Sanders' mental condition to the trial judge, the prosecutor, and Charters.  *See* TR Direct Appeal Vol. I at 134–44 (Dr. Candace Walker's letter and the KCPC Report).  Dr. Candace Walker, the team leader, drafted the report based largely on her evaluation of Sanders, the observations of Sanders by nursing personnel and corrections officers, and medical test results.  In her report, Dr. Walker also summarized the conclusions that other psychologists and social workers drew from their interviews with Sanders.  *Id.*

Dr. Walker determined that Sanders did not suffer from a psychotic illness, although he appeared to have a personality disorder. She also wrote that there was "no medical evidence" that he was suffering from a mental disease or defect at the time of the crimes. *Id.* at 135. Accordingly, Dr. Walker opined that Sanders had the capacity to appreciate the criminality of his conduct and to conform his conduct to the standard of the law. *Id.* In her report, Dr. Walker noted that Sanders gave inconsistent accounts of his personal history to the different team members. *Id.* at 136. She also observed that he gave detailed accounts of the charged crimes to his evaluators. *Id.*

Dr. Walker also summarized the findings of the social worker and other psychologists who observed and interviewed Sanders. In particular, she noted that Dr. Frank Flenning talked to Sanders about the physical abuse he experienced at the hands of his parents. *Id.* at 139. Dr. Flenning and Sanders discussed how Sanders did not feel close to anyone in his family growing up. *Id.* Finally, Dr. Walker noted that Sanders told Dr. Flenning that Sanders was expected to work on the farm starting at a young age. *Id.*

Nowhere in Dr. Walker's report did she mention that Dr. Flenning also evaluated Sanders' mental health. And though Dr. Walker discussed some of Dr. Flenning's conclusions, she never mentioned that Dr. Flenning actually wrote his own report in which he arrived at a conclusion contradicting the KCPC team's finding. In his independent report, Dr. Flenning recorded four main observations. First, he found that Sanders experienced a dissociative episode before committing the crime. Appellate Proceedings at 688. Second, after analyzing Sanders' performance on a series of psychological tests, he concluded that there is "very strong evidence for an atypical psychosis." *Id.* at 691. Third, he determined that a "highly unusual type of fragmentation" had taken place in Sanders' personality, such

that he had the potential for "brief psychotic episodes wherein he would experience a loss of contact with reality." *Id.* Finally, Dr. Flenning noted that these episodes may be triggered by "unusual stresses." *Id.*

Sanders claims that Charters was so deficient in his capacity as counsel for not unearthing Dr. Flenning's report that he deprived Sanders of his constitutional right to effective representation. R. 73 at 235, 238 (citing *Strickland*, 446 U.S. at 688). The Kentucky Supreme Court disagreed. *Sanders II*, 89 S.W.3d at 386. The court noted that an effective attorney need only conduct a reasonable investigation. The investigation need not be similar to one that the best lawyer in the world would conduct were he "blessed . . . with unlimited time and resources [and] with the inestimable benefit of hindsight." *Id.*

Under the "doubly deferential" standard that AEDPA imposes on a review of *Strickland* claims, the *Sanders II* decision must stand. *See Mirzayance*, 556 U.S. at 123. There was no indication in Dr. Walker's report that Dr. Flenning had produced his own report assessing Sanders' mental health—let alone that his conclusions contradicted Dr. Walker's conclusions. Charters had no notice that Dr. Flenning would have written his own report, particularly because Dr. Walker summarized Dr. Flenning's "conclusions" and described the KCPC report as a summary of the "full psychiatric evaluation." TR Direct Appeal Vol. I at 135. Accordingly, it was reasonable for Charters not to spend his limited time hunting for Dr. Flenning's report—a document that he had no reason to believe even existed. At the very least, the Kentucky Supreme Court could reasonably find that Charters acted logically when he placed trust in Dr. Walker's summary of the KCPC findings. *Strickland*'s deficient-performance prong is not necessarily violated where a defense attorney fails to regard the prosecution with suspicion and fact-check its documents. Accordingly, the

Kentucky Supreme court's application of *Strickland* on the facts underlying this claim was not so "unreasonable" as to warrant habeas relief. *Richter*, 131 S. Ct. at 785.

### C.  Claim 27(E): Failure to present a videotape of Sanders taken shortly after the murders.

On February 3, 1987, Sanders' appointed counsel, Ernie Lewis, videotaped Sanders at the Madison County Jail.  On the tape, Sanders appears distraught and remorseful about the murders.  *See* Tape 1at 8:12–20:35.  At trial, Charters sought to admit the videotape, which remained in Lewis's possession.  *See* VR 5/22/1987 10:46:22–10:50:18 (Tape 2 07:16–11:14).  Before ruling on the motion, the trial court requested a copy of the tape.  *See* VR 5/22/1987 10:55:42–10:56:30 (Tape 2 16:38–17:25).  Lewis was apparently willing to provide it, but wanted a signed attorney-client privilege waiver before doing so.  *Sanders II*, 89 S.W.3d at 390; VR 6/1/1987 9:36:54–9:37:36 (Tape 3 37:24–38:06).  The trial court did not rule on the motion, however, because no one produced the tape.

In his first state post-conviction motion in Madison Circuit Court, Sanders alleged that Charters was ineffective for failing to secure the tape and present it at trial.  Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42 at 48–49, Madison Circuit Court, No. 87-CR-018 (Feb. 9, 1993) (TR 2 at 150).  But Sanders did not provide the videotape in his RCr 11.42 motion.  Order Denying Motion to Vacate Pursuant to RCr 11.42 at 11, Madison Circuit Court, No. 87-CR-018 (Jan. 28, 1999) (TR. 4 at 13).  After the Madison Circuit Court denied his RCr 11.42 motion, Sanders provided the tape in his motion for reconsideration.  *See* Motion to Reconsider at 1–2, Madison Circuit Court, No. 87-CR-018 (Feb. 8, 1999) (TR. 4 at 25–27).

In *Sanders II*, the Kentucky Supreme Court relied on the absence of the videotape in finding that Sanders was not entitled to relief. *Sanders II*, 89 S.W.3d at 390 ("In the absence of the tape, there is nothing to complain about related to ineffective assistance.").  It is unclear why the *Sanders II* court relied on the absence of the tape—the *Sanders II* court had acknowledged that Sanders filed a motion to reconsider, *id.* at 385, but it made no mention of the attached videotape from that motion.  Though *Sanders II* does not explain whether the videotape was part of the record before it, the Kentucky Supreme Court could have reasonably concluded that the videotape was not properly before the court because it was not introduced in the initial RCr 11.42 motion.  *See* Ky. R. Crim. P. 11.42(2); *Short v. City of Olive Hill*, 414 S.W.3d 433, 441 n.7 (Ky. Ct. App. 2013) (explaining that a motion to reconsider "cannot be used to raise arguments and introduce evidence that should have been presented during the proceedings before entry of judgment").

But regardless of whether the videotape was properly before the state court, Sanders' claim fails.  If the videotape was not properly part of the state court record, the Court may not consider the videotape on federal habeas review.  *See Pinholster*, 131 S. Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").  Without the videotape, the Kentucky Supreme Court reasonably denied Sanders' ineffective-assistance-of-counsel claim.  Sanders bore the burden of proving his claim of ineffective assistance, which included providing the relevant evidence.  *See Strickland*, 466 U.S. at 687.  If the Kentucky Supreme Court did not view the videotape, then it had no basis to find that Sanders' counsel was ineffective for failing to use it at trial.  Rather, the only conclusion the court could reach, absent the videotape, was that Sanders failed to demonstrate that his

counsel was ineffective.  The Kentucky Supreme Court reasonably denied that claim if the videotape was not included in the record before it.

Even if the videotape was part of the state record, the Kentucky Supreme Court's decision was still reasonable.  The Court applies the "doubly deferential" standard for claims of ineffective assistance of counsel.  *Pinholster*, 131 S. Ct. at 1403.  In denying Sanders' ineffective-assistance claim, the Kentucky Supreme Court relied on the fact that "[t]here is nothing in the record to indicate that the prerequisite of [an attorney-client privilege] waiver was ever produced by Sanders."  *Sanders II*, 89 S.W.3d at 390.  The court did not tie that conclusion to a specific *Strickland* prong, but the conclusion reasonably supports a finding that Charters was not deficient.  The waiver had to be signed by Sanders, not Charters. Sanders offers no evidence that Charters had any role or responsibility for Sanders' decision not to sign the waiver.  The *Sanders II* court could reasonably find that the question of whether to sign the waiver was left to Sanders and that Sanders' apparent decision not to sign the waiver does not render Charters' assistance ineffective.  According to Sanders' brief, Charters must be responsible for the absence of the waiver because Sanders provided the videotape (and, presumably, the waiver) in his post-conviction proceeding.  R. 73 at 252. But Sanders may not have wanted to disclose the videotape at trial, and then changed his mind after his conviction and death-penalty sentence.  These scenarios are admittedly speculative; but Sanders bore the burden of proving the contrary.  All this information is known to Sanders, yet he has not attached an affidavit or declaration attesting that he did or would have signed the waiver during his trial.  Because the waiver had to be signed by Sanders, not Charters, it was reasonable for the Kentucky Supreme Court to conclude that the

lack of a signed waiver by Sanders—without any explanation of its absence—precluded a finding that his counsel provided ineffective assistance.

### D. Claim 27(F): Failure to investigate and present testimony from three witnesses.

After Sanders' arrest on February 2, 1987, he was placed on suicide watch in the Madison County Jail.   According to Sanders, three witnesses had relevant testimony regarding his emotional and mental state immediately after his arrest:  Deputy jailers Roger Portwood and Nolan Winkler, Jr. could have testified that Sanders was in tears, begged to speak with someone, beat his head against a wall, and expressed remorse for the murders. And Dr. John Moffitt, a psychiatrist who treated Sanders on February 3 and 4, could have testified that Sanders was emotionally distraught, suicidal, and might have been suffering from a serious psychiatric disorder.  R. 73 at 254–55.

Sanders argues that Charters performed deficiently by failing to speak with these potential witnesses and present their testimony at trial.   Sanders does not analyze the witnesses' testimony separately, but rather asserts that that the absence of their testimony was prejudicial for two reasons:  First, their testimony would have bolstered Sanders' insanity defense.   Second, it would have aided in mitigation by demonstrating Sanders' remorse and diminished mental capacity.  *See* R. 73 at 256–57.

The Kentucky Supreme Court denied relief on this claim in *Sanders II*.  89 S.W.3d at 391.  The court stated that Sanders had testified "extensively" about his emotional state and suicidal tendencies, so any additional testimony from the jailers or Dr. Moffitt would have been cumulative.  *Id.*  Citing one of its prior decisions, *Hodge v. Commonwealth*, 17 S.W.3d

93

824, 852 (Ky. 2000), the court determined that Sanders was not prejudiced by the failure to present cumulative testimony.  *Id.*

Sanders is not entitled to habeas relief on this *Strickland* claim because he provides no evidence that the witnesses would have testified at trial to what Sanders alleges in his brief. At a minimum, an affidavit from the witnesses or other evidence is necessary to confirm the content of their alleged testimony.  *See United States v. Allen*, 254 F. App'x 475, 478 (6th Cir. 2007) (declining to reach a claim of ineffective assistance where petitioner did not provide any "affidavits from the persons who would have potentially served as witnesses indicating the probative value of their testimony."); *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) ("In the absence of any evidence showing that [the uncalled witnesses] would have offered specific favorable testimony, [the petitioner] cannot show prejudice from counsel's strategy recommendation not to introduce this evidence.").  Courts must rely on evidence, not the type of unsupported claims that Sanders provides in his brief about the witnesses' possible testimony.  In the absence of any evidence showing that the witnesses would have actually supported Sanders' insanity defense or any other part of Sanders' defense, Sanders' claim fails.  The Kentucky Supreme Court reasonably concluded that Sanders failed to prove that Charters' performance was deficient or that there is a reasonable probability the witnesses' testimony would have changed the outcome of the trial or sentencing phase.

In an abundance of caution, the Court could view the letters from Dr. Moffitt to Sanders' initial counsel and to the court as evidence of the testimony that Moffitt would have presented at trial—one of the letters is notarized.  In those letters, Moffitt wrote that Sanders was "possibly homicidal" and suicidal and that Sanders might be suffering from a

94

"dissociative disorder."  Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42, Exhibit 5, Madison Circuit Court, No. 87-CR-018 (Feb. 9, 1993) (Exhibits PDF at 252–53).  In both letters, Moffitt recommended that state psychiatrists evaluate Sanders.  *Id.* But Moffitt was not making a diagnosis in his letter.  Instead, he recommended that Sanders receive a full battery of psychological tests.  Both the KCPC and Dr. Cooke administered those tests to Sanders, and the parties presented their results to the jury.  Nothing Moffitt wrote in his letters conclusively says that Sanders had a mental defect or contradicts Dr. Walker's testimony.  Without any affirmative diagnosis from Moffitt, the Kentucky Supreme Court could reasonably find that Charters reasonably determined that the testimony would not have aided Sanders' mitigation defense.  Additionally, Charters might not have wanted Moffitt to testify that Sanders was "possibly homicidal."  Under the double-deference standard, the Kentucky Supreme Court was reasonable in concluding that Charters was not deficient for not calling Moffitt to testify.

Sanders also makes a cursory request for an evidentiary hearing, stating only that the Court should "hold an evidentiary hearing if it is at all inclined to give [the government's argument that the testimony of the witnesses would have harmed Sanders] any weight."  R. 96 at 143.  Sanders does not request a hearing on this issue in general, nor does he attempt to meet the high threshold to obtain a hearing outlined in 28 U.S.C. § 2254(e)(2).  *See Pinholster*, 131 S. Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").  Accordingly, Sanders has not demonstrated that a hearing is warranted.

### E.  Claim 27(G): Failure to suppress or mitigate Sanders' pre-trial confession.

Between January 31 and February 3, 1987, police spoke to or interrogated Sanders several times.  According to Sanders, four of those conversations took place on January 31. Sanders was *Mirandized*, signed a waiver of his *Miranda* rights, and did not implicate himself in any criminal activity at that time.  *See* R. 73 at 259; Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42, Exhibit 3, Madison Circuit Court, No. 87-CR-018 (Feb. 9, 1993) (Exhibits PDF at 109–37).

On February 2, just before 6:00 p.m., police interviewed Sanders again.  He was *Mirandized*, informed that he was a suspect in a murder and robbery investigation, signed a written waiver of his *Miranda* rights, and began answering questions from the police. Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42, Exhibit 3, Madison Circuit Court, No. 87-CR-018 (Feb. 9, 1993) (Exhibits PDF at 109, 138–39).  During that interrogation, Sanders admitted that he was at the gas station where Brandenburg and Hatch were murdered around the time that they were killed, but he repeatedly denied killing the two men.  Officers pushed back on his story, noting the obvious problem: if Sanders was there when the men were shot, but did not shoot them, then someone else must have done it, and Sanders surely saw who it was.  *Id.* (Exhibits PDF at 163–64).  Sanders resisted, insisting that he was alone at the gas station, but nevertheless did not kill Brandenburg and Hatch.  *Id.* (Exhibits PDF at 165–75).  Police insisted Sanders was lying and told him to confess.  *Id.* The back-and-forth continued for just over an hour.  At 7:05 p.m., the police turned off the recording of the interrogation.  *Id.* (Exhibits PDF at 182).  There is no information regarding how long the tape was off, but after the break, Sanders' tone changed.  He stated that he picked up a hitchhiker, Donald Saylor, who then pulled a gun on him.  *Id.* (Exhibits PDF at

182–85).  After repeated denials from Sanders and pushback from the police, Sanders finally said he killed Saylor—insisting it was in self-defense.  *Id.* (Exhibits PDF at 186).  He told police that Saylor robbed the convenience store and killed Brandenburg and Hatch.  Over the course of the interrogation, he told police that Saylor shot a woman at a store in nearby Lincoln County as well.  *Id.* (Exhibits PDF at 204).  By the end of the interview, Sanders broke down and admitted that he and Saylor robbed the gas station—but that Saylor made him do it.  *Id.* (Exhibits PDF at 194).  At one point, Sanders asked the detectives "Can you give me a few minutes?"  Detective Benton responded "No."  *Id.* (Exhibits PDF at 203).  Later, Sanders told the detectives that Saylor shot Brandenburg, but Sanders shot Hatch.  *Id.* (Exhibits PDF at 206).  Then Sanders reiterated that he killed Saylor, specifically on the previous Wednesday.  *Id.* (Exhibits PDF at 221).  At that point, police informed Sanders that Saylor was not killed until Thursday—Sanders nevertheless insisted that he shot Saylor on Wednesday.  *Id.* (Exhibits PDF at 223).

At 12:01 a.m. on February 3, Sanders asked to speak to the police.  He was again *Mirandized*.  *Id.* (Exhibits PDF at 228).  Before Detective Benton finished reading Sanders his rights, Sanders interjected "I want to talk to you."  *Id.* (Exhibits PDF at 229).  Benton asked Sanders directly "do you want a lawyer?"  Sanders said no.  *Id.*  Sanders again signed a waiver of his rights.  *Id.*  During that interrogation, Sanders denied killing Saylor—he went so far as to say that he had never heard of Donald Saylor.  *Id.* (Exhibits PDF at 231).  But he admitted to both the Lincoln County and the Madison County shootings.  *Id.* (Exhibits PDF at 231–32, 234).

At trial, Detective Benton recounted Sanders' confession and highlighted the inconsistencies in his statements.  The Commonwealth used this testimony to paint Sanders

as manipulative and deceptive.  Charters did not move to suppress Sanders' interrogation statements.  According to Sanders, Charters' failure to move to suppress the interrogation statements amounted to constitutionally ineffective aid.  R. 73 at 269–76.

Again, Sanders must overcome the double-deference standard for ineffective-assistance-of-counsel claims.  In the specific context of counsel's alleged failure to file a suppression motion, *Kimmelman v. Morrison* sets out the relevant inquiry.  477 U.S. 365, 375 (1986).  So Sanders must show that the Kentucky Supreme Court unreasonably applied *Kimmelman*.  Under *Kimmelman*, a petitioner challenging the effectiveness of his attorney for failing to move to suppress evidence must demonstrate that, in addition to the regular *Strickland* prongs, (1) the underlying motion is meritorious and (2) there is a "reasonable probability" that the verdict would have been different absent the excludable evidence.  *Id.* In determining prejudice, "the court must consider the totality of the evidence before the judge or jury."  *Id.* at 381 (quoting *Strickland*, 466 U.S. at 695).  On habeas review, the Court looks only at whether the Kentucky Supreme Court reasonably applied *Kimmelman* and *Strickland*.

The Kentucky Supreme Court denied relief for lack of prejudice.  *Sanders II*, 89 S.W.3d at 386–87.  The court held that a motion to suppress would have been unsuccessful because Sanders' requests to stop the questioning or talk to a lawyer did not "even rise to the level of being 'equivocal.'"  *Id.* at 387.  Sanders' arguments that his statements were involuntary were "conclusory and unsupported."  *Id.* at 386.  But even if the statements had been suppressed, the court still concluded that "the outcome of the trial would not have been different" in light of the other evidence presented a trial.  *Id.*

According to Sanders, his statements were not voluntary because his statements were the product of "coercive, insistent questioning." R. 73 at 271. He also claims that his *Miranda* waivers on February 2 and 3 were not knowing and voluntary. *Id.* at 270–74.

The *Sanders II* court reasonably found that the suppression motion would not have been successful, and thus that Sanders did not suffer any prejudice from his counsel's failure to file the suppression motion. *See Premo v. Moore*, 131 S. Ct. 733, 741 (2011) (concluding that where "suppression would have been futile," it was reasonable for the state court to conclude that counsel's "representation was adequate"). The court reasonably concluded that the motion would have been futile because Sanders' statements to the police were voluntary. In assessing voluntariness, the question is "whether a defendant's will was overborne in a particular case." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Courts must consider the "totality of all the surrounding circumstances" including the "characteristics of the accused and the details of the interrogation." *Id.*

Here, the *Sanders II* court held that Sanders' contention that his statements were involuntary "due to his state of mind is conclusory and unsupported." *Sanders II*, 89 S.W.3d at 387. In his briefing before the Court, Sanders only alleges that his "mental condition deteriorated during the time the tape recorder was turned off." R. 73 at 271. Sanders, however, must rely on more than his alleged deteriorating mental state to make a claim of involuntariness. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (concluding that "a defendant's mental condition, by itself and apart from its relation to official coercion" may not "dispose of the inquiry into constitutional 'voluntariness'"). Here, there is no evidence of "the crucial element of police overreaching." *Id.* at 163. Sanders does not identify what acts by the police went beyond normal police-interrogation tactics. *See id.* at 163 n.1 (identifying

acts such as holding gun to defendant's head, interrogating for 36 hours without sleep, or interrogating for several days with little food as examples of police overreach).  Absent any evidence of actual coercion, the Kentucky Supreme Court reasonably concluded that Sanders' statements to the police were voluntary.

The Kentucky Supreme Court also reasonably concluded that Sanders knowingly and voluntarily waived his *Miranda* rights.  Sanders signed a *Miranda* waiver on February 2, 1987, at 5:56 p.m.  Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42, Exhibit 3, Madison Circuit Court, No. 87-CR-018 (Feb. 9, 1993) (Exhibit PDF at 110).  When questioning resumed at 12:01 a.m. on February 3, 1987, Detective Benton again read Sanders his *Miranda* rights, and Sanders waived those rights both orally and in writing.  *Id.* (Exhibit  PDF at 228).  The Supreme Court has stated that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity that waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  Here, the Kentucky Supreme Court found both express oral and written waivers.  Based on those findings, the Kentucky Supreme Court reasonably concluded that a suppression motion would not have been successful.

Sanders contends that even if the initial waivers were voluntary, he later invoked his right to remain silent.  According to Sanders, his question to the detectives—"Can you give me a few minutes?"—was an unequivocal assertion of his right to remain silent.  The Kentucky Supreme Court reasonably determined that the question was not an unequivocal assertion.  *Cf. Davis v. United States*, 512 U.S. 452, 462 (1994) (holding that defendant's statement—"Maybe I should talk to a lawyer"—was not an unequivocal request for counsel); *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (noting no "principled reason to adopt

different standards" for invoking right to remain silent and right to counsel).  Sanders never explicitly stated that "he wanted to remain silent or that he did not want to talk with police." *Id.*  Requesting a break for "a few minutes" does not suggest that Sanders desired to completely cut off questioning.  Reasonable jurists could find that asking for "a few minutes" necessarily implies that Sanders wanted to continue talking with police, but just wanted a pause.  Because reasonable jurists would find that Sanders' question was not an unequivocal invocation of the right to remain silent, the Kentucky Supreme Court reasonably concluded that he did not invoke that right and that the suppression motion would not have been successful.    Accordingly,  the  court  reasonably  denied  the  claim  that  Charters  was constitutionally ineffective for not moving to suppress Sanders' statements from his conversations with the police.

### F.  Claim 27(H): Failure to assert or advise on marital privilege and opening the door to "wife beating" testimony.

Sanders' wife testified during the Commonwealth's case-in-chief.  For approximately twenty minutes, Debbie Lynn Sanders painted a picture of the defendant that stood in stark contrast to the image that the prosecution cultivated over the course of the trial.  *See* VR 6/3/1987  13:44:09–14:03:18  (Tape  5  03:21:23–03:40:30).    Mrs.  Sanders  highlighted  her spouse's character as a caring husband, loving father, and hard worker who experienced a rare dissociative episode that left him plagued by guilt.  *Id.*

During the Commonwealth's direct examination, Mrs. Sanders primarily recounted the  events  that  transpired  on  the  day  Sanders  committed  his  crimes.    Throughout  her testimony, however, Mrs. Sanders indicated that she did not think that Sanders was guilty of any crime.  *See* VR 6/3/1987 13:48:58–13:49:06 (Tape 5 03:26:12–03:26:20) (noting that she

removed Sanders' vest from his vehicle after the police came by to question her about the crimes because she "knew David hadn't done anything"); *Id.* at 13:50:42–13:50:47 (Tape 5 03:27:56–03:28:01) (volunteering testimony about how she would have "sworn" that her husband had "nothing to do with [the crimes] whatsoever"); *Id.* at 13:51:49–13:52:20 (Tape 5 03:29:03–03:29:34) (recalling that she could not properly drive or sleep after the police questioned her because she was so upset).

On cross-examination, Charters asked Mrs. Sanders whether her marriage was a happy one; she said it was. Mrs. Sanders narrated how at the beginning of their marriage, Sanders calmly dealt with her ex-husband, who came by the house armed and drunk. *Id.* at 13:56:55–13:56:59 (Tape 5 03:34:08–03:34:12). On one occasion, the ex-husband even struck Sanders. But Sanders did not harm the ex-husband in any way. *Id.* at 13:57:10–13:57:24 (Tape 5 03:34:24–03:34:38). She also noted that Sanders was "the only father [her daughters] know" and that she had no reason of any kind to believe that he was capable of becoming involved in criminal behavior. *Id.* at 13:57:40–13:58:00 (Tape 5 03:34:53–03:35:13). Indeed, Mrs. Sanders testified that she had guessed that other people must have gotten access to Sanders' truck to plant evidence of a crime because there was "no way" that he could hurt anyone or "do anything against anyone." *Id.* at 13:58:07–13:58:28 (Tape 5 03:35:20–03:35:42). Mrs. Sanders described their family life positively. The family did not lack for material things and was financially stable. Sanders did not drink or do drugs. He played with the girls and played a little bit of basketball. The Sanders family would often watch rented movies together. *Id.* at 13:58:29–13:59:27 (Tape 5 03:35:43–03:36:40).

On redirect, the Commonwealth honed in on the "happy marriage" statement and asked if the Sanders' marriage had been violence-free. Mrs. Sanders then testified to two

incidents of violence that occurred over the space of two days.  One evening while driving, Sanders struck Mrs. Sanders and knocked her from the middle seat of the truck into the back seat—she indicated that she thought it was "[her] fault" because she had grabbed the steering wheel.  VR 6/03/87 13:59:56-14:00:12 (Tape 5 03:37:09–03:37:25).  The following day, Sanders attempted to smother her with a pillow in an incident that lasted "probably an hour." *Id.* at 14:00:14–14:00:1426 (03:37:27–03:37:39).

On re-cross, Charters allowed Mrs. Sanders to explain the context behind the violent incidents.  She noted that the first altercation occurred while the family was coping with a stressful situation.  On New Year's Eve, Mrs. Sanders' sister accused Mrs. Sanders' ex-husband of raping Mrs. Sanders' niece—that is, the sister's daughter.  Mrs. Sanders, her sister, and Sanders promptly drove the victim to the hospital for an examination.  *Id.* at 14:00:56–14:01:15 (Tape 5 03:38:08–03:38:28).  After staying up until "four in the morning," Mrs. Sanders explained that she and her sister began to argue.  Her sister wanted to kill Mrs. Sanders' ex-husband, while Mrs. Sanders explained that they were not even sure whether the ex-husband had committed a crime.  *Id.* at 14:01:17–14:01:33 (Tape 5 03:38:30–03:38:46).  Mrs. Sanders explained that her grabbing the steering wheel from Sanders during this argument scared him, so he pushed her to the back seat of the truck.  *Id.* at 14:01:39–14:01:46 (Tape 5 03:38:52–03:38:59).  She testified that Sanders told her to calm down and stop fighting.  Sanders also told Mrs. Sanders that she would not resolve anything or find out what really happened by arguing.  *Id.* at 14:02:12–14:02:24 (Tape 5 03:39:25–03:39:37).

Mrs. Sanders testified that the second violent incident was a continuation of the previous day's turmoil.  Mrs. Sanders explained that she was going "back and forth" with Sanders about the previous day's argument in the truck.  *Id.* at 14:01:52–14:02:04 (Tape 5

03:39:05–03:39:17).  All of a sudden, he began to smother her.  Mrs. Sanders noted that Sanders was not able to explain how or why it happened and that he hated himself for acting the way he did.  *Id.* 14:02:47–14:02:52 (Tape 5 03:40:00–03:40:04); *id.* at 14:02:52–14:02:57 (Tape 5 03:40:05–3:40:10).  Within a split second, she testified, Sanders stopped what he was doing.  He then cried "uncontrollably," and Mrs. Sanders went to comfort him. *Id.* at 14:02:33–14:02:47 (Tape 5 03:39:46–03:40:00).  Mrs. Sanders described how Sanders expressed extreme contrition for his actions and contemplated suicide.  Immediately after he stopped pinning her down, Sanders found a pistol and said he would shoot himself because "he didn't think a man should ever hit a woman."  *Id.* at 14:02:58–14:03:10 (Tape 5 03:40:11–03:40:23).

Sanders argues that Charters erred in two ways with respect to Mrs. Sanders' testimony, rendering his assistance ineffective.  Charters should have advised the couple about the marital testimonial privilege so that she could have refused to testify against Sanders.  And Charters should not have inquired about the Sanders' marriage during cross-examination, thereby opening the door for the prosecution to ask about the "highly prejudicial" incidents of domestic violence.  R. 73 at 277.  Sanders contends that Charters' behavior not only fell outside the wide range of actions that signify professional competence, but also negatively impacted both the guilt and sentencing phases of trial.  R. 73 at 278–81.

### 1) Marital Testimonial Privilege

Sanders does not develop any argument as to why Charters' failure to advise Sanders or Mrs. Sanders of the marital testimonial privilege constitutes deficient performance.  Besides referring to the issue in the heading of his habeas petition, he offers no cases or reasoning to support his argument.  Claims that are "adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived." *Taylor v. McKee*, 649 F.3d 446, 452 (6th Cir. 2011) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir.1996)).   Accordingly, Sanders has abandoned this portion of his ineffective assistance claim.   But Sanders may have done so for good reason.   Sanders, for example, never explains how Charters' failure to advise a non-client—Mrs. Sanders—violated his duty to his actual client—Sanders.   So Sanders does not show how Charters acted contrary to an "objective standard of reasonableness" by failing to advise a non-client of an evidentiary privilege.   *Strickland*, 466 at 688.   And for the reasons given below, it made sense for Sanders not to assert the privilege himself.

### 2)  Incidents of Domestic Violence

The *Sanders II* court found that Charters' decision to question Mrs. Sanders about her marriage was reasonable and, accordingly, did not deprive Sanders of his right to effective assistance of counsel.   89 S.W.3d at 391.   The court held that Charters actually used Mrs. Sanders' testimony to his advantage because she explained the violent incidents "so as to be consistent with the insanity defense."   *Sanders II*, 89 S.W.3d at 391.

Based the record before it, the *Sanders II* court was not unreasonable in determining that Charters' line of questioning was an appropriate tactic.   Charters could have properly decided to ask Mrs. Sanders detailed questions about her marriage on cross-examination after seeing how favorable her opinion of Sanders was on direct.   After all, Mrs. Sanders was a prosecution witness, yet she volunteered testimony on direct indicating that she did not think that Sanders could possibly have committed the offense.   *See* 13:50:42–13:50:47 (Tape 5 03:27:56–03:28:01).   And Charters could appropriately have sought to reveal the incidents of domestic violence in order to establish that Sanders experienced dissociative episodes.   Mrs.

Sanders' testimony revealed that Sanders:  (1) did not know why he had struck her, (2) cried uncontrollably immediately after doing so, and (3) wanted to kill himself out of remorse.  VR 6/3/1987 14:02:33–14:02:47 (Tape 5 03:39:46–03:40:00); *id.* 14:02:58–14:03:10 (Tape 5 03:40:11–03:40:23).   These facts exactly mirror the description of Sanders' behavior immediately following the murders in this case.  *See* VR 6/4/1987 13:00:27–13:01:37 (Tape 6 01:41:50–01:43:00) (Testimony of David Sanders indicating that he did not know why he shot the convenience store clerk as he had no reason to do so); *id.* at 13:25:53–13:26:33 (Tape 6 02:07:14–02:07:54) (noting that he felt "the same way" as he did when he committed the first shooting at the convenience store when he shot the clerk and customer at the second convenience store); *id.* at 13:46:09–13:46:33) (Tape 6 02:27:28–02:27:52) (testifying that he didn't know why he was crying after the shootings); *id.* at 14:00:09–14:00:59 (Tape 6 02:41:28–02:42:17) (stating that he felt like he "had to die" when he was in jail because he committed the convenience store shooting).  Mrs. Sanders' poised and clear testimony accordingly aided the defense in developing its case.

True, another defense attorney may have pursued a different line of questioning during the trial.  The attorney may have thought it was unwise to invite testimony about incidents of domestic violence just to show that Sanders suffered from a mental illness.  But simply because another attorney may have acted differently does not indicate that Charters' behavior, in this instance, fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 689.  In any case, the *Sanders II* court would not have been unreasonable in arriving at this conclusion.  *Strickland*'s deficiency inquiry gives courts wide "leeway" in evaluating whether an attorney provided competent representation.  *Richter*, 131 S. Ct. at 786.  And the facts do not indicate that it was patently unreasonable for Charters to ask Mrs.

Sanders to paint a more detailed picture of Sanders—even a picture that would reveal both his strengths and his vulnerabilities. Under this "doubly deferential" evaluation of Charters' conduct and in light of Mrs. Sanders' testimony, Sanders is not entitled to habeas relief on this claim.

The *Sanders II* court did not address whether Charters' improper questioning prejudiced Sanders at the sentencing phase of trial. However, because the court completely denied all relief, it necessarily adjudicated all the components of this claim in a manner that would also deny habeas relief. *See Richter*, 131 S. Ct. at 785 (holding that a state court need not give reasons before its decision can be deemed to have been "adjudicated on the merits"). The Court may therefore determine "what arguments or theories supported, or could have supported, the state-court decision" and then ask whether it is possible that "fair-minded jurists" could disagree that those arguments or theories are inconsistent" with Supreme Court precedent. *Id.* at 778.

Sanders argues that the wife beating testimony made him look like a future danger. He cites a number of social science studies that suggest future dangerousness tends to aggravate the jury and increase the likelihood of a death sentence. But Sanders does not establish that it made the difference in *this* case. Sanders ignores the fact that the jury found two aggravating factors to support recommending the death penalty: (1) the crime was committed during a 1st-degree robbery, and (2) the crime resulted in multiple deaths. VR 06/26/87 at 10:04:25–10:04:45 (Tape 9 at 00:04:26–00:04:46). Both aggravating factors were inherent in the conviction itself. Either one would have supported the death penalty by itself. Neither factor turned on whether Sanders had ever struck his wife.

Attorneys may disagree about whether Charters should have questioned Mrs. Sanders in a manner that revealed more information about Sanders' family life. But that disagreement would not change that fact that Charters' choice fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. At the very least, the Kentucky Supreme Court could find that Charters' trial strategy did not rob Sanders of his right to effective counsel. Because this is not a case where the court's decision was so unsupported by the record that there was "no possibility for fairminded disagreement," habeas relief is unwarranted. *Titlow*, 134 S. Ct. at 12.

## G. Claim 27(I): Failure to prepare for the penalty phase.

Sanders asserts that Charters conducted no mitigation investigation and presented less than 10 minutes of evidence during the penalty phase of the trial. Had Charters engaged in any meaningful preparation, Sanders argues, Charters would have interviewed Sanders' mother, brothers, grandparents, wife, relatives, friends, and clergyman. All of them could have given significant mitigation testimony. *See* R. 73 at 318 (claiming that Sanders' family members "could have testified to a wealth of mitigation, including the physical abuse Sanders suffered as a child").

The *Sanders II* court rejected this claim on procedural grounds. *See* 89 S.W. 3d at 390. The court concluded that Sanders' allegations of ineffective assistance were too vague and devoid of factual support to satisfy "the standards required by RCr 11.42(2)." *Id.* RCr 11.42(2) required Sanders to "state specifically the grounds on which the sentence is being challenged" and identify the facts on which he relies for support. The court pointed out that Sanders did not indicate what testimony his various relations, friends, and clergyman would have offered. *Sanders II*, 89 S.W.3d at 390. Because the Kentucky Supreme Court found

Sanders failed to comply with a procedural pleading rule, the court summarily dismissed his claim. *Id.*

The Court may address the merits of a claim only where (1) the Kentucky Supreme Court's decision "fairly appears to rest *primarily* on federal law," (2) the decision appears to be "interwoven with the federal law," or (3) the "adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (emphasis added). Sanders argues that the Kentucky Supreme Court did not exclusively rely on state procedural grounds to resolve this ineffective-assistance claim, so the Court can reach the merits here. *See* R. 96 at 156–59. But the Court cannot adjudicate a claim on the merits just because the state court discussed both federal and state procedural law in its opinion.

The text of *Sanders II* reveals that the Kentucky Supreme Court did not rest its decision "primarily" on federal law. The court repeatedly referred only to RCr 11.42 to support its conclusion that Sanders made vague and general allegations insufficient to warrant habeas relief. 89 S.W.3d at 390. The court also cited two Kentucky Supreme Court cases interpreting RCr 11.42. *Id.* Neither did the court interweave federal and state law in arriving at its decision. Although the court made a passing, one-word reference to *Strickland*, the court did so only to explain that Sanders should have pled "specific facts" to support each prong of the *Strickland* test. *Id.* Taken as a whole, there is no ambiguity that the Kentucky Supreme Court relied primarily on RCr 11.42 in resolving Claim 27(I). *Cf. Haliym v. Mitchell*, 492 F.3d 680, 693 (6th Cir. 2007) (determining that the state court primarily relied on federal law to resolve a claim where the court "explicitly stated that it was adjudicating the claim on the merits" and expressly declined to rule on state procedural

109

grounds). So there is no "good reason to question whether there is an independent and adequate state ground" supporting the Kentucky Supreme Court's decision. *O'Guinn v. Dutton*, 88 F.3d 1409, 1422 (6th Cir. 1996) (quoting *Coleman*, 501 U.S. at 739). Accordingly, Sanders procedurally defaulted on Claim 27(I).

Absent an adequate showing that Sanders may overcome his procedural default, the Court is barred from entertaining the claim. *Burroughs v. Makowski*, 282 F.3d 410, 413 (6th Cir.) *modified on reh'g*, 35 F. App'x 402 (6th Cir. 2002). Sanders argues that he had cause for procedurally defaulting on his ineffective assistance of trial counsel claim. R. 96 at 158–59; *Coleman*, 501 U.S. at 750 (permitting federal habeas courts to excuse procedural default for cause and prejudice resulting from the default). He points to the incompetence of his initial-review collateral attack counsel—the ones who prepared the RCr 11.42 motion. The incompetence of initial-review collateral attack counsel can provide cause for procedural default in some instances on claims for ineffective assistance of trial counsel. *See Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1318–21 (2012)). But Sanders has not met his burden to demonstrate cause in this case. *See id.* (requiring a petitioner to show, among other things, that the "state procedural framework . . . makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim for ineffective assistance of trial counsel on direct appeal").

Even if Sanders pled all the requirements for excusing procedural default under *Martinez* and *Trevino*, the Court cannot decide his claim. Why? Because the Court faces the same problem the Kentucky Supreme Court faced. Sanders failed to attach any affidavits to his habeas petition to show what mitigation testimony his family members, friends, or clergy would have offered. *See United States v. Bass*, 460 F.3d 830, 839 (6th Cir. 2006) (finding

that a court properly declined to hold a hearing on the issue of uncalled witnesses when the defendant failed to provide affidavits and relied only on his counsel's bare assertion of what the testimony would include). And absent such evidence, the Court would have no basis to determine that Sanders was prejudiced by his counsel's failure to introduce testimony from other mitigation witnesses. *See Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) (noting that the petitioner could not show prejudice when his counsel failed to introduce affidavits or other evidence of what potential witnesses would say at the hearing). For these reasons, the Court cannot resolve Sanders' ineffective-assistance claim on the merits.

### H. Claim 27(J): Failure to consult with and prepare Sanders to testify during sentencing.

During the trial, the prosecutor broached the subject of an instruction on Sanders' right not to testify. The court then recalled a recent case where the defendant alleged the trial was unfair because he was not apprised of his right *to* testify. Seeking to avoid a similar problem, the court held a conference in chambers to advise Sanders of his right to testify. VR 06/08/87 at 09:22:40–09:23:05 (Tape 8 at 00:28:13–00:28:37). During that conference, the court asked Sanders if he was aware that he had the right to testify; Sanders said that he was aware because Charters had told him. *Id.* at 09:23:40–09:24:12 (00:29:12–00:29:44). The court then asked if Sanders wanted to testify; Sanders said that he did not know. *Id.* at 09:24:12–17 (29:44–49). The court then directed Sanders to talk to his attorney. Sanders and Charters went off to a side room to talk for about three minutes. When they returned, Charters informed the court that Sanders would testify for "a few moments." VR 06/08/87 at 09:22:25–09:27:40 (Tape 8 at 00:27:57–00:33:12).

Right after the chambers conference, Sanders took the stand.  *See generally* VR 06/08/87 at 09:28:15–09:36:00 (Tape 8 at 33:47–41:32).   Charters did not ask many questions, largely leaving Sanders to say whatever he felt he needed to.   Sanders cried through most of his testimony.  He said that he understood that he had been found guilty, but felt that in a bigger sense, he was not guilty.  He said that he did not understand what happened or what was happening to him, but he knew something was wrong.  He stated that he asked for help from his attorneys and from the KCPC, to no avail.  When asked if he would cooperate with treatment, his response was to complain at length about the KCPC.  He denied having any financial motivation to commit the murders and reiterated his need for mental health help.   After this went on for about eight minutes, Charters asked the Commonwealth if it had any questions.   The Commonwealth did not.   VR 6/8/1987 09:35:51–09:35:56 (Tape 8 00:41:22–00:41:27).  The court promptly excused Sanders from the stand.  VR 06/08/87 at 09:28:15–09:36:00 (Tape 8 at 33:47–41:32).

Sanders alleges that Charters performed deficiently by (1) failing to advise him of his right to testify and (2) failing to prepare him before he took the stand.  The Kentucky Supreme Court found that Sanders "did not present anything but speculation" to argue that Charters did not apprise him of his right to testify or prepare him to take the stand.  *Sanders II*, 89 S.W.3d at 391.  Accordingly, the court denied relief.  *Id.*  For the reasons below, the Kentucky Supreme Court's decision on each of these points was a reasonable application of the *Strickland* standard.

### 1)  Failure to Advise of Right to Testify

Sanders stated on the record that Charters informed him of his right to testify.  *See* VR 09:23:40–09:24:12 (00:29:12–00:29:44).  So the *Sanders II* court did not unreasonably

determine that Charters informed Sanders of his rights—indeed, the record supports that conclusion.   Because Charters informed Sanders of his right to testify, the Kentucky Supreme Court could reasonably find that Charters rendered constitutionally competent representation.   Under the "doubly deferential" standard that AEDPA imposes on the *Strickland* inquiry, Sanders is not entitled to relief on this ground.

### 2)  Failure to Prepare Before Testifying

Sanders argues that Charters rendered constitutionally deficient representation by not adequately preparing him to take the stand.  Competent counsel, Sanders says, would have talked to him at length about the decision to testify and requested a recess to prepare him. Sanders also claims Charters failed to prepare him any time before the day he testified, as diligent counsel would do.  R. 73 at 321.   Furthermore, Sanders did not testify about his remorse, his numerous head injuries, or his childhood abuse.  This allowed the prosecutor to highlight his lack of remorse.  R. 73 at 323–25.  In his federal habeas petition, Sanders argues that this error was prejudicial because Sanders' unprepared testimony alienated the jury by denying his guilt and shifting blame for his problems to KCPC.

But Sanders did not make such a prejudice argument before the Kentucky Supreme Court.  Indeed, the focus of his petition is to argue that Charters was ineffective for spending just three minutes with him right before his testimony.  *See* Appellate Proceeding Record at 1372–74.  And in making that argument, Sanders did not say what Charters could or should have said to him.  He did not even disclose what Charters *did* say during their brief conversation.  He simply insisted that Charters should have spent more time with him without any indication of what that would have accomplished.

Sanders' pleading deficiencies are fatal to his claim.  In order to succeed on his *Strickland* claim, Sanders had to argue both that Charters was ineffective and that Sanders suffered prejudice from the deficient legal representation.  He did not set forth any argument to establish the "prejudice" prong of the *Strickland* test.  So the Kentucky Supreme Court could reasonably have found that he did not meet his burden of proof to satisfy the pleading requirements of RCr 11.42.  Given his failure to establish both prongs of the *Strickland* test, the *Sanders II* court could reasonably have denied habeas relief.  *See, e.g.*, *Cornwell v. Bradshaw*, 559 F.3d 398, 415 (6th Cir. 2009) (holding that a petitioner who failed to bear his burden to demonstrate prejudice under *Strickland* was properly denied habeas relief, given AEDPA's deference to state court decisions).  For this reason, the Court cannot grant Sanders habeas relief on Claim 27(J).

### I.   Claim 27(L): Failure to seek competency proceedings.

In his direct appeal brief, Sanders argued that the trial court erred in failing to order a competency hearing before his trial and his sentencing.  *See* Appellate Proceeding Record at 2191–94.  The *Sanders I* court found the claim to have no merit.  801 S.W.2d at 681–82.  Sanders presented a different version of this claim in his collateral attack under Rule 11.42, arguing instead that his *attorney* was ineffective for failing to request competency hearings.  Appellate Proceeding Record at 1374–75.  The *Sanders II* court concluded—incorrectly—that the *Sanders I* court had already decided the claim for ineffective assistance of counsel for failure to request competency hearings.  Accordingly, the *Sanders II* court assumed that Sanders could not again present the claim for review.  89 S.W.3d at 391.  But the *Sanders I* court only decided whether the trial court erred by failing to order a competency hearing.  That claim had nothing to do with Charters.  Because the Kentucky Supreme Court denied

114

review based on the erroneous conclusion that Sanders' claim had already been adjudicated on the merits, there is no bar to federal habeas review. *See Cone v. Bell*, 556 U.S. 449, 467–69 (2009). And since the Kentucky Supreme Court did not reach the merits, the Court reviews the claim *de novo*. *Robinson v. Howes*, 663 F.3d 819, 822–23 (6th Cir. 2011). As explained below, even under *de novo* review, Sanders is not entitled to relief.

### 1) Facts

Sanders' attorneys paid close attention to his mental condition immediately after his arrest, throughout the guilt phase of the trial, and during the time between Sanders' trial and sentencing. Sanders had a mental and emotional breakdown shortly after he was booked into the Madison County Jail. In response, Sanders' appointed counsel and the Madison County jailers requested that he be treated by a physician. Dr. Moffitt treated Sanders and promptly recommended that he be transferred to a state psychiatric correctional facility. *See* TR Direct Appeal Vol. I at 17. Soon afterward, Charters took over as Sanders' counsel and also moved for a mental health evaluation. *See id.* at 19. A week later, the trial court ordered Sanders to undergo a competency evaluation at the KCPC. *See id.* at 21–22. The KCPC issued a nine-page report, concluding that Sanders was competent to stand trial and was not legally insane when he killed Brandenburg and Hatch. *Id.* at 136–44.

Notably, Charters never informed the trial court that Sanders might have been suffering from a mental disorder during the guilt phase of the trial. Right before the prosecution opened its case-in-chief, however, Charters told the court that he needed to get a doctor to the jail to see Sanders. Charters explained that Sanders had gone two nights without sleep and that Charters was "losing [Sanders'] attention" because "[Sanders] can't concentrate." The court said that Charters could work that out with the jailer. 06/03/87 at

09:02:14–09:02:44 (Tape 5 at 3:16–3:46).  Charters again mentioned Sanders' health to the trial court the morning the penalty phase was scheduled to begin.  Charters asked for a weekend continuance in part because Sanders was not "physically able" to take the witness stand that day.  VR 06/05/87 at 09:06:12–09:06:27 (Tape 8 at 00:00:18–00:00:33).  But in neither instance, did Charters indicate to the trial court that Sanders might be suffering from a mental disorder or seek a competency hearing.

Charters raised an issue related to Sanders' mental health during the sentencing phase of the proceedings.  At the beginning of Sanders' sentencing hearing, the court asked if there was any legal cause why Sanders should not be sentenced.  Charters responded that, as he had privately relayed to the court, he did not believe that Sanders understood why he was being sentenced or that Sanders was competent to be sentenced.  VR 06/25/87 at 10:00:53–10:01:06 (Tape 9 at 00:00:53–00:01:07).  The court then asked Sanders if he understood that he was facing formal sentencing where the court would impose final judgment.  Sanders said that he understood, but did not understand how it had "come this far."  VR 06/25/87 at 10:01:07–10:01:23 (Tape 9 at 00:01:07–00:01:23).  The court explained that Sanders had been tried and found guilty of murder and robbery and would be sentenced as a result.  The court then explained that it was the duty of the judge—not the jury—to impose a formal sentence.  After shrugging his shoulders and looking at Charters, Sanders said he understood that.  The judge then declared that there was no legal cause why judgment should not be imposed and proceeded with sentencing.  VR 06/25/87 at 10:00:35–10:02:22 (Tape 9 at 00:00:36–00:02:23).  Charters did not move for a competency hearing at this juncture.

### 2)  Analysis

Sanders' claim for ineffective assistance fails because he has not established a "reasonable probability" that his verdict would have been different had Charters formally requested competency hearings.  Sanders already received a six-week evaluation at the KCPC that ended just six weeks before trial.  *See* Appellate Proceeding Record at 712 (Dr. Walker's letter indicating Sanders' evaluation lasted from March 3 to April 21, 1987).  At the end of the evaluation, the KCPC team found that Sanders was competent to stand trial. *Id.* at 713.  The KCPC team also concluded that Sanders understood "the nature of the proceedings against him and the possible penalties which could be imposed were he to be convicted." *Id.*

Given these facts, Sanders faced an uphill battle in demonstrating that he suffered prejudice from Charters' failure to request another competency hearing.  To secure a competency hearing, Charters needed to call the trial judge's attention to reasonable grounds to doubt Sanders' competence.  *Pate v. Commonwealth*, 769 S.W.2d 46, 47 (Ky. 1989).  But there is no indication that Sanders could have made this showing.  The KCPC report concluded after a comprehensive evaluation that Sanders was competent, although he previously exhibited more serious symptoms of a mental breakdown at the Madison County Jail.  The record contains no evidence that Sanders' competence changed in the time after the KCPC's evaluation.  Indeed, Sanders does not even make that argument.

Though Charters did mention to the trial court that he was concerned about "losing" Sanders, he clarified that Sanders was having trouble paying attention due to lack of sleep. *See* VR 6/03/87 08:02:33–08:02:50) (Tape 5 00:03:25–00:03:42).  The only other mention of

Sanders' health involved his *physical* health—whether he was physically able to take the stand.  VR 06/05/87 at 09:06:12–09:06:27 (Tape 8 at 00:00:18–00:00:33).

Without reasonable grounds to find Sanders incompetent, there can be no "reasonable probability" that a motion for a competency hearing would have changed the outcome of his proceedings.  *Richter*, 131 S. Ct. at 792.

In contrast to his statements to the court during trial, Charters explicitly stated before the sentencing hearing that Sanders may not be fully competent.  Charters explained that he doubted that Sanders could understand why he was being sentenced.  Yet Sanders responded to the trial judge's questions by indicating that he understood that he was facing formal sentencing where the court would impose final judgment.  Sanders only said that he could not understand how things had "come this far."  VR 06/25/87 at 10:01:07–10:01:23 (Tape 9 at 00:01:07–00:01:23).   But such a statement does not provide reasonable grounds to question Sanders' competency.   Rather, the record suggests that Sanders was expressing disbelief and shock at the fact that he had been found guilty of murder—not that he literally could not understand the nature of the proceedings against him.  Sanders' response indicates that the trial court would have had no reasonable grounds to order a competency hearing. And without grounds for a competency hearing, there is not even a remote possibility that ordering a competency hearing would have changed the outcome of trial.   Sanders must show more than a possibility that the outcome would have been different if his attorney had requested a competency hearing.  *Hart/Cross v. United States*, 89 F.3d 833 (6th Cir. 1996).

Nothing in the record reveals that the trial court would have had any grounds to grant a new motion for a competency hearing after the trial began.  So Sanders cannot demonstrate

that he was prejudiced by Charters' failure to move for a competency hearing.  Accordingly, Sanders is not entitled to habeas relief on this claim.

## VII.    Claim 34.5: Ineffective Assistance of Appellate Counsel

Sanders argues that his direct appeal counsel performed so deficiently as to be constitutionally ineffective.  R. 73 at 365.  Specifically, Sanders claims that his appellate counsel erred by failing to raise seven arguments:  (1) The prosecutor's definition of reasonable doubt deprived Sanders of his right to trial by jury (Claim 8.5); (2) Sanders was deprived of his constitutional rights when he was denied a defense-based expert and when the mental health examiner divulged his statements to the prosecution (Claim 10.5); (3) Sanders was incompetent to stand trial (Claim 10.6); (4) The trial court violated Sanders' due process rights by failing to hold a competency hearing before trial (Claim 10.7); (5) Sanders' attorney had a conflict of interest, rendering his representation per se unconstitutional (Claim 10.8); (6) Introducing the statements Sanders made during his mental evaluation violated his constitutional rights (Claim 10.9); and (7) The trial court violated due process by failing to hold a competency hearing before Sanders' sentencing (Claim 22.6). *Id.*  For the reasons below, the Court will only decide two of the ineffective-assistance-of-appellate-counsel ("IAAC") claims.

### A. Sanders I Claims

Sanders' appellate attorneys raised only two of the IAAC claims on direct appeal. *See* Appellate Proceeding Record at 2191–94 ("[Sanders] was denied due process of law by the trial court's failure to . . . hold a competency hearing prior to both trial and sentencing."). And the Kentucky Supreme Court adjudicated both of these claims on the merits in *Sanders I.* 801 S.W.2d at 681–82.  Sanders does not argue that his appellate counsel performed

deficiently by failing to adequately argue these two issues.   Rather, he implies that his appellate counsel did not raise these arguments on appeal at all.   *See* R. 73 at 362.   But Sanders is wrong.   Sanders' direct appeal counsel presented these two claims to the Kentucky courts and even cited to some of the same legal authorities that Sanders references in his federal habeas petition.   *Compare, e.g.*, Appellate Proceeding Record at 2193–94 (citing *Pate v. Robinson*, 383 U.S. 375 (1966) and Ky. Rev. Stat. § 504.100), *with* R. 73 at 145–46 (same).   Because Sanders' appellate counsel actually raised these claims on appeal, Sanders' claim—that counsel was ineffective for not raising them—fails.

### B.  Unexhausted Claims

Early in the adjudication of Sanders' federal habeas petition, this Court stayed the case to let Sanders present his IAAC claims to the Kentucky courts in a Rule 60.02 motion. R. 32.   Because Sanders only partially availed himself of that opportunity, he now raises in his habeas petition three IAAC claims that he never presented to the Kentucky courts. *Compare* R. 73 at 362 (claiming that direct appeal counsel was ineffective for failing to argue that (1) The prosecutor's definition of reasonable doubt deprived Sanders of his right to trial by jury (Claim 8.5); (2) Sanders was deprived of his constitutional rights when he was denied a defense-based expert and when the mental health examiner divulged his statements to the prosecution (Claim 10.5); and (3) Sanders' attorney had a conflict of interest, rendering his representation per se unconstitutional (Claim 10.8)) *with* Brief for Petitioner at 21, *Sanders III*, 339 S.W.3d 427 (Ky. 2011) (No. 2008-SC-000825-MR), 2009 WL 8181351, at *21 (raising different IAAC claims).

State prisoners must completely exhaust their available state court remedies by "fairly presenting" all their claims to the state courts.   28 U.S.C. § 2254(b), (c); *Rhines v. Weber*,

544 U.S. 269, 274 (2005).  This exhaustion requirement bars Sanders from bringing to this Court any claims that he did not first bring to the Kentucky courts.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  But Sanders is trying to do just that.  There is no indication in the record that Sanders ever presented these three IAAC claims to the Kentucky courts, and he does not introduce any evidence showing that he did present them.  *See* Brief for Petitioner at 21, *Sanders III*, 339 S.W.3d 427 (Ky. 2011) (No. 2008-SC-000825-MR), 2009 WL 8181351, at *21.  So Sanders has not carried his burden to demonstrate that he exhausted these claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

Because Sanders failed to exhaust three of his IAAC claims—and because no remedy remains available to exhaust them now—those claims are procedurally defaulted.  *Landrum v. Mitchell,* 625 F.3d 905, 918 (6th Cir. 2010) ("When the petitioner has failed to present the grounds to the state courts and . . . no state remedy remains available, his grounds are procedurally defaulted.").  The Kentucky Supreme Court would only entertain new claims in another Rule 60.02 motion in truly "*extraordinary* situations."  *See Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983) (quoting *Howard v. Commonwealth*, 364 S.W.2d 809, 810 (Ky. 1963)) (emphasis added).  But Sanders can point to nothing extraordinary.  When the Court stayed this case so that Sanders could raise his IAAC claims before the Kentucky Supreme Court, that court determined that Sanders had properly exhausted those claims. *Sanders v. Commonwealth (Sanders III)*, 339 S.W.3d 427, 435 (Ky. 2011).  Though Sanders could have also exhausted these three IAAC claims at the same time, he chose not to raise them.  Because Sanders cannot demonstrate extraordinary circumstances to justify that decision, the Rule 60.02 remedy is unavailable to him now.  *See Gross*, 648 S.W.2d at 856

(requiring extraordinary circumstances); *Landrum,* 625 F.3d at 918 (conditioning procedural default on the unavailability of state remedies).

Neither can Sanders show cause for failing to bring his IAAC claims before the *Sanders III* court. *Hodges v. Colson*, 727 F.3d 517, 530–31 (6th Cir. 2013) (affirming that even ineffective assistance of post-conviction counsel generally cannot excuse procedural default of ineffective-assistance-of-appellate-counsel claims) (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)). Because courts need not consider claims that have been procedurally defaulted without cause, *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Court will not decide the three unexhausted IAAC claims Sanders raises in his federal habeas petition.

### C. Remaining IAAC Claims

Sanders' remaining claims deal with his competency to stand trial (Claim 10.6) and statements he made during his mental evaluation (Claim 10.9). Sanders did not present his two remaining IAAC claims in his RCr. 11.42 motion during the state court collateral review proceeding. *See* Appellate Proceeding Record at 501–66 (Motion to Vacate, Set Aside, or Correct Sentence Pursuant to RCr 11.42). Rather, Sanders filed a federal habeas petition in this Court, sought a stay of the case, and then returned to the Kentucky Supreme Court to exhaust his IAAC claims in a Rule 60.02 motion. *See* R. 29 (Motion to Stay); *Sanders III*, 339 S.W.3d at 434–35. In reviewing Sanders' Rule 60.02 motion, the Kentucky Supreme Court acknowledged that the Commonwealth recently changed its law to recognize IAAC claims in RCr. 11.42 motions. *Id.* at 434 (citing *Hollon v. Commonwealth*, 334 S.W.3d 431 (Ky. 2010)). But the court noted that *Hollon* only applied prospectively and so did not permit Sanders to raise his IAAC claims in state court. *Id.* (quoting *Hollon*, 334 S.W.3d at

429).  As a result, the court determined that Sanders had properly exhausted his IAAC claims

and presumed that this Court would consider the claims on federal habeas review.  *Id.* at 435.

At the same time, however, the Kentucky Supreme Court held that Sanders had had

sufficient information—or could have obtained it by "reasonably diligence"—to raise his

IAAC claims in his earlier RCr. 11.42 motion.  *Id.* at 437.

Ordinarily, a petitioner's failure to raise claims at his first opportunity to do so

constitutes procedural default.  *See, e.g.*, *Whiting v. Burt*, 395 F.3d 602, 610 n.6 (6th Cir.

2005); *Whitworth v. Price*, 90 F. App'x 458, 460 (6th Cir. 2004).  But the Kentucky Supreme

Court did not explicitly hold that Sanders procedurally defaulted on his IAAC claims.  And

where the Kentucky state court does not enforce its procedural rules, this Court does not

disregard the Commonwealth's interest in enforcing its laws by reaching the merits of a

petitioner's habeas claim.  *Berry v. Capello*, 576 F. App'x 579, 588–89 (6th Cir. 2014); *see

also Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (holding that federal habeas

courts need not decide complicated procedural default issues before ruling on the merits of a

petitioner's claim).  Because the Kentucky Supreme Court did not reach the merits of the

IAAC claims, this Court will evaluate the IAAC claim under a *de novo* standard of review.

*Robinson*, 663 F.3d at 822–23.

The *de novo* standard for resolving IAAC claims is simply another variation of the

*Strickland* test for assessing whether counsel is constitutionally ineffective.   Under the

*Strickland* standard—as modified for IAAC claims—a petitioner is entitled to habeas relief if

he can show two things:  (1) appellate counsel was objectively unreasonable in failing to find

non-frivolous, arguable issues to appeal; and (2) a reasonable probability that, but for

counsel's error, his appeal would have prevailed.  *Smith v. Robbins*, 528 U.S. 259, 285–86

(2000); *see also McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).  In applying this test, the Court may consider factors like whether the omitted issues were "significant and obvious" and whether there existed arguably contrary authority on the omitted claims. *Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir. 1999) (articulating a non-exhaustive list of eleven factors that a reviewing Court may consider when evaluating the performance of a direct appeal attorney).

The first prong of the IAAC test is deferential to the appellate attorney.  Direct appeal counsel need not raise every non-frivolous claim and may select from among the claims to maximize the chances of a successful appeal.  *Jones v. Barnes*, 463 U.S. 745 (1983).  Generally, a petitioner may overcome the presumption of attorney competence where the non-appealed issues are "clearly stronger" than those appealed.  *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  And this Court need not even evaluate the first, or performance, prong of an IAAC claim that fails on the second, or prejudice, prong.  *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

To properly review an IAAC claim for prejudice, the federal habeas court must consider the merits of the issues not raised on direct appeal.  *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003).  But a review of the merits does not help Sanders' case.  The factual record does not indicate that Sanders was incompetent to stand trial.  Nor does Sanders demonstrate how the prosecution violated his constitutional rights when it introduced statements that Sanders made during a mental evaluation at the KCPC.  Because Sanders

124

cannot prevail on the merits of these claims, he cannot demonstrate that he suffered prejudice when his counsel failed to raise them.

### 1)  Incompetency to Stand Trial (Claim 10.6)

Sanders cannot prevail on his challenge to his own competency to stand trial because the trial court's competency determination finds sufficient support in the record.  Before Sanders' trial, the court ordered him to undergo a comprehensive mental evaluation at the KCPC.  *See* TR Direct Appeal Vol. I at 21–22 (Order for Sanders to be evaluated at the KCPC).  There, a team of social workers, psychologists, a psychiatrist, and a neurologist observed Sanders for twenty-four hours a day for six consecutive weeks.  VR 6/5/87 19:13:23–19:13:40 (Tape 7 00:34:39–00:34:56) (Testimony of Dr. Walker describing the KCPC examination as a "long, six-week, 24-hour observation").  At the end of the examination, the KCPC team concluded that Sanders was competent to stand trial.  TR Direct Appeal Vol. I at 134–44 (Dr. Candace Walker's letter concluding that Sanders was competent to stand trial and that he "underst[ood] the nature of the proceedings against him and the possible penalties which could be imposed were he to be convicted").

In determining whether a defendant is competent to stand trial, a court considers medical opinions, as well as a defendant's irrational behavior and demeanor.  *See Drope v. Missouri*, 420 U.S. 162, 180 (1975).  The court can also consider defense counsel's doubts about his client's competence.  *See Woodley v. Bradshaw*, 451 F. App'x 529, 538 (6th Cir. 2011) (citing *Drope*, 420 U.S. at 178 n.13).  So to succeed on appeal, Sanders' appellate counsel would have had to convince the Kentucky Supreme Court that, based on a balance of the *Drope* factors, Sanders was incompetent.  But the facts do not support this argument. The KCPC's extensive evaluation concluded that Sanders was competent to stand trial.  And

although Sanders' counsel told the trial court that he was "losing" Sanders, counsel clarified that he meant Sanders' attention was flagging because he had not been sleeping properly—an unsurprising reaction to the gravity of the trial.  VR 6/03/87 08:02:33–08:02:50) (Tape 5 00:03:25–00:03:42).  So Sanders' attorney did not directly call into question or raise doubts about Sanders' competence.

Even if the balance of factors weighed in favor of Sanders' competence, appellate counsel would still have had to overcome the traditional deference to competency determinations by trial courts.  *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006) (citing *Thompson v. Keohane*, 516 U.S. 99, 110–11 (1995)).  The balance of *Drope* factors makes it unlikely that appellate counsel could successfully challenge the trial court's competency finding.  And Sanders points to no other facts that suggest a different result.  Because Sanders did not demonstrate a reasonable probability that the claim would have succeeded on appeal, he cannot establish any prejudice from his counsel's decision not to bring the claim. *Smith*, 528 U.S. at 285–86.  Accordingly, Sanders' direct appeal counsel was not constitutionally ineffective for failing to present the issue to the *Sanders I* court.

### 2)  Statements during mental evaluation (Claim 10.9)

Sanders cannot prevail on his Fifth-Amendment challenge to Dr. Walker's testimony because, in light of "arguably contrary" Supreme Court precedent, Sanders cannot demonstrate prejudice.  *See Mapes*, 171 F.3d at 427–28.  While Sanders was being evaluated at the KCPC, he spoke to a number of psychiatrists, social workers, and other KCPC employees.  At trial, the prosecution introduced testimony from Dr. Candace Walker, a KCPC psychiatrist.  In her testimony, Dr. Walker disclosed statements that Sanders made to KCPC personnel.  *See generally* VR 06/5/87 09:01:00–09:53:50 (Tape 7 00:02:18–00:55:14)

(Testimony of Dr. Walker).  Sanders argues that, because he was not advised of his right to remain silent during his KCPC evaluation, Dr. Walker violated Sanders' right against self-incrimination by introducing his statements at trial.  *See* R. 73 at 159 (identifying the right articulated in *Estelle v. Smith*, 451 U.S. 454, 468 (1981)).

But *Estelle* stands for a different rule:  When the defendant does *not* present psychiatric evidence, the prosecution may not introduce statements the defendant made during a court-ordered competency hearing where the defendant was not aware that he "was assisting the State's efforts."  451 U.S. at 466–68.  The *Estelle* Court explicitly recognized that cases involving an insanity defense are different.  451 U.S. at 465–68, 472.  When a defendant claims insanity as a defense, "his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case."  *Id.* at 465.  Indeed, calling a psychiatrist to support an insanity defense necessarily "interject[s]" psychiatric evidence into the case and, as a result, forfeits *Estelle*'s protection.  451 U.S. at 465–68, 472.

The Kentucky Supreme Court agrees.  In *Sanborn v. Commonwealth*, the defendant could not prevent his psychiatrist from revealing his statements to evaluators because the statements rebutted psychiatric evidence that the defendant introduced.  892 S.W.2d 542, 553 (Ky. 1994) (citing *Estelle*, 451 U.S. at 472).  The *Sanborn* court even found that the expert's testimony may go beyond the subject matter of the evaluation.  *See id.*  ("If the statements are necessary for the expert to formulate and explain her opinion, then the statements are admissible and are not violative of the defendant's rights.").

Dr. Walker's testimony fits squarely within this exception:  Her testimony highlighted the inconsistencies in the various statements that Sanders made at the KCPC to support her

ultimate conclusion that he may have been fabricating a mental disorder—a disorder that Sanders supported by introducing psychiatric evidence.  VR 6/5/87 09:26:16–09:29:10 (Tape 7 00:25:32–00:28:35).  Because *Estelle* and *Sanborn* provide authority that is "arguably contrary" to Sanders' claim, *Mapes*, 171 F.3d at 427–28, there is no reasonable probability that Sanders would have prevailed on appeal.  So Sanders has not demonstrated prejudice from his direct appeal counsel's decision not to raise Claim 10.9 on appeal.  Accordingly, Sanders' claim that the counsel was constitutionally ineffective fails.

## VIII.   Cumulative Prejudice: Claim 36.

In his final claim, Sanders argues that the Court should aggregate the errors that his attorney committed along with other constitutional violations that occurred during trial.  R. 73 at 367.  Taken together, Sanders argues, these errors were so prejudicial as to entitle him to habeas relief.  *Id.*  Though Sanders did not raise his cumulative-prejudice argument in his state court habeas proceeding, *see* Appellate Proceeding Record at 1323–88, he did exhaust the claim by presenting it to the Kentucky Supreme Court after he filed his federal habeas petition, *see Sanders III*, 339 S.W.3d at 436 (noting that Sanders presented the claim of cumulative prejudice).  Because the Kentucky Supreme Court did not reach the merits of his cumulative-prejudice claim, the Court will review the claim *de novo*.  *See Robinson*, 663 F.3d at 822–23.

The Court may only entertain a part of Sanders' cumulative-prejudice claim because the Sixth Circuit does not allow petitioners to aggregate claims of constitutional error to demonstrate cumulative prejudice.  *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).  Thus, Sanders may only argue that the totality of his counsel's errors resulted in prejudice under *Strickland*.  *See Strickland*, 466 U.S. at 694 (holding that the appropriate test for

prejudice is whether there is a "reasonable probability that but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added); *id.* at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of . . . circumstances did not warrant death.").

The Court need not consider claims where it previously concluded that Charters did not perform deficiently under the first prong of *Strickland*. *See Mackey v. Russell*, 148 F. App'x 355, 369 (6th Cir. 2005) (identifying instances where counsel was deficient and then aggregating those errors to determine prejudice). So that leaves only two claims: that Charters failed to consult with Sanders before he took the stand (Claim 27(J)), and that he failed to request competency evaluations (Claim 27(L)).

Even taken together, Charters' failure to move for a competency hearing and his failure to prepare Sanders to testify could not have prejudiced Sanders. Why? Because, as explained above, Sanders did not meet his burden to argue that he suffered *any* prejudice from Charters' failure to prepare Sanders to take the stand. *See supra* at 113. The Court cannot aggregate prejudice from the only remaining claim where Sanders argues he suffered from Charters' conduct—Claim 27(L). *See, e.g.*, *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) ("[W]e do not find more than one error to consider cumulatively."). And in any case, Sanders did not demonstrate that he suffered prejudice in the single remaining claim. *See supra* at 116–18 (concluding that Sanders did not show that Charters' failure to seek competency hearings created a "reasonable probability" that the outcome of his trial or sentencing would have been different). Accordingly, Sanders cannot get habeas relief on his cumulative-prejudice claim.

129

## IX.   Evidentiary Development

Sanders seeks to conduct discovery and to hold an evidentiary hearing to find facts that he needs in order to develop several of his claims.  *See* R. 78; R. 79.  A habeas petitioner is generally entitled to discovery and an evidentiary hearing if he can allege facts that, if proven, would entitle him to habeas relief.  *See Plummer v. Jackson*, 491 F. App'x 671, 675 (6th Cir. 2012) (articulating the rule in the context of an evidentiary hearing); *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (interpreting the "good cause" provision of Rule 6 of the Rules Governing § 2254 Cases related to discovery); *see also Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (citing *Bracy v. Gramley*, 520 U.S. 899 (1997)).  But Sanders' motion fails for three reasons:  (1) the Court cannot consider new evidence when deciding claims that the Kentucky Supreme Court adjudicated on the merits in accordance with § 2254(d); (2) discovery will not help to resolve claims on which Sanders has procedurally defaulted without cause and prejudice; and, (3) even on the claims on which the Court could reach the merits, Sanders has not alleged facts that, if proven, would entitle him relief.

### A. Claims the Kentucky Supreme Court Decided On the Merits

In 28 U.S.C. § 2254(d), Congress limited when federal courts may hold hearings in habeas proceedings.  *See Pinholster*, 131 S. Ct. at 1398 (interpreting 28 U.S.C. § 2254(d)). The *Pinholster* Court found that the rule directed federal habeas courts to limit their review "to the record that was before the state court that adjudicated the claim on the merits."  *Id.* (interpreting the backward-looking language of § 2254(d)(1) as requiring federal courts to examine state-court decisions in light of the record as it existed at the time of the state court decision).  So where the state court decides a claim on the merits, and this Court upholds that determination under § 2254(d), the Court may not conduct an evidentiary hearing.  *See*

*Hodges*, 727 F.3d at 541 (quoting *Pinholster*, 131 S. Ct. at 1400) (noting that the district court properly denied a motion for an evidentiary hearing because the evidence introduced would "have no bearing on § 2254(d)(1) review"); *see also Sadler v. Howes*, 541 F. App'x 682, 692 (6th Cir. 2013) ("Because the state appellate court's action satisfies § 2254(d)'s on-the-merits requirement, the district court's denial of an evidentiary hearing was true to [*Pinholster*].").  The Court upheld all of the claims that the Kentucky Supreme Court decided on the merits.  Accordingly, it may not grant Sanders' motion for an evidentiary hearing, R. 79, on those claims.[17]

The same rationale governs the decision to deny Sanders' motion for discovery on the claims that the Kentucky Supreme Court decided on the merits.  Sanders seeks to depose his trial counsel, Charters, to determine whether Charters had a strategy or whether he rendered ineffective assistance at points during the trial.  R. 78 at 14.  But the Court already found the Kentucky Supreme Court's decisions on these claims to be reasonable applications of clearly established federal law, under § 2254(d).

Sanders also seeks to unearth evidence that may help him further develop a new argument related to his *Brady* claim.  Sanders wants discovery to determine whether the prosecution had communications about, or actual possession of, a report authored by psychiatrist Dr. Frank Flenning at the KCPC.  R. 78 at 23 (discussing *Brady* claim).  Sanders maintains that the report is exculpatory evidence, since Dr. Flenning concluded that Sanders

---

[17] The Court upheld the Kentucky Supreme Court's merits determination on the following claims for which Sanders requests an evidentiary hearing:  Claim 2 (Failure to remove jurors Meinzer and Warren); Claim 27(A) (Failure to obtain adequate, independent mental health assistance), Claim 27(B) (Failure to obtain Dr. Flenning's report from the KCPC), Claim 27(E) (Failure to obtain and present a videotape of Sanders taken shortly after his arrest), Claim 27(F) (Failure to present testimony of three witnesses), Claim 27(G) (Failure to move to suppress Sanders' statements to the police), Claim 27(H) (Opening the door to testimony about Sanders' violence towards his wife), Claim 27(J) (Failure to prepare Sanders before he testified during the penalty phase), and Claim 28 (Violation of the prosecution's *Brady* obligation).

suffered from a form of psychosis.  *See id.*  If, as Sanders suspects, the government was in possession of the Flenning report or had communications about its contents, but did not disclose the report to him, Sanders argues that the prosecution committed a *Brady* violation. But Sanders did not argue either in his RCr 11.42 motion or in his federal habeas petition that the prosecution had actual access to Dr. Flenning's report or information about the report. *See* R. 73 at 339–41 (developing the argument that the Flenning report was "at least in the prosecution's constructive possession" and failing to argue that the prosecution also had actual possession of the information).

Sanders may only obtain discovery in a habeas proceeding "where specific allegations . . . show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Williams*, 380 F.3d at 974 (quoting *Bracy*, 520 U.S. at 908–09).  So even if Sanders were to find that the prosecution had access to Dr. Flenning's report, he could not use the information to obtain relief on his habeas petition. Why?  Because Sanders never presented the argument that the prosecution had actual access to *Brady* material in his habeas petition.  Accordingly, Sanders is not entitled to discovery on this new claim that he develops for the first time in his motion for discovery.

Sanders may not present further evidence to decide claims that the Kentucky Supreme Court already adjudicated on the merits.  *See Pinholster*, 131 S. Ct. at 1400 (holding that if a claim has been adjudicated on the merits by a state court, then the federal habeas court must conduct its review on the record as it existed when the state court adjudicated the claim). Accordingly, Sanders' motion for discovery, R. 78, is denied as to claims that the Kentucky Supreme Court decided on the merits.

132

### B. Claims that Sanders Procedurally Defaulted Without Cause and Prejudice

Sanders is not entitled to an evidentiary hearing to develop facts related to claims that he procedurally defaulted without cause and prejudice.[18]   The Court cannot decide those claims because federal habeas corpus review is barred for procedurally defaulted claims where the state prisoner does not demonstrate cause or prejudice.  *See Coleman*, 501 U.S. at 729–30.  So it would make no sense to devote time and resources to develop facts in support of claims the Court cannot decide.  *See Hodges*, 727 F.3d at 532 (holding that it was appropriate for the district court to deny both an evidentiary hearing and habeas relief where the claim was procedurally barred).  In the absence of cause and prejudice, Sanders is not entitled to an evidentiary hearing on procedurally defaulted claims.

Sanders may not conduct discovery on his procedurally defaulted claims for similar reasons.  Sanders asks to depose his initial-review collateral proceeding counsel to determine whether their ineffectiveness could excuse his procedural default of several claims.  R. 78 at 22; R. 111 at 2.[19]  But ineffectiveness of initial-review collateral proceeding counsel can only excuse procedural default of a claim for ineffective assistance of trial counsel.  *See Martinez*, 132 S. Ct. at 1318–21; *Trevino*, 133 S. Ct. at 1921.  The only procedurally defaulted claim that fits the bill is Claim 10.8 (ineffectiveness claim based on Charters' conflict of interest).  But Sanders did not properly present this claim to the Kentucky courts and, accordingly, it is

---

[18] These claims are as follows: Claim 10.5 (Denial of a defense-based psychiatric expert and improper disclosures from the neutral psychiatric expert); Claim 10.8 (Sixth Amendment claim based on Charters' conflict of interest); Claim 10.9 (introduction at trial of Sanders' statements at the KCPC); Claim 27(I) (Failure to prepare mitigating evidence for the penalty phase), and Claim 29 (Failure to correct Dr. Walker's false testimony at trial).

[19] These claims are as follows:  Claim 8.5 (the prosecutor's improper definition of reasonable doubt violated Sanders' right to a jury trial); Claim 10.5 (Denial of a defense-based psychiatric expert and improper disclosures from the neutral psychiatric expert); Claim 10.6 (Sanders was incompetent to stand trial); Claim 10.7 (the trial court failed to hold a competency hearing before trial); Claim 10.8 (ineffectiveness claim based on Charters' conflict of interest); Claim 10.9 (introduction at trial of Sanders' statements at the KCPC); Claim 22.5 (Sanders was incompetent at sentencing); Claim 22.6 (the trial court failed to hold a competency hearing); and Claim 29 (the prosecution failed to correct Dr. Walker's false testimony at trial).

now procedurally defaulted. No matter what Sanders might discover about his state habeas counsel, that evidence could not be considered to resolve an ineffectiveness claim presented for the first time in this federal habeas petition.

### C. Claims that the Court Considers on the Merits

The only claims on which the Court reaches the merits are Claim 27(L) (Failure to seek competency proceedings) and part of Claim 34.5 (Ineffective assistance of appellate counsel). Sanders requests an evidentiary hearing on both of these claims, arguing that he should have an opportunity to investigate facts that may support why Charters thought Sanders was incompetent and why Sanders' direct appeal counsel may have forgone some arguments. *See* R. 79 at 16; R. 93 at 14. He also seeks discovery on the claims by deposing his trial counsel, Charters, to determine whether Charters rendered ineffective assistance. R. 78 at 14.

When a court performs an independent review of a claim, it may conduct an evidentiary hearing pursuant to the AEDPA's hearing section, 28 U.S.C. § 2254(e), in order to permit the petitioner to present additional evidence. *See Van Tran v. Colson*, 764 F.3d 594, 621 (6th Cir. 2014) (citing *Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring)).

Here, however, a hearing is not necessary. Sanders has not shown that he was prejudiced by any of his attorneys' failures. So he cannot "allege facts that, if proven, would entitle him to habeas corpus relief." *Gustafson v. Burt*, 467 F. App'x 434, 436 (6th Cir. 2012). Even if a hearing were to reveal that Sanders' attorneys were objectively deficient, he could not succeed in showing that he was prejudiced by their failings. *See supra* at 116–18 (concluding that, without grounds for a competency hearing, Sanders could not establish more than a remote possibility that requesting a competency hearing would change the

outcome of his trial or sentencing); *see also supra* at 125–27 (noting that Sanders could not establish a "reasonable probability" that his appellate counsel would have prevailed on the claims that his trial counsel was defective in failing to request a competency hearing and to suppress statements he gave during his psychological evaluation).  Absent allegations that, if proven, would establish prejudice, Sanders is not entitled to an evidentiary hearing.  *Cf. Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (granting a motion for an evidentiary hearing where the petitioner "sufficiently alleged the deficient performance and the prejudice prongs of a *Strickland* claim").  The same rationale applies to Sanders' claim for discovery: even if he discovered that his attorneys were deficient, he has not stated facts that show that he can demonstrate prejudice in order to obtain habeas relief.

Because Sanders cannot prevail on his ineffective assistance claims, he is not entitled to habeas relief, no matter what evidence he may gather through discovery or at an evidentiary hearing.  Accordingly, Sanders' motions for discovery and for an evidentiary hearing are denied as to Claim 27(L) and Claim 34.5.

## X.   Motion to Expand the Record and for a Psychologist

Sanders seeks to expand the record to include an affidavit related to Claim 27(I) (Failure to prepare mitigating evidence for the penalty phase).  He also asks for funds to hire an expert to investigate the childhood abuse that he suffered in order to explain the way the trauma impacted him later in life.  R. 80.  According to Sanders, securing the expert is necessary to resolving this claim.  *Id.*  By not raising this claim in state court, however, Sanders procedurally defaulted on this claim.  *See supra* at 109–10.  Because Sanders has not demonstrated cause and prejudice to excuse the procedural default, the Court may not reach

the merits of this claim.  Accordingly, Sanders' motions to hire an expert, R. 80, and to expand the record, R. 97, are unnecessary to resolve Claim 27(I) and are therefore denied.

## CONCLUSION

Accordingly, it is **ORDERED** that Sanders' petition for the writ of habeas corpus, R. 1, 73, motion for discovery, R. 78, motion for an evidentiary hearing, R. 79, motion for funds, R. 80, and motion to expand the record, R. 97 are **DENIED.**

This the 18th day of February, 2015.

Signed By:

*Amul R. Thapar*

United States District Judge