UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

DAVID LEE SANDERS,                )
                                  )
          Petitioner,             )
                                  )          Civil No. 03-455-ART
v.                                )
                                  )
RANDY WHITE, *Warden*,            )          **MEMORANDUM OPINION AND**
                                  )          **ORDER**
          Respondent.             )
                                  )

*** *** *** ***

David Lee Sanders shot two men execution-style in a convenience store. Although he admitted to the murders—and another shooting—he told the jury he was insane at the time. The jury nevertheless found him guilty and sentenced him to death, an outcome Sanders has been challenging ever since. Most recently, he brought a federal habeas petition stating over forty claims for relief, all of which this Court denied. R. 113; R. 150.

Sanders now wants to bring many of those claims before the Sixth Circuit. To do so, he needs a certificate of appealability. 28 U.S.C. § 2253. As shown below, the Court has grounds for issuing one, but only as to Claim 18 and specific aspects of Claims 27(F) and 36. *See id.* § 2253(c)(3) ("The certificate of appealability . . . shall indicate which specific issue or issues satisfy the showing required[.]").

I.      **The law**

This Court sits in essence as a court of third instance. In the first, the Kentucky state courts declined to grant Sanders relief. In the second, this Court declined to overturn that

decision. Now the question is whether a reasonable jurist could disagree with this Court's decision about the state courts' decision. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). First of all, a reasonable jurist would need to know how the Court made its decision.

### a. AEDPA

Sanders was sentenced in state court, first brought his habeas claims in state court, and first saw them denied in state court. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") tells the Court how to review state courts. 28 U.S.C. § 2254.

AEDPA respects comity, *i.e.*, it prevents federal courts from pretending to be what they are not: better than state courts at applying law. *See Harrington v. Richter*, 526 U.S. 86, 102–03 (2011). Since they are not, AEDPA makes it difficult for federal courts to overturn state-court decisions. The one time AEDPA permits a federal court to review a habeas claim *de novo*—deciding the merits of the claim for itself—is when the state court has not decided the merits of that claim for *itself*. *See Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("Claims that were not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of law."). Sometimes, for example, a state court will improperly find a claim procedurally barred. *See Walker v. Martin*, 562 U.S. 307, 316 (2011) (noting that state procedural rules are inadequate unless "firmly established and regularly followed." (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009))). And in that case, the federal court will review the claims *de novo* to ensure that someone does.

Otherwise, federal-court review of state-court habeas decision is quite circumscribed. If a state procedural rule is adequate—firmly established, regularly followed—a federal court

must respect it.  Thus, if a petitioner "defaults" a claim by failing to comply with such a rule, a federal court must generally decline to hear it.  *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  If the state court reached the merits of the claim, a federal court may consider them, too.  But it may overturn the state court's decision in only one of three limited circumstances: where that decision (1) "was contrary to . . . clearly established Federal law," (2) "involved an unreasonable application of[] clearly established Federal law," or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

In the claims he seeks to appeal, Sanders argues that the state court either contradicted (circumstance one) or unreasonably applied (circumstance two) federal law.  Not just any federal law will do, however.  Sanders must show that the Kentucky Supreme Court either disregarded or mishandled some "clearly established Federal law[] as determined by the *Supreme Court of the United States*."  28 U.S.C. § 2254(d)(1) (emphasis added).  And that law must have been around when the Kentucky Supreme Court decided his habeas claims. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

To have reached a decision "contrary to" that law, the state court basically must have missed an on-point Supreme Court case while doing its legal research.  Specifically, the court must have either applied a rule that "contradicts" one that the Supreme Court has set forth or decided the opposite of what the Supreme Court did on "materially indistinguishable" facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  As a corollary, if the state court identifies and applies the right rule—as articulated by the Supreme Court—it has not made a decision "contrary to" federal law.  *Id*. at 406.

But it still might have applied that rule unreasonably, in which case a federal court would have to grant habeas relief. For AEDPA purposes, however, a state court's decision must be deeply flawed to be considered unreasonable. A decision is not "unreasonable" just because a federal court disagrees with it. As the saying goes, reasonable minds can disagree; though they might disagree, they are both still reasonable. And AEDPA presumes that state courts are reasonable. When applying AEDPA, therefore, federal courts usually do not upset state-court decisions—even if a federal court believes a particular decision is "clear error." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). Rather, to be considered "unreasonable," a decision must be "so lacking in justification" that its incorrectness is "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Imagine every judge in the country picked up the state-court decision and that each of them is reasonable. If none could possibly disagree that the state court had misapplied Supreme Court law, the decision is unreasonable. Then, and only then, does a petitioner have a claim under AEDPA's third prong. But if some of those judges *could* disagree—in other words, if some could find the state court's reasoning reasonable—the petition does not have a claim. *Id*. at 101–02. As with any standard that considers what a reasonable person would do (while wearing robes or not), this standard is an "objective" one. *Woodall*, 134 S. Ct. at 1702. If a state-court decision was objectively reasonable, a federal habeas court may not displace it.

### b. Certificates of appealability

The Court has already held that none of Sanders's claims meet either the contrary-to- or unreasonable-application-of-federal-law standards. R. 113; R. 150. Sanders now wants to appeal some of those claims.

But AEDPA respects economy as well as comity. Thus, before appealing his claims, a petitioner needs a certificate stating that his claims are actually appeal worthy. Though this requirement "screens out issues unworthy of judicial time and attention," *Gonzalez v. Thaler*, 565 U.S. 134, 145 (2012), it does not foreclose the appellate process entirely. If a petitioner can make a "substantial showing" that he has been denied a constitutional right, he deserves a certificate of appealability. 28 U.S.C. § 2253(c)(2). Here again, courts apply an objective standard, asking that imaginary reasonable jurist sitting on our shoulders what she would do. If "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner," the petition is appealable. *Slack*, 529 U.S. at 483–84. The standard demands modesty: Courts must acknowledge when they have ruled on a difficult issue that "deserve[s] encouragement to proceed further." *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

With only a few exceptions—which the Court will explain as they arise—the Court reviewed and denied Sanders's habeas claims under AEDPA, specifically its unreasonable-application prong. Before addressing those claims once more, it is important to define how the Court must address them. The Court is not permitted to decide Sanders's claims anew: whether counsel was ineffective, whether the trial court mis-instructed the jury, and so on. The Kentucky Supreme Court has already decided those claims, and this Court has already found its decision objectively reasonable. Now Sanders must show that the Court was wrong or at least debatably wrong: that if another jurist were in the undersigned's place, he might not have let the state court's decision stand. *Slack*, 529 U.S. at 484. Sanders may appeal any claim for which this is true.

## II.    The claims

Sanders seeks to appeal twelve of his forty-plus habeas claims.  R. 151.  In eight of them he alleges that his trial attorney assisted him ineffectively; in one he challenges the trial court's jury instructions; in another he argues that the prosecution violated *Brady*; and in the last he contends that all these alleged errors prejudiced him cumulatively.

The Court will address the claims in the order Sanders has raised them here.

### a.  Ineffective-assistance claims

To prove that his lawyer was so deficient as to deprive him of his Sixth Amendment right to effective assistance of counsel, Sanders must show more than that his lawyer made some bad calls.  That's because the Sixth Amendment guarantees defendants *effective*—not perfect—counsel.  And "effective" encompasses a broad range of attorneys.  Thankfully, it normally does not include those who are (literally) asleep on the job.  *E.g.*, *United States v. Ragin*, 820 F.3d 609, 612–13 (4th Cir. 2016).  But otherwise, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," given that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

The Supreme Court has turned that presumption into the two-prong *Strickland* test.  To get his conviction overturned on account of his lawyer's performance, a defendant must first show that his lawyer's performance was indeed deficient.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id*. at 687.  Second, a defendant must show that his lawyer's deficient performance prejudiced him.  "This requires showing that counsel's errors were so

serious as to deprive the defendant of a fair trial[.]" *Id*. Unless he can make both showings, the claim will fail. *Id*. And thus, if a defendant fails to satisfy either prong, the court will deny relief without considering the other one. *Id*. at 697.

As the Sixth Circuit has often said, "AEDPA, in conjunction with *Strickland*, requires [courts] to give double deference to the findings of the" state courts. *Brown v. McKee*, 460 F. App'x 567, 579 (6th Cir. 2012); *see David v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011). Under *Strickland*, the Kentucky courts were required to give deference to Sanders's lawyer; under AEDPA, meanwhile, this Court is required to give deference to the Kentucky courts' assessment of his performance. Thus—assuming the state court applied the right standard (a.k.a. *Strickland*)—the question is not whether Sanders's lawyer stepped outside of the wide professional boundaries that *Strickland* draws, but whether the state court was reasonable in determining that he did not. *See Richter*, 562 U.S. at 101. This Court decided that it was. Now that Sanders seeks to appeal, the question is more attenuated still: Could reasonable jurists find this Court's decision about the state court's decision wrong or at least debatable? *Slack*, 529 U.S. at 484.

### i. Claim 27(L): Ineffective assistance for failure to seek competency proceedings.

In Claim 27(L), Sanders argues that his trial attorney was ineffective for failing to request a competency evaluation after noticing that Sanders had lost the ability to concentrate at trial and sentencing. R. 73 at 313–316. Because the Kentucky Supreme Court denied this claim on erroneous procedural grounds, this Court reviewed it *de novo*. R. 113 at 114–15; *see Robinson*, 663 F.3d at 822. The Court assumed—without deciding—that counsel might

have been deficient. R. 113 at 129. But this deficiency did not prejudice Sanders's case. Sanders had already gone through a six-week evaluation. His evaluators had found him competent to stand trial. *See* R. 113 at 117. And he was losing focus during trial largely because he was not getting enough sleep—not because he had suddenly become mentally incompetent. *Id.* Because "[n]othing in the record reveal[ed] that the trial court would have had any grounds to grant a new motion for a competency hearing after the trial began," Sanders could not "demonstrate that he was prejudiced by [his attorney's] failure to move for a competency hearing." *Id.* at 118–19. Thus, he had no *Strickland* claim.

Sanders contends that reasonable jurists could disagree with the Court in two ways. First, he argues that he must show "merely that he would have been entitled to a competency hearing if trial counsel had requested one," R. 151 at 11—and not, as this Court held, go the extra step of showing a "'reasonable probability' that his verdict would have been different had [trial counsel] formally requested" such a hearing, R. 113 at 117. But Claim 27(L) is a claim of ineffective assistance of counsel.[1] To prove that claim, Sanders must show that his attorney acted unreasonably *and* that his unreasonableness prejudiced Sanders's case. Thus, Sanders cannot show that his attorney violated his Sixth Amendment rights without showing reasonable probability that his trial would have come out differently if his lawyer had done things differently. *See, e.g.*, *Hart/Cross v. United States*, 89 F.3d 833 (6th Cir. 1996) (table). This case is therefore unlike the Eleventh Circuit case that Sanders cites, *Davis v. Sec'y for Dep't of Corrs.*, 341 F.3d 1310, 1316 (11th Cir. 2003), which dealt with an attorney's failure

---

[1] Sanders also says that "the failure to hold [a competency] violated [his] constitutional rights." R. 151 at 8. To the extent he means to suggest that the trial court violated his rights by failing to hold one, he has already conceded that such a claim is procedurally defaulted here. *See* R. 113 at 12.

to preserve an issue for appeal, not an attorney's alleged failure to halt—or at least delay—the trial itself by requesting a competency hearing.

Even so, Sanders argues next, he *can* show that his lawyer prejudiced him. Because (he says) "reason existed to believe Sanders may have become incompetent" during his trial, the trial court would—or at least should—have granted a competency hearing had his lawyer asked for one. R. 151 at 7. In Kentucky, such a hearing is required "only" when a trial court sees "reasonable grounds to believe that the defendant is not mentally competent." *Pate v. Commonwealth*, 769 S.W.2d 46, 47 (Ky. 1989). And Kentucky defendants have "no right to a continual succession of competency hearings in the absence of some new factor." *Id.* Such "new factors" are difficult to show. *See, e.g.*, *id.* ("The testimony of the psychiatrist that [the defendant] suffered from schizophrenia and was mildly retarded and defense counsel's statement that she could not communicate with the defendant as well as [the defendant]'s testimony that he did not remember confessing to the crimes *was not sufficient to require the trial judge to hold a second competency hearing* prior to sentencing." (emphasis added)). Aside from alleging that he was "quite possibly" reaching a "boiling point" during trial, R. 151 at 8, Sanders offers no actual evidence of any new incompetence factor. Meanwhile, he had not only already undergone a six-week evaluation—where he was found competent—but he explicitly told the judge that he understood what was going on. *See* R. 113 at 116. The court would have had no reason (at least not that Sanders has shown) to grant another evaluation. And if the court had no reason to grant one, Sanders suffered no prejudice from his counsel's failure to ask for one.

Sanders was therefore not deprived of his constitutional right to effective counsel. Because no reasonable jurist looking at the relevant facts and law could disagree, this claim does not warrant a certificate of appealability.

### ii. Claim 27(J): Ineffective assistance for failing to prepare Sanders to testify during sentencing.

In Claim 27(J), Sanders asserts that his lawyer failed to tell him of his right to testify and, when Sanders decided to do so anyway during sentencing, failed to prepare him enough. R. 73 at 306–12. The Kentucky Supreme Court denied this claim as mere "speculation." *Sanders v. Commonwealth*, 89 S.W.3d 380, 391 (Ky. 2002), *overruled in part on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009). Because that court denied the claim on the merits, this Court reviewed it under AEDPA, concluding that the state court had reasonably applied the *Strickland* standard. Sanders himself stated on the record that counsel told him of his right to testify. And even if counsel prepared Sanders poorly for his moment on the stand, Sanders failed even to argue in state court that this preparation prejudiced him. Fairminded jurists could therefore agree with the state court that Sanders did not meet his burden to prove an ineffective-assistance claim. R. 113 at 112–14.[2]

Sanders replies in three ways. First, he says reasonable jurists could debate whether his lawyer performed effectively—more specifically, (1) whether "an attorney could ever

---

[2] Sanders interprets the state-court decision as applying—and this Court's decision as reinforcing—a "procedural barrier" against his claim. R. 151 at 13. This Court might have given that impression when it said that "Sanders'[s] pleading deficiencies are fatal to his claim." R. 113 at 114. So to clarify: The Kentucky Supreme Court denied this claim not because Sanders failed to go through particular motions. It denied this claim because Sanders failed to meet his burden of proof. That is a merits decision. And it was one that this Court found reasonable, since Sanders had not proven one of the *Strickland* elements (prejudice) that he was required to prove—which he could not have proven given that he had not even pled it. *See, e.g.*, *Cornwell v. Bradshaw*, 559 F.3d 398, 415 (6th Cir. 2009) (holding that a petition who failed to show prejudice was properly denied habeas relief).

adequately prepare a defendant to testify" in just "three minutes," the amount of time he and his lawyer allegedly spent together right before he took the stand; (2) whether "a reasonable attorney would elicit the testimony trial counsel elicited from Sanders," putting aside that counsel asked Sanders no questions and instead opted to just let him speak; (3) whether "a reasonable attorney would have advised Sanders not to testify . . . that he was innocent and that everything was the state correctional psychiatric center's fault," as Sanders did; and (4) whether "Sanders suffered prejudice from the content of [his] testimony." R. 151 at 15. Numbers one through three are deficiency arguments and thus do not help prove what Sanders needed but failed to prove in state court: that this deficiency prejudiced him.

Number four goes to prejudice, in that it states simply that Sanders was prejudiced. But his failure to prove this statement in the state court—rather than for the first time here— is exactly why the statement does not entitle Sanders to habeas relief. On AEDPA review, the Court is constrained by its role. Its role is not to decide Sanders's claims; its role is to double-check the court that originally did so. And its oversight may not be too penetrating: As long as the state court's decision was not so unreasonable that no reasonable jurist could fail to spot the problem, the Court must deny relief. So what matters are not the prejudice arguments that Sanders presents here; federal habeas review is not a chance to hone claims. What matters is how the state court ruled on the arguments he presented there. Because he presented none about prejudice, it was not clearly unreasonable—indeed, it was reasonable— for the state court to decide that Sanders had failed to prove his ineffective-assistance claim. For AEDPA purposes, if a federal court can say that much, then that is all it may say.

Second, Sanders contends that he actually presented prejudice arguments before the Kentucky Supreme Court. In his brief to that court, he says, he described his case taking a turn for the worse because of these aspects of his testimony: "that he feels guilty," "that he d[id]n't know what to say to the jury," and his "blaming the state psychiatric center [where he had been evaluated] for what happened and for not helping him." *Id*. But these are all arguments that his *testimony* prejudiced him, not that his *lawyer's conduct* prejudiced him. To conclude that his lawyer's conduct prejudiced him—as the Court would need to conclude before ruling in his favor—the Court would need to believe that Sanders would have testified so differently had his lawyer prepared him differently that trial would have ended differently. And as the Kentucky Supreme Court explained, that belief could rest only on speculation— not a sufficient ground for habeas relief. *See Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

Finally, Sanders argues that if this claim is speculative, it is speculative because Sanders has never received the evidentiary hearing to which he is entitled. R. 151 at 13–14. The Court has already explained why he is not entitled to such an additional hearing in *this* Court. R. 113 at 130–32. But Sanders still argues that he needs and deserves one for various claims. *See infra* Parts II.a.v–vii. This argument implies that the Court got things wrong because it did not have the facts necessary to get them right. So a recap is necessary. AEDPA "strongly discourage[s]" petitioners from "submit[ting] new evidence in federal court." *Pinholster*, 563 U.S. at 186. Generally, if the state court adjudicated the claim on the merits, the federal court may only consider that claim "on the record that was before the state court." *Id*. at 185. If AEDPA did *not* deny Sanders relief—because the state court did not

adjudicate his claim on the merits—the Court would have some leeway to develop evidence; the Court might need that evidence as it considers the claim afresh. But even then, since Sanders "failed to develop" the "factual basis" for these claims in state court, the Court could let him do so here only if he qualified for one of the limited exceptions provided in 28 U.S.C. § 2254(e)(2). He fails to argue that he does. Plus, the analysis need not go even that far. The state court adjudicated these claims on the merits (and this Court upheld its decision). Thus, AEDPA denies relief, and this Court is constrained to the record that was before the state court.[3]

But Sanders also asserts that the state court should have given him another chance to develop evidence. Its failure to do so, he says, shows that it denied his claim on improper procedural grounds. And so, the argument goes, this Court should have reviewed the claim *de novo* (while presumably allowing him to develop more evidence).

The first proposition—that the state court was obliged to grant Sanders an evidentiary hearing—misconstrues Kentucky law. Citing Kentucky Rule of Criminal Procedure 11.42 and *Fraser v. Commonwealth*, 59 S.W.3d 448 (Ky. 2001), Sanders argues that if a petitioner alleges facts that "could, if proven, entitle the petitioner to relief, an evidentiary hearing must be held." R. 151 at 13. But Rule 11.42 actually says—and *Fraser* actually makes clear— that a hearing is required only "if there is a material issue of fact that cannot be conclusively

---

[3] Sanders has argued that the Kentucky Supreme Court unreasonably determined the facts when it called another of his claims too speculative without first holding an evidentiary hearing. *See* R. 144-1 at 2–4. He does not explicitly argue the same here. But in case he meant to do so impliedly, the Court has already explained that a statement like "this claim is too speculative" is "not a statement about 'what happened' out in the world," which is what AEDPA means by "fact." R. 150 at 10. Rather, it "is a statement about the contents of Sanders's brief." *Id.* An evidentiary hearing would not change those contents. At any rate, the state court did not unreasonably determine those contents. As explained above, they are indeed speculative.

resolved" on the record as it already exists. *Fraser*, 59 S.W.3d at 452. If "the allegations in the motion can be resolved on the face of the record," by contrast, "an evidentiary hearing is not required." *Id*.; *see* Ky. R. Crim. P. 11.42(5) ("If the answer raises a material issue of fact that cannot be determined on the face of the record the court shall grant a prompt hearing."). Thus, the state courts contradicted no state law by deciding this claim without an evidentiary hearing; the courts grant hearings when they are needed, not whenever they are requested. And more importantly, even if the state courts had contradicted state law, they contradicted no clearly established *federal* law.

Understanding the actual reach of Rule 11.42 answers Sanders's second proposition: that the Kentucky Supreme Court did not adjudicate his claim on the merits. Sanders seems to argue that the court blocked his claim with an improper procedural bar (which, if true, would entitle him to *de novo* review). R. 151 at 13–14. He interprets the court's decision as denying his claim because he failed to fulfill post-conviction pleading requirements, which, he says, the court should not have done without first granting him an evidentiary hearing. *Id*. As noted, however, such hearings are not necessary in all situations—only those in which the record contains a disputed issue of fact preventing the court from readily deciding the merits. And here, Sanders failed to put prejudice in dispute; as the Kentucky Supreme Court said, Sanders offered only speculation as to that necessary element of his ineffective-assistance claim. *Sanders*, 89 S.W.3d at 391. Thus, according to Kentucky's clear procedural rules, the court could rule on the merits. And that is what it did. This case is therefore distinct from the one Sanders cites, *Gordon v. Braxton*, 780 F.3d 196, 202–04 (4th Cir. 2015). There, the Fourth Circuit held that a state court had not decided a claim on the merits because the court

declined to hear evidence on a material issue (counsel's failure to appeal). Crucially, though, the petitioner had actually managed to put in dispute through his pleadings. *See id.*

Sanders's third proposition—that this Court should review this claim *de novo*—fails because the above two propositions fail and because it rests on a misreading of another law: this time, AEDPA itself. Sanders argues that AEDPA does not apply where the state court decides a claim based on an "incomplete" record. R. 151 at 14. Yet as explained, AEDPA has the same presumption as Kentucky's Rule 11.42 *against* further factual development. Here, the Kentucky Supreme Court had enough facts before it to determine that Sanders's claims lack merit under *Strickland*. And this Court has enough facts before it to determine that his claims lack merit under AEDPA. Thus, AEDPA denies relief, and where AEDPA denies relief, the Court may only consider the facts that the state court was able to consider. *See Pinholster*, 563 U.S. at 185. AEDPA prevents—not requires—considering facts that the state court did not consider.

It might be debatable to say that every reasonable jurist would agree with how the Kentucky Supreme Court handled this claim. But it is undebatable that at least some would conclude that the court reasonably applied clearly established federal law while handling it. Thus, the Court may not grant permission to appeal this claim.

### iii. Claim 27(B): Ineffective assistance for failing to obtain a copy of the Flenning report

In Claim 27(B), Sanders argues that his lawyer was ineffective because he failed to discover a report that one of his mental-health examiners—Dr. Flenning—wrote about him. R. 73 at 221–236. Although the evaluation team as a whole had found Sanders competent,

Dr. Flenning wrote his own report, concluding that Sanders suffered from atypical psychosis and a fragmented personality. In the Kentucky Supreme Court, however, this claim failed at *Strickland* prong one. As that court noted, *Strickland* guarantees a "reasonable investigation" into the facts, and "[a] reasonable investigation is not the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight would conduct." *Sanders*, 89 S.W.3d at 386. Sanders's lawyer, that court found, had provided such an investigation—a finding that this Court, being doubly deferential, determined a reasonable application of *Strickland*. The evaluation team's main report did not even mention that Dr. Flenning had written a report of his own. Thus, "it was reasonable for [Sanders's lawyer] not to spend his limited time hunting for [the] report— a document that he had no reason to believe even existed." R. 113 at 89. And thus, it was reasonable for the state court to consider his conduct reasonable.

Sanders does not dispute that his evaluators' main report makes no mention of any counter-report. He simply argues that "two facts" in the main report would have "suggested to trial counsel," had he been reading a bit closer, "that Dr. Flenning may have produced a report." R. 151 at 18. First "fact": The main report "refers to a 'psychological history' that is not included," thus implying the possible existence of other reports. *Id*. Second "fact": The main report also "noted that Sanders discussed his childhood abuse with Dr. Flenning," marking him as someone to whom Sanders spoke and with whom Sanders's lawyer should have followed up. *Id*. "In light of these facts," Sanders argues, "reasonable jurists could at least debate" this Court's "conclusion that trial counsel had no indication that Dr. Flenning produced a report" and that counsel's performance thus "could not be deficient." *Id*. at 19.

This argument illustrates why it is so important to pin down the exact question before a court on AEDPA review. By the time Sanders's claim got to this Court, the question was not "Could his counsel have been deficient?" It was: "Could reasonable jurists agree with the state court that he was not deficient?" Sanders has shown why they would. As even he acknowledges, the main report never discusses, cites, or footnotes Dr. Flenning's report; readers must infer its existence from other "facts." Maybe a different lawyer would have drawn the inferences. In fact, maybe a better lawyer would have done so. But so would a lawyer with infinite time to read the report. And as the Kentucky Supreme Court noted, *Strickland* does not guarantee a lawyer with infinite time. *Sanders*, 89 S.W.3d at 386. Nor does it guarantee a better lawyer than the defendant had, as long as the one he had stayed within the broad range of permissible conduct. Sanders's lawyer chose not to spend his limited time pursuing mystery reports. That choice was within his professional discretion. Because it was, the state court reasonably found that did not violate *Strickland*.

This case is therefore unlike *Porter* and *Wiggins*, the only clearly established Federal law, as determined by the Supreme Court of the United States, that Sanders cites. R. 151 at 19 (citing *Porter v. McCollum*, 558 U.S. 30 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003)). There, counsel failed to "take the first step of interviewing witnesses or requesting records," *Porter*, 558 U.S. at 39, or "abandoned their investigation of [their client's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources," *Wiggins*, 539 U.S. at 524. But Sanders has not accused his lawyer of such dereliction here. Rather, he has accused his lawyer of failing to take a particular *next* step and of abandoning his research when another lawyer might have kept digging. For the reasons above, however,

no reasonable jurist would say that *Strickland* required the extra digging. Thus, Sanders does not warrant a certificate of appealability on this claim.

### iv. Claim 27(A): Ineffective assistance for failing to find an adequate mental-health expert

Sanders's lawyer relied on a pro-bono expert to conduct a pro-defense mental-health examination instead of paying for better services with the funds that Sanders had supposedly earmarked for the purpose. In Claim 27(A), Sanders argues this decision was unreasonable and prejudicial. R. 73 at 202–215. But the Kentucky Supreme Court held that (1) counsel's choice to accept pro-bono services, freeing up money for other uses, was a quintessential tactical decision and thus not unreasonable, and (2) the decision did not prejudice Sanders because his other experts would have said just what his free expert said. R. 113 at 83–86. And this Court believed both holdings reasonable applications of *Strickland*. *Id*.

Sanders now contests multiple aspects of that belief: First, that the state court could properly have concluded that counsel's choice was reasonable because it let him focus more closely on other parts of the defense. Okay, Sanders says: Then "we must ask to what other defense efforts did trial counsel devote resources?" R. 151 at 24. But in fact, we do not. Sanders contends that his lawyer did nothing with his free time. Put aside the difficulty of proving a negative. Even if Sanders is right, that does not make his lawyer unreasonable. Because the reasonableness of this tactical choice does not depend on whatever else counsel happened to do with the time and money he freed up. His choice was reasonable *because* he freed up time and money by using a qualified expert at no expense. That is just Strategy 101, and "strategic choices" are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

18

Second, Sanders contests that the state court could properly have found counsel's choice reasonable because the pro-bono expert was as qualified as the others Sanders wanted. R. 113 at 84. Sanders says paper qualifications are not enough under *Hinton v. Alabama*, 134 S. Ct. 1081 (2014); if other experts would have been better, he says, his lawyer should have used them. R. 151 at 25–26. In *Hinton*, however, defense counsel himself thought (correctly) that his expert was not what the defense team really needed. *Id.* at 1088. Had Sanders's lawyer thought that here, then under *Hinton* it would have been unreasonable for him not to have shopped around for another expert. But there is no indication here that such a thought did—or had any reason to—cross his mind while he prepared for trial.

Third, Sanders contests that a court can only speculate whether his preferred experts would have fared better than his pro-bono one. R. 151 at 26–27. There is hard evidence, according to Sanders, that they would have: Specifically, the prosecution tore holes into the pro-bono expert's testimony, holes that Sanders says his other experts would have sealed. *Id.* Were one inclined to agree with that argument, however, one could only do so by speculating that these other experts would have prepared differently, that their own presentations would not have other holes, and that the jury would have bought the defense's story but for the specific holes the pro-bono expert's testimony had. And speculation alone is not proof of prejudice. *See Richter*, 562 U.S. at 111–12.

Fourth, Sanders argues that even assuming counsel chose reasonably among experts, counsel failed to prepare reasonably the expert he chose. By (allegedly) contacting the pro-bono expert just a few weeks before trial, scheduling an examination for the eve of trial, and not providing the expert with certain state records, Sanders says, counsel undershot the level

of preparation that the law requires. R. 151 at 29. By "law," Sanders means opinions from the Ninth Circuit and one from the Sixth. But AEDPA does not require the Kentucky courts to apply holdings from the Ninth Circuit or even the Sixth. It requires them to reasonably apply those of the United States Supreme Court. Sanders cites no holding from that Court that the Kentucky Supreme Court failed to follow. Nor does he provide any evidence to show that the Kentucky Supreme Court failed to follow *Strickland* in a reasonable fashion. Indeed, he fails even to allege a "reasonable probability" that his trial would have come out differently had his lawyer prepared his expert differently. *Strickland*, 466 U.S. at 694.

Fifth, and finally, Sanders argues that his counsel's performance deprived him of his separate constitutional right—guaranteed by the Due Process Clause and *Ake v. Oklahoma*, 470 U.S. 68 (1985)—to competent psychiatric assistance in preparing an insanity defense. "Once his attorney settled on an insanity defense," Sanders argues, "he had an obligation to pursue an expert assistance that would support an insanity defense." R. 151 at 25. Indeed: That is exactly what, by all accounts, he did.

After dealing with this claim the last time around, the Court wrote that "other jurists could disagree with the Kentucky Supreme Court's determination that [counsel's] conduct did not violate Sanders's rights under *Strickland*." R. 113 at 87. Sanders agrees, and he argues that the Court must therefore grant a certificate of appealability. R. 151 at 24. Not so. For all the reasons above, other jurists could also agree with the Kentucky Supreme Court. And unless no reasonable jurist could agree with a state-court decision, a federal court has no power to overturn it. Because no reasonable jurist could disagree with *that*, the Court cannot issue a certificate of appealability on this claim.

### v. Claim 27(H): Ineffective assistance for failing to advise Sanders's wife about the marital privilege and opening the door to testimony about domestic violence

In Claim 27(H), Sanders argues that his lawyer should have told Sanders's wife that she did not have to testify against Sanders. R. 73 at 263–68. He also argues that, while she was on the stand, his lawyer should not have asked whether hers was a happy marriage, "open[ing] the door" for the government to ask whether Sanders had ever been violent to her. R. 151 at 29. This Court considered counsel's performance reasonable and not prejudicial. It therefore concluded that fairminded jurists could agree with the Kentucky Supreme Court that this performance satisfied *Strickland*. R. 113 at 104–08.

As an initial matter, Sanders argues that the Court did not need to consult with any hypothetical reasonable jurists at all. He believes the Court should have reviewed this claim[4] *de novo*, not under AEDPA. R. 151 at 31–32. And he believes this because, he says, the Kentucky Supreme Court's analysis of the claim began and ended at this one sentence: "Sanders has previously raised the issue about the violent incidents in his direct appeal. It cannot be reargued at this point." *Id*. at 31 (quoting *Sanders*, 89 S.W.3d at 391). If that court did in fact find this claim procedurally barred, that finding would have been erroneous. As Sanders points out, he argued on direct appeal that the *prosecution* violated his rights by getting his wife talking about domestic violence, whereas, in his collateral attack, he argues that *his own lawyer* was deficient for enabling the prosecution to do so. *Id*. at 32.

---

[4] Sanders now focuses only on the second half of his original claim: the questions that his lawyer asked his wife. Thus, he apparently does not seek to appeal the first half: that his counsel unreasonably failed to advise Mrs. Sanders (a non-client) about the marital privilege.

But the Kentucky Supreme Court did not in fact find this claim procedurally barred. Although the court wrote the two sentences Sanders recites, it went on to write "[t]he conduct of [Sanders's] counsel was reasonable." 89 S.W.3d at 391. That is a merits determination. The two earlier sentences merely clarify the claim before the court. And the court clearly knew it had an ineffective-assistance claim before it, for it explicitly stated its holding—that Sanders's counsel acted reasonably—in ineffective-assistance terms. Because that holding is a merits holding, AEDPA applies.

Coming at it from a different angle, Sanders argues that the state court only *appeared* to adjudicate his claim on the merits—because actually, it could not have done so. Again he cites a Fourth Circuit case, *Gordon*, for the proposition that "[a] claim is not adjudicated on the merits when the state court makes its decision on a materially incomplete record." *Gordon*, 780 F.3d at 202 (internal quotation marks omitted); *see* R. 151 at 33. Sanders argues that this proposition applies here because no state court gave him an evidentiary hearing on this claim. Even if this Court were obliged to follow a case from another circuit, however, *Gordon* does not change the result. There, the state court denied an evidentiary hearing on a material issue in actual dispute. *See Gordon*, 780 at 202–04. Further evidence might have meant habeas relief; as the record stood, though, there was just no way to know. Here, a court can take all of Sanders's allegations as true and Sanders would still not prevail. Indeed, there is no dispute that the lawyers for both sides asked the questions Sanders says they asked. All the same, it is reasonable to think that the marriage-related questions defense counsel posed to Mrs. Sanders were useful. Her answers put Sanders in a better light than he had been in before (even if the prosecution later elicited answers that dimmed it). Thus, it

was reasonable for the state court to conclude that Sanders has no *Strickland* claim without holding a separate evidentiary hearing first.

Sanders also argues—and here he gains better purchase—that the Court should at least have reviewed the prejudice element of his *Strickland* claim *de novo*. R. 151 at 33–35. The Kentucky Supreme Court denied his claim under the deficiency prong, and when a state court applies one *Strickland* prong but not the other, the Court reviews the adjudicated prong under AEDPA and the "unadjudicated prong" *de novo*. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012). Although this Court has acknowledged this rule in other cases, *see Bowling v. Haeberlin*, Civil No. 03-00028-ART, 2012 WL 4498647, at *6 (E.D. Ky. Sept. 28, 2012), it did not explicitly do so in this one. But this rule only affects this case if the state court unreasonably applied the first prong. Otherwise, no matter how closely the Court reviews his claim under the second prong, Sanders cannot get relief. And here, the Kentucky Supreme Court reasonably applied the first *Strickland* prong. So Sanders cannot get relief.

He argues otherwise, mainly on the theory that his lawyer let things get out of control: He opened the door to violence questions with his questions about marriage, whereas, if he had meant to open it, he should have done so on direct examination when he could have "control[ed]" the witness better.[5] R. 151 at 37–38. Given all this, Sanders says, it was "objectively unreasonable" for the state court not to dub his lawyer deficient. *Id*. at 37.

Sanders might not agree with his lawyer's strategy, but it was a strategy nonetheless. All things considered—and even though the prosecution might have had "gotcha" questions in hand—it was reasonable for counsel to ask Mrs. Sanders about the health of her marriage.

---

[5] The colloquy at issue here occurred on cross.

Her testimony painted Sanders as a "kind husband" and a "loving father." *See* R. 113 at 101. And her testimony about his violent episodes was not entirely damning. His wife confirmed that Sanders had not known why he hit her and had felt suicidally guilty afterwards. *Id*. at 105–06. This testimony supported Sanders's claim that he turned violent only during "dissociative episodes," and thus his overall insanity defense. Besides, no matter when counsel asked Mrs. Sanders about her marriage, he would have opened the same door for the government to ask about domestic abuse. So the alternative strategy Sanders suggests—*i.e.*, asking about the marriage on direct rather than cross—would have fared no better. (Not to mention that a lawyer has more "control" over a witness on cross, when he may ask leading question, than on direct, when he may not.) To be sure, different lawyers might have asked Mrs. Sanders different questions. But the Sixth Amendment guaranteed Sanders an effective lawyer, not a different lawyer. *Strickland*, 466 U.S. at 689. And the "strategic choices" his lawyer made are "virtually unchallengeable." *Id*. at 690.

Thus, the Kentucky Supreme Court's decision—that counsel was reasonable—was itself reasonable. Although some jurists might disagree, others might look at this defense lawyering and call it strategic. At least, they could. Under AEDPA, that much is enough. And since that much is undebatable, this Court cannot issue a certificate of appealability.

### vi.   Claim 27(E):  Ineffective assistance for failing to present a video of Sanders taken shortly after the murders

Before the lawyer who represented him at trial, Sanders had a court-appointed lawyer. That lawyer videotaped Sanders in jail shortly after arrest. Sanders appeared distraught. *See* R. 113 at 90 (discussing the tape). In Claim 27(e), Sanders argues that his trial lawyer was

ineffective because he failed to obtain and show the jury a copy of the tape. R. 73 at 236–40. That's not to say he didn't try. Sanders's trial lawyer moved to admit the tape. But he could not give the trial court any tape to admit because the previous lawyer-turned-videographer "wanted a waiver of privilege signed by Sanders," which Sanders apparently never signed. *Sanders*, 89 S.W.3d at 390. The Kentucky Supreme Court concluded that "[i]n the absence of the tape," Sanders had "nothing to complain about related to ineffective assistance." *Id.*

Since that is a conclusion about the merits of Sanders's claim, the Court applied AEDPA. The Court did find it "unclear why th[at] court relied on the absence of the tape," given that Sanders had attached the tape to a later motion for reconsideration. R. 113 at 91. Nevertheless, this Court found the state court's conclusion reasonable under any possible version of events. That court could correctly have thought the tape was not in evidence: Under clear state procedural rules, a motion to reconsider "cannot be used to raise arguments and introduce evidence that should have been presented during the proceedings before entry of judgment." *Short v. City of Olive Hill*, 414 S.W.3d 433, 441 n.7 (Ky. Ct. App. 2013); *see* Ky. R. Crim. P. 11.42(2) (requiring the motion for post-conviction relief itself "specify . . . the facts on which the movant relies"). And if the tape was not properly before that court, this Court cannot consider it. *Pinholster*, 563 U.S. at 185 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of [AEDPA] on the record that was before that state court."). Moreover, even if the tape *was* in the record, the state court still could have reasonably concluded that Sanders failed to prove his ineffective-assistance claim—specifically, the deficiency prong. That the tape exists does not prove that Sanders's trial lawyer was ineffective because he failed to obtain it. After all,

25

it was Sanders's signature that the previous lawyer wanted before he would release the tape. And Sanders offered no evidence showing—or even an affidavit stating—that his trial lawyer prevented him from signing a waiver. *See* R. 113 at 92.

Sanders now argues that the Court should review this claim *de novo* because the state court "improperly found [it] procedurally defaulted" and therefore never reached the merits. R. 151 at 45. The Kentucky Supreme Court did consider the merits of the claim, however— it simply did not find any. *Sanders*, 89 S.W.3d at 390 ("[T]here is nothing to complain about related to ineffective assistance. In addition, Sanders has not met his burden of establishing that the tape would have been admissible."). As explained above, reasonable jurists could find that conclusion reasonable, with the tape in the record or not. Since the conclusion was reasonable, AEDPA prevents the Court from either providing habeas relief *or* re-determining the facts for itself. *See Pinholster*, 563 U.S. at 185.

Sanders responds that the state court could not have decided the merits of this claim reasonably because, "under Kentucky law," the state court owed him an evidentiary hearing to develop the claim. R. 151 at 43–44. When a state court adjudicates a claim on the merits, however, AEDPA cares whether the court reasonably followed federal—not state—law. *See* 28 U.S.C. § 2254(d)(1). Sanders cites no federal law that the state court contradicted or misapplied by adjudicating his claim without a further hearing. As a matter of fact, he cites no such state law, either. In Kentucky, "[c]onclusory allegations which are not supported by specific facts do not justify an evidentiary hearing." *Sanders*, 89 S.W.3d at 385 (citing *Sanborn v. Commonwealth*, 975 S.W.2d 905 (1998)). Sanders offers nothing but conclusions to show that his lawyer—rather than Sanders himself—was the reason why the tape did not

make it to court sooner. This case is therefore unlike the one case Sanders cites, *Mills v. Commonwealth*, 170 S.W.3d 310 (Ky. 2005), where "the facts that [the petitioner] ha[d] alleged" in his post-conviction motion actually created "an issue of fact that c[ould not] be determined on the face of the record." *Id.* at 340. Sanders's motions contain no such facts. Although he says that "the state court record does not *refute* [his] allegations," R. 151 at 43 (emphasis added), a claim is not proven simply because it is not disproven. Sanders himself must have presented some specific support for his claims to receive an evidentiary hearing, let alone habeas relief.

At the end of the day, this much is undebatable: A reasonable jurist could conclude that the Kentucky Supreme Court reasonably applied federal law in holding that Sanders had failed to prove his ineffective-assistance claim. Regardless of the tape's whereabouts *after* trial, the responsibility for procuring it *for* trial rested with Sanders himself—not his lawyer. There is no evidence that his lawyer prevented Sanders from carrying out that responsibility. Thus, this claim warrants neither habeas relief nor a certificate of appealability.

### vii. Claim 27(F): Ineffective assistance for failing to speak with and to present testimony from three witnesses

By his own account, Sanders was distraught after his arrest. But his lawyer failed to speak with or to call to the stand two jailers who witnessed just how distraught he was. Nor did counsel call a doctor who apparently would have testified that Sanders might have been suffering from a psychiatric disorder. R. 73 at 240–45. Because Sanders himself testified "extensively" about his post-arrest state, however, the Kentucky Supreme Court concluded that his lawyer had not been ineffective for failing to show the jury more of the same.

*Sanders*, 89 S.W.3d at 391. This Court found that conclusion reasonable because Sanders offered only speculation about what these potential witnesses would have said if called. Plus, the doctor in question never actually diagnosed Sanders, so counsel could have thought that his testimony would not help his client much. R. 113 at 94–95. Because these were "reasonable bas[e]s for the state court to deny relief," this Court found itself forced to deny relief, too. *Richter*, 562 U.S. at 98.

Sanders argues that fairminded jurists could disagree with the Court on three grounds. First, he asserts that the Court misapplied the procedural rules of habeas review, specifically by creating a new one. He points out—correctly—that "this Court faulted [him] for not attaching affidavits to his habeas petition" to indicate what these three witnesses would have said. R. 151 at 48. He then proceeds—incorrectly—to argue that the Court "fashion[ed] and impose[d]" a new pleading requirement that all habeas petitioners supply such affidavits. *Id*. He then surveys the Rules Governing Section 2254 Cases, demonstrating that none imposes a formal "affidavit requirement." R. 151 at 48–53. He also argues that his habeas petition itself is enough like an affidavit to satisfy any such requirement. *Id*. at 56–59.

The Court did not deny Sanders's claim just because he failed to file anything titled "Affidavit." The Court denied his claim because he has consistently failed to support it with evidence. To show that his lawyer simply had to call these witnesses—and that the state court was grievously mistaken in holding otherwise—Sanders must offer some evidence of what they would have said. That evidence will often, if not always, come in an affidavit. Yet Sanders offers no such evidence, giving this Court no grounds to grant habeas relief. This is true even if the Court considers his brief as an affidavit. Calling it something else

28

does not make the statements in it any less speculative. The only requirement being imposed here is that habeas petitioners support their allegations with something beyond speculation. This Court did not "fashion" that requirement. It comes from the Supreme Court, which has said that speculation is not sufficient grounds for habeas relief, *Richter*, 562 U.S. at 111–12, and from the Sixth Circuit, which has added that "[i]n the absence of any evidence showing that [the witness] would have offered specific favorable testimony, [the petitioner] cannot show prejudice from counsel's strategy recommendation not to introduce this evidence," *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005).

Second, Sanders argues that he deserved an evidentiary hearing to make his claims more concrete. R. 151 at 55. As elsewhere, he argues that he is "entitled" to such a hearing because, if he could prove what he speculates, "he would be entitled to habeas relief." *Id*. But speculation is neither grounds for relief nor an open sesame for an evidentiary hearing. "[W]here," as here, "the state court decides a claim on the merits, and this Court upholds that determination under [AEDPA], the Court *may not* conduct an evidentiary hearing." R. 113 at 130 (emphasis added); *see Pinholster*, 563 U.S. at 185. In *Pope*, which Sanders cites, the defendant differed from Sanders in this important respect: He had proffered a "substantial body of evidence that he would develop if granted an evidentiary hearing." *See Pope v. Sec'y for Dep't of Corrs.*, 680 F.3d at 1271, 1294 (11th Cir. 2012). For the same reason, this case is distinct from *Gordon*, which Sanders cites again here. There, the petitioner—unlike Sanders—managed to put a material issue in actual dispute and thus, the Fourth Circuit said, deserved a better hearing than the one the state court had given him. *Supra* Part II.a.ii, v.

Because Sanders has not managed the same showing as the *Pope* or *Gordon* petitioners, these cases from other circuits do not entitle him to an evidentiary hearing here.

Finally, Sanders argues that the Kentucky Supreme Court's decision is contrary to clearly established federal law. The court concluded that additional mental-state witnesses "would have been cumulative" since the jury had already heard about Sanders's mental state, from Sanders himself no less. So defense counsel's choice "not to present such cumulative testimony was not ineffective." *Sanders*, 89 S.W.3d at 391. But Sanders points to *Skipper v. South Carolina*, where the Supreme Court held it improper for a trial court to exclude two jailers from testifying that a defendant had "made a good adjustment" during his time in jail. 476 U.S. 1, 3 (1986). "[C]haracterizing the evidence as cumulative," the Court said, would have been "implausible." *Id*. at 8. "The evidence petitioner was allowed to present on the issue of his conduct in jail"—like his own testimony that it was "satisfactory"—"was the sort of evidence that a jury naturally would tend to discount as self-serving." *Id*. Sanders reads *Skipper* as "clearly established Supreme Court law" that the "mitigation testimony of neutral witnesses is not cumulative of the arguably self-serving testimony of a capital defendant," here meaning Sanders. R. 151 at 60.

To render a decision contrary to Supreme Court law, a state court must either flaunt a directly applicable holding or reach the opposite conclusion than the Supreme Court did on "materially indistinguishable facts." *Williams*, 529 U.S. at 405–06.[6] The Kentucky Supreme Court did neither. As to the first, *Skipper* might clearly establish that a *court* cannot exclude

---

[6] Sanders argues that the Kentucky Supreme Court "unreasonabl[y] appli[ed]" *Skipper*. R. 151 at 62. But that court never even cited, much less applied, *Skipper*. So the proper question is whether the court contradicted *Skipper*, *i.e.*, failed to apply a holding that it allegedly should have applied.

neutral witnesses as cumulative when a defendant offers them to back up his own story. Yet it says nothing about whether *counsel* can choose to offer those witnesses in the first place. Had the state courts excluded Sanders's witnesses as an evidentiary matter, they would have contradicted *Skipper*. But they did not. Defense counsel never gave them the chance.

As to the second, the facts of *Skipper* are distinct from the facts here. There, the only behavior evidence the petitioner had to offer—aside from his neutral witnesses—was his own rather obviously self-serving statement that his behavior was satisfactory. Here, Sanders was not the only one to comment on his medical state; his own medical expert, among others, spoke to it, too. It was "implausible," on the facts before the *Skipper* Court, to call witness testimony cumulative. *Skipper*, 476 U.S. at 8. But it is not implausible to do so here. Counsel could reasonably have thought that the jury did not need lay observers to repeat what the expert said—especially since, even now, Sanders can only speculate about what the observers would have said themselves. And most importantly for present purposes, *Skipper* never said that lawyers are deficient if they choose not to present witnesses because they think the testimony will be cumulative. The Kentucky Supreme Court therefore did not contradict *Skipper* in holding that counsel's choice not to pursue additional witnesses was a reasonable trial strategy.

Although the Court cannot grant Sanders a certificate of appealability on any of these grounds, there is an issue on which it can grant one: whether the Kentucky Supreme Court unreasonably applied *Strickland*. The Court has already given Sanders permission to appeal Claim 27(I). R. 150 at 23. In that claim, as in this one, Sanders argues that his lawyer failed to seek out enough witnesses, specifically witnesses to the abuse he received as a child and

the head injuries he suffered as a result.  R. 73 at 268.  For two reasons, this Court found that

the Kentucky Supreme Court had not unreasonably applied *Strickland* in denying this claim.

First, Sanders had "provided hardly any information" about what those witnesses would have

said.  R. 150 at 19.  And second, there was "at least a 'reasonable argument'" that testimony

from the witnesses would have been cumulative of Sanders's own.  *Id*. at 20.  But the Court

recognized that "[t]he Supreme Court has charted only parts of th[e] expanse" of attorney

conduct.  *Id*. at 18 (quoting *Davis v. Carpenter*, 798 F.3d 468, 473 (6th Cir. 2015)).  And

"here the [Kentucky] courts found themselves in open water," *id*. at 19 (quoting *Davis*, 798

F.3d at 473), because the Supreme Court has not explained exactly "what kinds of evidence

the Constitution requires a defense attorney to present," *id*.  Thus, although the Court denied

Sanders's habeas claim, it acknowledged that reasonable jurists might navigate these waters

another way.  It therefore granted him a certificate of appealability.  *Id*. at 23.

It must do the same here.  Sanders argues that his lawyer's failure to present more

mental-state witnesses "was not a strategic choice but a failure to investigate."  R. 73 at 242.

This claim is as speculative as Claim 27(I), and it too faces a reasonable counterargument

that these witnesses would have just been cumulative anyway.  But a different lawyer might

have done a more thorough job than counsel did here.  And a reasonable jurist might think

that his allegedly cursory lawyering amounted to constitutionally ineffective assistance.

Such a jurist would debate this Court's conclusion that the state court applied *Strickland*

reasonably.  For that reason, a certificate of appealability shall issue.

To summarize:  *Strickland* and AEDPA—and especially *Strickland* plus AEDPA—

are difficult to satisfy.  *Strickland* gives lawyers a lot of room to do their jobs, and AEDPA

gives state courts a lot of room to do theirs. For the most part, it is indisputable that the Kentucky Supreme Court did not stray past the wide bounds of its discretion here. But a reasonable jurist might think it did when it reached Claim 27(F), specifically the question of how many witnesses a defense lawyer must call to prove a point. The Court must therefore grant a certificate of appealability as to that aspect of Sanders's ineffective-assistance claims, but it has no grounds to grant one as to any others.

### b. Other claims

Beyond Claim 27, Sanders alleges that various other errors have plagued different stages of his case. He wants the Sixth Circuit to hear about the following ones.

### i. Claim 26: Constitutionality of Kentucky's proportionality review

Kentucky law applies a comparative proportionality review in death-penalty cases. To determine whether imposing the penalty is constitutional in a given case, Kentucky law requires Kentucky courts to compare the case only to cases where the penalty was imposed, not to those where the jury might have found similar aggravating factors against a defendant but did not sentence him to death. *See* Ky. Rev. Stat. ("KRS") § 532.075; R. 113 at 18–20 (describing this review). In Claim 26, Sanders argues that this style of review violates the Eighth and Fourteenth Amendments. R. 73 at 190–200. The Court has disagreed and denied the claim. R. 113 at 18–20. Sanders seeks to appeal because the Sixth Circuit has granted a certificate of appealability on the exact same issue in *Wheeler v. Simpson*. *See* R. 151 at 5–7. The Sixth Circuit has since decided *Wheeler*, and not in Sanders's favor. The court held that because "no Supreme Court precedent support[ed] [the petitioner's] notion that the Kentucky Supreme Court should have compared his cases to cases in which the death penalty was not

33

imposed"—the same notion Sanders argues here—"we conclude he is not entitled to relief on his claim." *Wheeler v. Simpson*, No. 11-5707, 2017 WL 1089518 (6th Cir. Mar. 23, 2017). Thus, the appeals court has decided the issue that Sanders seeks to appeal. This Court need not send that court the same issue to decide again.

### ii.  Claim 10.8:  Conflict of interest

In Claim 10.8, Sanders asserts that his family gave his lawyer $2,000 to spend on an expert, money that the lawyer instead pocketed as his fee after finding the pro-bono expert. R. 73 at 134–141. This, Sanders argues, created a conflict of interest, a form of ineffective assistance that can violate defendants' Sixth Amendment rights. *See Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980). Sanders seeks to bring this claim before the Sixth Circuit, but fails to mention his previous admission that this claim is procedurally defaulted. *See* R. 113 at 12. Although courts can consider defaulted ineffective-assistance claims if petitioners can show "cause" for defaulting them—as "cause" is defined in *Martinez* and *Trevino*—the Court has already explained that Sanders also defaulted the *Martinez-Trevino* password claim, *i.e.*, the claim that petitioners must assert before *Martinez* and *Trevino* can even apply. *See* R. 113 at 14–17. (Namely, he must show ineffective assistance of post-conviction, as opposed to trial, counsel.) True, the Court then proceeded to show how, "[e]ven if the Court could reach the *Martinez-Trevino* factors, Sanders has not established that his conflict-of-interest claim" satisfies them. *Id*. at 17. According to Sanders, reasonable jurists could debate the analysis that followed. R. 151 at 63–65. But even if they could, this claim would still not merit a certificate of appealability: Reasonable jurists could not debate the Sanders has defaulted it. And Sanders cannot appeal a claim that he cannot bring in the first place.

### iii.   Claim 18:   The trial court gave erroneous jury instructions

In Claim 18, Sanders argues that parts of the trial court's jury instructions violated the Due Process Clause.  Sanders told the jury he was not guilty of the crimes charged because he was insane when he committed them.  He also told them that, if he was guilty, he was "guilty but mentally ill" and thus should be sentenced to treatment rather than prison.  R. 73 at 172; *see* KRS §§ 504.130, .150 (establishing this defense).  Although, in Kentucky, the defendant has the burden of proving his own insanity or mental illness, he must only do so by a preponderance of the evidence.  *See Ball v. Commonwealth*, 81 Ky. 662, 663–64 (1884). According to their "prevailing practice," however, Kentucky courts do not use the word "preponderance" in jury instructions.  *Hardin v. Savageau*, 906 S.W.2d 356, 359 (Ky. 1995). The idea being that the term "may not be easily understood and is essentially redundant," telling jurors to do what they would do anyway: figure out which way the evidence leans.  *Id*. Thus, Kentucky courts "merely instruct[] the jury that to render a verdict it must 'believe' or be 'satisfied' from the evidence."  *Id*.; *see also Gall v. Commonwealth*, 607 S.W.2d 97, 110 (Ky. 1980) (same), *overruled on other grounds by Payne v. Commonwealth*, 623 S.W.2d 867 (Ky. 1981).  The trial court followed this practice here.  It instructed the jurors that they could find Sanders either insane and not guilty or guilty but mentally ill "from the evidence," omitting the phrase "by a preponderance of the evidence."  *See* R. 73 at 172–73.

Sanders argues that these instructions violated due process because they failed to tell the jury just how low his burden of proof really was.  *Id*. at 172–79.  The Kentucky Supreme Court denied that claim on the merits.  This Court reviewed it under AEDPA, holding that "[r]easonable jurists could conclude that the jury would not have been confused" by the

instruction as written.  R. 113 at 71.  After all, "[i]t is well established that [an] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  And the context of this instruction, the Court found, likely prevented any confusion.  When the trial court discussed the *government's* burden of proof, it explicitly used the phrase "beyond a reasonable doubt"; where the court discussed *Sanders's* burden of proof, it explicitly did not.  A reasonable juror could see the difference.  R. 113 at 71.  Thus, neither the state trial court (which gave the instruction) nor the Kentucky Supreme Court (which Okayed it) was so wrong as to require this Court's intervention.

Sanders continues to think otherwise.  He argues that the insanity and mental-illness instructions were more confusing than the Court reads them and that the Sixth Circuit should therefore give them a read, too.  R. 151 at 66–67.  Specifically, he argues that context is not really all that clarifying: that reasonable jurors would not look closely enough to "pick up on the fact that something was omitted from one instruction" and "that the omission matters." *Id*. at 66.  So, the theory goes, the befuddled jurors held Sanders to a higher standard than state law required, depriving him of his due-process right to a fair trial, *i.e.*, a trial conducted according to the state's rules.  *Id*. at 66–67.

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction" amounts to "a due process violation."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  Some do.  *Id*. (explaining the conditions under which a jury instruction will violate due process).  But the Court concluded that the challenged instructions were not among them—and thus that the

Kentucky Supreme Court neither contradicted nor unreasonably applied any clear federal law about confusing jury instructions when it denied Sanders's claim. Sanders deserves to appeal that claim, however, if a reasonable jurist could debate the Court's conclusion. Of course, that jurist would first need to find the instruction actually confusing. The first question is therefore whether reasonable jurists could find the insanity and mental-illness instructions more confusing than the Court did.

They could. Context here is more of a prism than a window. Looking at it one way, the instruction was clear enough. After all, the instruction did not say that Sanders had to prove a mental illness "beyond a reasonable doubt." But at the same time, the instruction did not specify that the burden was lower than that. Because the trial court never mentioned "preponderance," the jury heard only one definition of any burden of proof: that the government's burden was to prove its claims "beyond a reasonable doubt." Without further instructions, a reasonable (though mistaken) juror could think that the same burden applied throughout. *See United States v. Takhalov*, 827 F.3d 1307, 1318 (11th Cir. 2016) ("After all, the average juror is not Mr. Spock. If he were, then a trial-court judge's job would be much easier. He could instruct the jury in broad strokes—instructing only as to the bare elements of the crime, perhaps—and be confident that the jury would deduce all of the finer-grained implications that must logically follow. As it stands, however, the vast majority of American juries are composed exclusively of humans. And humans, unlike Vulcans, sometimes need a bit more guidance as to exactly what the court's instructions logically entail.").

But confusing instructions do not violate due process just because they are confusing. *See Middleton*, 541 U.S. at 437. The allegedly "ailing instruction" must have "so infected

37

the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). If "'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution," the instruction violates the Constitution. *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). The reasonable jurist who finds the challenged instructions clearly confusing would also find a "reasonable likelihood" that they led the jury to hold Sanders to a higher burden of proof than preponderance. If a jury can violate the Constitution by doing so, then that jurist would debate the Court's conclusion that Claim 18 does not entitle Sanders to relief under AEDPA, and the Court would have to certify that claim for appeal. So the second question is whether, according to clearly established federal law, applying a higher than required burden of proof violates the federal Constitution.

It depends. Specifically, it depends on what Supreme Court case one reads. In some, the Court has said that a "'mere error of state law' is not a denial of due process" under the Constitution. *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (quoting *Gryger v. Burke*, 334 U.S. 728, 731 (1948). Due process does not require any particular burden of proof for insanity defenses; for all the Constitution cares, the state can make defendants prove their insanity beyond a reasonable doubt. *See Leland v. Oregon*, 343 U.S. 790, 798–99 (1952). Kentucky does not. But that, of course, is state law. Thus, if a Kentucky trial judge instructs a jury to apply a higher burden than preponderance—or confuses them into doing so—his error would be one of state law, not of constitutional due process.

In other cases, the Court has said that due process entitles defendants to a trial that follows the state's procedures. These cases treat the procedure as a right: By choosing the

procedure, the state gives defendants a "liberty interest" in seeing the procedure followed. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). There may be no due-process right per se to seek a divorce in court, for example. But "having made access to the courts an entitlement or necessity" for those seeking a divorce, "the [s]tate may not deprive someone of that access" willy-nilly. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 n.5 (1982). Kentucky has chosen a low burden of proving mental illness. And it has codified that burden in a statute. *See* KRS § 504.130(1)(a) ("The defendant may be found guilty but mentally ill if: . . . The defendant proves by a preponderance of the evidence that he was mentally ill at the time of the offense.").[7] Under the "entitlement" line of cases, Kentucky defendants might well have a liberty interest in being held to that particular burden.

But it is not entirely clear which line of cases—"mere error" or "entitlement"—this one falls under. Both lines appear to be "clearly established [f]ederal law" in their own right. 28 U.S.C. § 2254(d)(1). They also contradict each other. And there appears to be no third line signaling when courts should apply one or the other. As such, it is unclear which "law" the Kentucky Supreme Court was supposed to apply. Since that is unclear, this Court cannot say whether that court contradicted or unreasonably applied the law it was supposed to apply. In the face of such uncertainty, it is prudent to ask the circuit court to take a look. Granted, one could argue the opposite: that—under AEDPA—uncertainty should *prevent* an appeal. If the law is unclear, then there was no clearly established federal law for the state court to

---

[7] The not-guilty-by-reason-of-insanity statute is not equally clear on the burden of proof. But it would likely create an absurdity in the law to require different levels of proof for "insanity" and "mental illness," two near synonyms— especially given Kentucky's common-law practice of allowing defendants to prove insanity by mere preponderance. *See Ball*, 81 Ky. at 663–64.

contradict or to misapply. But AEDPA and prudence align here. Some reasonable jurist could think that one of the "entitlement" line of cases applies. That jurist could think that no other jurist would fail to see that the Kentucky Supreme Court was wrong for not applying it. And since this Court concluded the opposite, that jurist could debate the Court's conclusion. So not only prudence, but also AEDPA, requires the Court to certify this claim for appeal. *See Slack*, 529 U.S. at 483–84.

### iv. Claim 28: *Brady* violation

Claim 28 brings back Dr. Flenning, the mental-health evaluator and author of the favorable counter-report. Sanders argues that, by failing to tell him about this report, the prosecution violated its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material evidence to the defense. But the Kentucky Supreme Court found the prosecution had complied with *Brady*. And this Court found that finding reasonable, mainly because the prosecution itself did not know or have any reason to know about the report—*Brady* does not require the prosecution to disclose what it doesn't know. R. 113 at 75–79. Although *Brady* does require the prosecution to learn (and then disclose) information from people working on its behalf—such as the police, *see Strickler v. Greene*, 527 U.S. 263, 280–81 (1999)—the Supreme Court has never extended that obligation to people not working for the prosecution, such as Dr. Flenning. Citing no case to the contrary, Sanders was unable to show that the Kentucky Supreme Court had contradicted or unreasonably applied any clearly established federal law that existed when he was prosecuted.

But reasonable jurists would debate that, Sanders argues, because he *did* cite a case: *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). *See* R. 151 at 69 (citing R. 73 at 322). There,

the Supreme Court held that the prosecution was obligated to disclose material information gathered by an investigatory agency. *Ritchie*, 480 U.S. at 57–58. But as this Court explained the first time it dealt with Sanders's argument, an investigatory agency—an arm of the state that responds to crime, like the prosecution itself—is different than the psychiatric center for which Dr. Flenning and Sanders's other evaluators worked and which under Kentucky law is essentially an arm of the courts. R. 113 at 78. Although the prosecution is obliged to learn information from its own agents, the Supreme Court has not extended the obligation to the court's agents. Sanders once again offers no law to the contrary; the Fourth Circuit case he cites does not count, of course, as it is not a "clearly established Federal law[] as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Reasonable jurists hence could still agree that the prosecution had no reason to know about a side report that Sanders's evaluators did not even mention in their main report—and thus that the prosecution did not (since it could not) violate *Brady*. If this were debatable, Sanders would have the right to appeal his claim. But it is not, so he does not.

### v. Claim 36: Cumulative Prejudice

In Claim 36, the last Sanders seeks to appeal, he argues that the Court should consider all the above "errors" in the aggregate. Even if one error did not prejudice him on its own, he argues, taken together they still prejudiced him cumulatively. R. 73 at 353–355. Because the Kentucky Supreme Court did not address the merits of this claim, this Court reviewed it *de novo*. R. 113 at 128–29. The above "errors" fit roughly into two types: errors by counsel (allegedly denying Sanders's right to effective assistance) and errors by the prosecution and the courts (allegedly denying his rights to due process and a fair trial). Courts can aggregate

41

the first type: *Strickland* tells them to assess the odds "that but for counsel's unprofessional *errors*, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 695 (emphasis added); *see Mackey v. Russell*, 148 F. App'x 355, 369 (6th Cir. 2005) (aggregating counsel's deficiencies to determine prejudice). But the Court found nothing to aggregate here. Sanders's counsel did perform deficiently in two ways: he failed to prepare Sanders to take the stand (Claim 27(J)) or to request further competency evaluations (Claim 27(L)). Both times, though, the Court held that these deficiencies had not prejudiced Sanders in any way. And zero plus zero still equals zero. R. 113 at 129. As to the other bucket of errors— those by the prosecution and the courts—the Court simply may not aggregate them. The way is blocked by *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005). Thus, the Court denied Sanders's cumulative-prejudice claim.

Sanders now seeks a certificate of appealability on two grounds: first, "so the en banc [Sixth Circuit] and/or the United States Supreme Court has the opportunity to overrule *Moore*." R. 151 at 73. Sanders offers three rather compelling reasons why one of those courts should do so. *Id*. at 71–73. First, he notes that the Supreme Court in its own cases seems comfortable considering the cumulative prejudice of trial errors. *See Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses."). Second, he says many other circuits allow aggregation. R. 151 at 72 (collecting cases). Third, he questions why a court can consider the cumulative

impact of one type of error (ineffective assistance of counsel) but not others. *Id.* at 73. Assumedly, all errors prevent a defendant from receiving the process he is due.

Although these points might convince the Sixth Circuit to take a case that will allow it to reconsider *Moore*, this is not that case. For all the reasons given above, none of the errors that Sanders alleges were errors in fact. *See supra* Parts II.b.i–iv. At least, the Kentucky Supreme Court concluded they were not, and this Court found that reasonable jurists could agree with that conclusion. Under AEDPA, that means Sanders suffered no errors that can garner him habeas relief. So there are no errors to consider cumulatively, even if the Court could. Overturning *Moore* would therefore not change the result here. Reasonable jurists might still disagree with *Moore*. But they could not "debate whether (or, for that matter, agree that) [Sanders's] petition should have been resolved in a different manner." *Slack*, 529 U.S. at 483–84. *Moore* or no *Moore*, Sanders is not entitled to habeas relief on these claims. As such, he is not entitled to appeal them singly or together.

Second, Sanders argues that if the Court grants a certificate of appealability for more than one ineffective-assistance claim, it should also grant a certificate as to the ineffective-assistance part of his cumulative-prejudice claim. R. 151 at 73. Indeed, "the clear mandate of *Strickland* and several other Supreme Court cases is that the effect of all counsel's errors is to be considered in toto." *Mackey*, 148 F. App'x at 368–69; *see id.* at 369 (citing cases). The Court has granted a certificate of appealability as to Claim 27(I), *see* R. 150, and it will grant one as to Claim 27(F), *see supra* Part II.a.vii. Both are ineffective-assistance claims. The Court must therefore pass along to the Sixth Circuit the ineffective-assistance part of Sanders's cumulative-prejudice claim. A reasonable jurist could hold that the failure to track

43

down more witnesses—the basis of Claims 27(F) and 27(I)—was clear ineffective assistance. That jurist would disagree with the Court's conclusion that the Kentucky Supreme Court had reasonably applied *Strickland*. That jurist would also disagree with the Court's decision not to consider the combined effect of these alleged deficiencies. When a jurist sees that another might disagree with him, he must let the circuit decide. *Slack*, 529 U.S. at 484.

### III.    Conclusion

Accordingly, it is **ORDERED** that Sanders's motion for a certificate of appealability, R. 151, is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to:

(1)    Claim 18;

(2)    Claim 27(F), specifically as whether the Kentucky Supreme Court unreasonably applied *Strickland*; and

(3)    Claim 36, specifically as to whether Sanders suffered cumulative prejudice from the deficiencies alleged in Claims 27(F) and 27(I).

The motion is otherwise denied.

This the 16th day of May, 2017.



**Signed By:**

*Amul R. Thapar*

**United States District Judge**